**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| NETCHOICE,<br><br>       *Plaintiff*,<br><br>       v.<br><br>JASON S. MIYARES, in his official capacity as Attorney General of the Commonwealth of Virginia,<br><br>       *Defendant*. | Case No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.    Virginia Senate Bill 854 is the latest attempt in a long line of government efforts to restrict new forms of constitutionally protected expression based on concerns about their potential effects on minors.  Books, movies, television, rock music, video games, and the Internet have all been accused in the past of posing risks to minors.  Today, similar debates rage about "social media" websites.  These debates are important, and the government may certainly take part in them.  But the First Amendment does not take kindly to government efforts to resolve them.  The Constitution instead leaves the power to decide what speech is appropriate for minors where it belongs:  with their parents.

2.    Nevertheless, some states have recently taken it upon themselves to try to restrict minors' access to constitutionally protected speech on some of the most popular online services.  Courts across the country have rejected those efforts as inconsistent with the First Amendment.  *See, e.g.*, *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007, at *11-13, 21 (N.D. Fla. June 3, 2025); *NetChoice v. Carr*, 789 F.Supp.3d 1200, 1220-23, 1234 (N.D. Ga. 2025); *NetChoice, LLC v. Reyes*, 748 F.Supp.3d 1105, 1120-23, 1134 (D. Utah 2024); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F.Supp.3d 1011, 1032-34, 1044 (W.D. Tex. 2024); *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1117-22, 1125-26 (9th Cir. 2024); *NetChoice, LLC v. Yost*, 716 F.Supp.3d 539, 552-58, 561-62 (S.D. Ohio 2024); *NetChoice, LLC v. Griffin*, 2025 WL 978607, at *7-10, 17 (W.D. Ark. Mar. 31, 2025).  And rightly so.  While states certainly have a legitimate interest in protecting minors who use such services, restricting the ability of minors (and adults) to access them via age verification and parental consent requirements is not a narrowly tailored means of advancing any such interest.  The state perhaps "has the power to *enforce* parental prohibitions—to require, for example, that the promoters of a rock concert exclude those minors whose parents have advised the promoters that their children are forbidden to attend," *Brown v. Entmt. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011), but "it does not follow that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*."  *Id.*  Such laws "are obviously an infringement" on the First Amendment rights of "young

1

people and those who wish to proselytize young people." *Id.* They "do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." *Id.*

3.　　Like the laws that have preceded it, SB 854 violates the First Amendment. *See* 2025 Va. Acts ch. 703, Senate Bill 854 (SB 854). SB 854 requires "social media platforms" to verify every user's age and bans anyone under 16 from accessing social media sites for more than an hour a day without parental consent. *See id.* §59.1-577.1(B). By restricting the ability of minors (and adults, who must now prove their age) to access these websites, Virginia has "with one broad stroke" restricted access to valuable sources for speaking and listening, learning about current events, "and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).

4.　　Indeed, it is not obvious what SB 854 is designed to "protect" minors from. The law does not focus on any particular activity on "social media" that may pose special risk to minors. Nor does it focus on identifying specific means of or forums for communication that those seeking to take advantage of minors have proven more likely to use. SB 854's definition of "social media platform" instead appears designed to restrict access to websites that minors especially enjoy using—specifically, websites that facilitate significant amounts of First Amendment activity. Indeed, whether a service is covered turns in part on whether the website focuses principally on user generated content—i.e., speech—and limits access to that speech to one hour per day absent parental consent. But by that metric, the state could restrict access to the most popular segments of nearly any medium for constitutionally protected speech, be it enticing video games, page-turning novels, binge-worthy TV shows, or marathon movie nights. Burdening protected speech that citizens find especially interesting and want to spend extra time consuming is especially inconsistent with the First Amendment.

5.　　In all events, the state cannot begin to show that its age verification and time limit restrictions are necessary to advance any legitimate interest it may assert. Parents already have a wealth of tools at their disposal to limit what online services their minor children use, what they

can do on those services, and how often they can use them.  Virginia may wish that more Virginians shared its own views about whether and how much minors should use "social media platforms." But while the state may take many steps to protect minors from harm, including by persuading parents to take advantage of tools to limit their minor children's access to "social media platforms," it may not take matters into its own hands and restrict access itself.  After all, "punishing third parties for conveying protected speech to children just in case their parents disapprove of that speech" is not "a proper governmental means of aiding parental authority."  *Brown*, 564 U.S. at 802.  And the state burdens every user's First Amendment rights by requiring that each user verify their age or else have their access to protected First Amendment speech restricted to one hour per application per day.  *See* Va. Code §59.1-577.1(B).

6.      For these reasons and others, the Court should declare SB 854 unconstitutional and enjoin the Attorney General of Virginia from enforcing it.

## THE PARTIES

7.      Plaintiff NetChoice is a nonprofit trade association for Internet companies. NetChoice's members include (among others) YouTube, Meta Platforms, Inc., which owns Facebook and Instagram, Reddit Inc., and Dreamwidth Studios, LLC.  A full list of NetChoice's members is located here: https://perma.cc/H2DL-275H.  NetChoice's mission is to promote online commerce and speech and to increase consumer access and options through the Internet, while minimizing burdens on businesses that make the Internet more accessible and useful.  NetChoice serves the interests of its members, which share a commitment to the vital First Amendment protections that SB 854 undermines.  NetChoice brings this action on behalf of its members to vindicate their First Amendment rights and the First Amendment rights of their users, and to prevent the economic and other injuries that SB 854 will cause members absent judicial relief.

8.      Defendant Jason Miyares is the Attorney General of Virginia.  Virginia Code §59.1-584(A) charges the Virginia Attorney General with enforcement of the provisions amended by SB 854.  Attorney General Miyares is a resident of Virginia.  NetChoice sues Attorney General Miyares for declaratory and injunctive relief in his official capacity as the Attorney General of

3

Virginia.

## JURISDICTION AND VENUE

9.    NetChoice's causes of action arise under 42 U.S.C. §1983 and the United States Constitution.  This Court therefore has subject matter jurisdiction under 28 U.S.C. §1331.  This Court has authority to grant legal and equitable relief under 42 U.S.C. §1983 and *Ex parte Young*, 209 U.S. 123 (1908), injunctive relief under 28 U.S.C. §1651, and declaratory relief under 28 U.S.C. §§2201(a) and 2202.

10.    NetChoice has standing to challenge SB 854 because: (1) some of its members have Article III standing to sue in their own right; (2) challenging the Act is germane to NetChoice's associational purposes; and (3) its members' individual participation as parties is unnecessary in this challenge.  *See Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977); *NetChoice, LLC v. Fitch*, 134 F.4th 799, 803-07 (5th Cir. 2025); *Carr*, 789 F.Supp.3d at 1213; *Uthmeier*, 2025 WL 1570007, at *6-9; *Reyes*, 748 F.Supp.3d at 1118-19; *Paxton*, 747 F.Supp.3d at 1029-31; *Yost*, 716 F.Supp.3d at 548-50; *Griffin*, 2025 WL 978607, at *6.

11.    Venue is proper in the Eastern District of Virginia under 28 U.S.C. §1391 because the defendant performs his official duties there and is therefore considered to reside in this district as a matter of law.

## BACKGROUND

12.    NetChoice is an Internet trade association whose members operate many online services, including Facebook, Instagram, YouTube, Reddit, and Dreamwidth.  These services "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind."  *Packingham*, 582 U.S. at 107.  "On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos." *Id.* at 104.  YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions.  On Dreamwidth, users can share blog or journal entries or creative work with friends and family.  And on Reddit, users can join communities dedicated to shared interests and make their knowledge accessible to each other.

13.     Like adults, minors use these websites to engage in an array of First Amendment activity on a wide range of topics.  Minors use online services to read the news, connect with friends, explore new interests, follow their favorite sports teams, and research their dream colleges. Some use online services to hone a new skill or showcase their creative talents, including photography, writing, or other forms of expression.  Others use them to raise awareness about social causes and to participate in public discussions on salient topics of the day.  Still others use them to build communities and connect with others who share similar interests or experiences, which is particularly helpful for minors who feel isolated or marginalized at home, or are seeking support from others who understand their experiences.

These websites also engage in their own First Amendment activity.  They curate and disseminate third-party speech to their users and, as a result, produce a "distinctive expressive offering."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 738 (2024).  Both Facebook and Instagram curate and disseminate third-party content to their users based on their judgment about what users are likely to enjoy seeing and what content is appropriate for users.  YouTube likewise disseminates videos to users based on YouTube's judgment about what the user may find especially valuable and what is appropriate for users.  Reddit curates users' feeds based in part on the communities they have joined or visited and the content they view, upvote, and downvote.  And Dreamwidth, like others, removes content across its service that it deems objectionable under the standards in its terms of service and also provides a single limited forum on a separate page where users can go to view suggestions for accounts that they may be interested in based on what accounts their friends follow.  These websites also engage in speech when they post their own speech on the service.  For example, Dreamwidth's owners post updates on important topics to their users directly through the service so that users and visitors can stay abreast of issues impacting the service. *See, e.g.*, Denise Pauloucci, *Mississippi Site Block, Plus A Small Restriction on Tennessee New Accounts*, Dreamwidth (Aug. 31, 2025, 12:28 PM), https://tinyurl.com/57fkt9dj.  And they provide the means for users to engage in their own speech which the First Amendment protects from government

targeting. *See Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591-92 (1983).

14.    Just as people inevitably have different opinions about what books, television shows, and video games are appropriate for minors, people inevitably have different views about whether and to what degree online services like Facebook, Instagram, YouTube, Reddit, and Dreamwidth are appropriate for minors. Concerns that new means of communication may be harmful to minors, however, are hardly new. The same basic concerns animating discussion about minors' access to the Internet have been raised repeatedly in the past about other types of speech and other mediums of expression.

15.    In the 1800s, for example, "penny dreadful" publications were condemned for glorifying criminals and were blamed for youthful delinquency by the media and parents alike. *See* James B. Twitchell, *Preposterous Violence: Fables of Aggression in Modern Culture* 169 (1989). Decades later, comic books were derided as "particularly injurious to the ethical development of children." *Juvenile Delinquency (Comic Books), Hearings Before the Subcommittee to Investigate Juvenile Delinquency*, 83rd Cong., 2d Sess. 86 (1954) (testimony of Dr. Frederic Wertham). Movies were accused of "possess[ing] a great[] capacity for evil, particularly among the youth of a community." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952). Television too. *See, e.g.*, Surgeon General's Scientific Advisory Committee on Television and Social Behavior, *Television and Growing Up: The Impact of Televised Violence, Report to the Surgeon General*, U.S. Pub. Health Serv. (1971), https://tinyurl.com/39xcysnk; *Juvenile Delinquency (Television Programs): Hearings Before the Subcommittee to Investigate Juvenile Delinquency of the Senate Committee on the Judiciary*, 83d Cong., 2d Sess. (1954). In the 1980s, "partly clad, long-haired rockers who sing about sex, sado-masochism, suicide, murder and other things" were the problem. *See* I. Molotsky, *Hearing on Rock Lyrics*, N.Y. Times (Sept. 20, 1985), https://tinyurl.com/yrknwwf8. A decade later, families and lawmakers alike raised concerns about the harmful effects of the Internet. *See* H.R. Rep. No. 105-775, p.7 (1998). Concerns about violent video games followed soon after. *See Brown*, 564 U.S. at 789-90.

16.     As these historical examples reflect, people inevitably have different opinions about what content and mediums are appropriate for minors.   Some believe that Mark Twain's *Adventures of Huckleberry Finn* is inappropriate because it contains racial epithets; others think it is a uniquely valuable piece of literature.  *See* Alvin Powell, *Fight Over Huck Finn Continues: Ed School Professor Wages Battle for Twain Classic*, Harvard Gazette (Sept. 28, 2000), https://tinyurl.com/ye2xwphb.  Some think *Saving Private Ryan* is too violent for minors; others think it imparts valuable lessons.  *See Graphic 'Private Ryan' Not For Kids*, Chicago Tribune (Aug. 6, 1998), https://tinyurl.com/44tf6jfr.  Some think that video games are unduly violent.  *See* William Siu, *I Make Video Games. I Won't Let My Daughters Play Them*, N.Y. Times (Oct. 2, 2022), https://tinyurl.com/muakc2hh.  Others say that smartphones are too addictive.  *See* Tayana Panova & Xavier Carbonell, *Is Smartphone Addiction Really an Addiction*, 7 J. Behav. Addictions 252 (2018), https://tinyurl.com/9rfsbbum.  Opinions likewise differ greatly when it comes to whether and to what extent it is appropriate for minors to use online services like Facebook, Instagram, YouTube, Reddit, and Dreamwidth.

17.     There are certainly legitimate concerns underlying both sides of these debates, and the government may have a role in empowering parents with tools and information to make their own judgments about what speech is appropriate for their own minor children.  But when the government crosses the line into deciding for itself which constitutionally protected speech minors may access, courts have invalidated such efforts as inconsistent with the First Amendment.  *See, e.g.*, *Brown*, 564 U.S. at 794-95 (invalidating law prohibiting distribution of violent video games to minors without parental consent); *Erznoznik v. Jacksonville*, 422 U.S. 205, 213-14 (1975) (invalidating law prohibiting display of movies containing nudity at drive-in theaters).  "Minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them."  *Erznoznik*, 422 U.S. at 212-13 (citation omitted).  The government may, for example, "adjust the boundaries of an existing category of unprotected speech" like obscenity "to ensure that a definition designed for adults is not uncritically applied to children."  *Brown*, 564 U.S. at

794. After all, something that is not obscene for adults may still be obscene for children.  *See, e.g.*, *Free Speech Coal., Inc. v. Paxton (FSC)*, 606 U.S. 461, 477-78 (2025).  But that does not give the government carte blanche to restrict wide swaths of "fully protected speech," *id.* at 484-85, or "create a wholly new category of content-based regulation that is permissible only for speech directed at children," *Brown*, 564 U.S. at 794.

18.    Indeed, even restrictions on access to speech that is *not* constitutionally protected as to some or all minors have rarely survived scrutiny, as they often impede the First Amendment rights of adults.  *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656 (2004) (enjoining law restricting access to sexually explicit materials on the Internet); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000) (invalidating law restricting sexual programing on television); *Reno v. ACLU*, 521 U.S. 844, 885 (1997) (invalidating law enacted to protect minors from "indecent" and "patently offensive" communications on the Internet).  As courts have explained in striking down such laws, tools that enable parents to decide for themselves what speech their minor children may access are typically "less restrictive" than imposing "universal restrictions at the source."  *Ashcroft*, 542 U.S. at 667.

19.    In short, in a Nation that values the First Amendment, the preferred response from the government is to let parents decide what speech is appropriate for their minor children, including by using tools that make it easier for them to restrict access should they choose to do so.  And while the government may have some role to play in facilitating access to such tools, it has rarely needed to do so since market forces typically drive industries to be responsive to parents' concerns.  The movie, music, and video game industries, for example, have all developed sophisticated ratings systems to assist parents.

20.    The same is true of the Internet.  Plaintiff's members and others have developed sophisticated tools and technologies that allow parents to supervise and restrict what their minor children see and how they see it.  Parents who wish to limit minors' access to online services like Instagram and YouTube, or to filter or monitor the content to which they are exposed, have many options at their disposal.

21. ***Device-level restrictions.*** Parents can decide whether and when to let their minor children use computers, tablets, and smartphones in the first place. And those who choose to let them use such devices have many ways to control what they see and do. Apple, for example, provides parents with tools to limit how long minors can spend on their iPhones, iPads, and MacBooks. *See, e.g.*, Apple, *Use parental controls to manage your child's iPhone or iPad*, https://tinyurl.com/uxfnna4y (last visited Nov. 12, 2025). It also provides them with tools to control what applications (*e.g.*, Facebook, YouTube, and Reddit) minors can use, set age-related restrictions for those applications, filter online content in Safari and on other applications, and control privacy settings. *Id.* Google, Microsoft, and Samsung similarly offer parental controls for their devices. *See* Google, Family Link, *Help Keep Your Family Safer Online*, https://tinyurl.com/mr4bnwpy (last visited Nov. 12, 2025); Microsoft, *Getting Started with Microsoft Family Safety*, https://tinyurl.com/yc6kyruh (last visited Nov. 12, 2025); Samsung, *Manage Family Groups and Parental Controls with Your Samsung Account*, https://rb.gy/u4y1sz (last visited Nov. 12, 2025). And many third-party applications allow parents to control and monitor minors' use of Internet-connected devices and online services. *See, e.g.*, Alyson Behr, *The Best Parental Control Apps in 2025, Tested by Our Editors*, CNN underscored (Jan. 2, 2025), https://tinyurl.com/s6bje2jd.

22. ***Network-level restrictions***. Cell carriers and broadband providers also provide parents with tools to block apps and websites from their minors' devices, ensure that they are texting and chatting with only parent-approved contacts, and restrict screen time during certain hours. *See, e.g.*, Verizon, *Verizon Family*, https://tinyurl.com/ycyxy6x6 (last visited Nov. 12, 2025); AT&T, *AT&T Secure Family App*, https://tinyurl.com/d995ya2u (last visited Nov. 12, 2025); T-Mobile, *Family Controls and Privacy*, https://tinyurl.com/57run7ac (last visited Nov. 12, 2025); Comcast Xfinity, *Set Up Parental Controls for Your Home Network*, https://tinyurl.com/mpny6txv (last visited Nov. 12, 2025). Most wireless routers (the devices that provide wireless Internet throughout a home) contain parental control settings as well. *See* Molly Price & Ry Crist, *Parental Controls Are Easy to Set Up on Your Wi-Fi Router: Here's How to Do*

*It*, CNET (June 26, 2025), https://tinyurl.com/mtvdwypu. Parents can use those settings to block specific websites and applications (Facebook, YouTube, etc.) if they do not want their minor children to access them. *See, e.g.*, Netgear, *NETGEAR Smart Parental Controls*, https://tinyurl.com/34e4hxv4 (last visited Nov. 12, 2025). They can limit the time spent on the Internet by turning off their home Internet at specific times during the day, pausing Internet access for a particular device or user, or limiting how long their minor children can spend on a particular website or service. *Id.* And they can set individualized content filters for their minor children and monitor the websites they visit and services they use. *Id.*

23. **Browser-level restrictions.** Parental controls on Internet browsers offer another layer of protection. Google Chrome, Microsoft Edge, and Mozilla Firefox all offer parents tools to control which websites minors can access. *See, e.g.*, Mozilla, *Block and Unblock Websites with Parental Controls on Firefox*, https://tinyurl.com/6u6trm5y (last updated Aug. 11, 2022). Microsoft offers "Family Safety," which allows parents to filter digital content and place screen time limits. *See* Microsoft, *Microsoft Family Safety*, https://tinyurl.com/zuseucpr (last visited Nov. 12, 2025). Google has a similar feature. It also provides parents with "activity reports," allowing them to see what apps and websites their minor children are accessing the most. Google, *Google's Parental Controls – Google Safety Center*, https://tinyurl.com/kwkeej9z (last visited Nov. 12, 2025).

24. **Application-level restrictions.** On top of all that, NetChoice members provide parents with many tools to decide what their minor children can see and do on their services. And they have devoted extensive resources to developing policies and practices to protect minors who use them.

25. For starters, services operated by NetChoice members, including Facebook, Instagram, and Reddit, prohibit minors under 13 from accessing their main services. Some members offer separate experiences for users under 13 geared for that age group. For example, YouTube offers two services (YouTube Kids and a "Supervised Experience" on YouTube) for minors younger than 13. *See* YouTube for Families Help, *Important Info for Parents About*

*YouTube Kids*, https://tinyurl.com/2z6cw92p (last visited Nov. 12, 2025); YouTube Help, *What Is a Pre-Teen Supervised Experience on YouTube*, https://tinyurl.com/2uat3j5r (last visited Nov. 12, 2025).  These services allow parents to select content settings, set screen-time limits, and otherwise oversee minors' use of the services.

26.    NetChoice members also expend significant resources curating the content users post on their services to ensure that it is appropriate for adults and teens alike.  Members restrict the publication of (among other things) violent and sexual content, bullying, and harassment.  Some prohibit content that encourages body shaming and promote content that encourages a positive self-image.  Several use "age gating" to keep minors from seeing certain content visible to adults, or younger teens from seeing content visible to older teens.  For example, Reddit enforces an age gate to ensure that users under 18 cannot access mature content or not safe for work communities.  *See* Reddit Help, *Why is Reddit Asking for My Age?*, https://tinyurl.com/yufr9tcn (last visited Nov. 11, 2025).  NetChoice members implement their policies through algorithms, automated editing tools, and human review.  If a member determines that a piece of content violates its policies, it can remove the content, restrict it, or add a warning label or a disclaimer to accompany it.  And members can (and do) suspend or ban accounts that violate their policies.

27.    NetChoice members also provide users with tools to curate the content they wish to see.  Users can generally choose whom to follow.  Users can also generally block or mute other users and control who may see and interact with their own content.  Some members provide users with tools to exclude specific categories of content they wish to avoid.  Facebook users, for example, can alter the content Facebook displays by hiding certain types of content or opting to see fewer posts from a specific user or group (or blocking them altogether).  Instagram users can select a "not interested" button to filter out content they do not wish to see.  They can also use keyword filters (for example, "fitness" or "recipes" or "fashion") to do the same.

28.    NetChoice members also empower parents to monitor their children's online activities on their services.

29.    Facebook offers supervision tools that parents and guardians can use.  Parents can

see how much time their teens have spent on the Facebook app.  They can set scheduled breaks for them and see their Facebook friends.  Parents can also review some of their teens' privacy settings and content preferences and see the people and pages they have blocked.  *See, e.g.*, Meta, *Supervision on Facebook*, https://tinyurl.com/595h985k (last visited Nov. 12, 2025).

30.    Instagram enables parents and guardians to set time limits for their teens, set reminders to close the app, monitor the time spent on Instagram, and monitor accounts followed by their teens and the accounts that follow them.  Parents can also review the accounts blocked by their teens, as well as their teens' privacy, messaging, and sensitive content settings.  *See, e.g.*, Instagram, Help Center, *About Supervision on Instagram*, https://tinyurl.com/zxxmmbhb (last visited Nov. 12, 2025).  Instagram recently announced that users under 18 will automatically be placed into "Instagram Teen Accounts," which default to the strictest privacy settings and have limitations on who can contact teens, which content they can see, and what time of day they receive notifications.  Minors under 16 will need a parent's permission to relax any of these Instagram Teen Account settings.  Instagram will also provide additional supervision features, including features that allow parents to monitor with whom their teens are chatting and what they are seeing. *See, e.g.*, Instagram, *Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents* (Sept. 17, 2024), https://tinyurl.com/22fwuzz9.

31.    YouTube offers a "supervised experience" for teens (separate from the supervised experience for minors younger than 13), allowing parents (1) to receive email notifications when a teen uploads a video or starts a livestream; (2) to gain insights into their teens' channel activity (such as uploads, comments, and subscriptions); and (3) to choose whether to link accounts between a parent and teen.  YouTube, *Choices for Every Family*, https://tinyurl.com/2dpetf76 (last visited Nov. 12, 2025).  YouTube has also developed features and policies directed at promoting digital wellbeing among teens and children, such as turning auto-play off by default, refining its recommendation systems so teens are not repeatedly exposed to potentially harmful content, and reminding teens to take a break or go to bed.  *Id.*

32.    NetChoice members also restrict communications between adults and teens on their

services, if they allow such communications at all.

33.    Facebook and Instagram, for example, all take steps to limit adults from messaging teens to whom they are not connected.  *See, e.g.*, Meta, *Introducing Stricter Message Settings for Teens on Instagram and Facebook* (Jan. 25, 2024), https://tinyurl.com/2ucma8sv.

34.    Instagram encourages teens via prompts and safety notices to be cautious in conversations with adults, even those to whom they are connected.  And Instagram Teen Accounts take this a step further by restricting direct messaging from people teens do not follow or are not connected to, regardless of the user's age.

35.    Some NetChoice members also inform users when an adult who has been exhibiting potentially suspicious behavior attempts to interact with them.  If, for example, an adult is sending a large amount of friend or message requests to people under age 18, or has recently been blocked by people under age 18, Instagram alerts the recipients and gives them the option to end the conversation and block, report, or restrict the adult.

36.    YouTube and other members do not offer private messaging between users at all.

## VIRGINIA SENATE BILL 854

37.    Notwithstanding the long line of cases striking down government efforts to decree what constitutionally protected speech minors may access, and the wealth of tools available to help parents tailor and restrict their minor children's Internet access should they choose to do so, Virginia has taken it upon itself to decide what is appropriate for minors on the Internet.  In May 2025, Virginia enacted SB 854, which dramatically restricts minors' access to "social media platforms," significantly curtailing (and in some cases, eliminating) their ability to engage in core First Amendment activities on many of the most popular online services, as well as burdening adult social media users by requiring that they provide identification to verify their age.

38.    SB 854 defines "social media platform" as a "public or semipublic Internet-based service or application that has users in the Commonwealth" that "[c]onnects users in order to allow users to interact socially with each other" and "[a]llows users to" "[c]onstruct" a profile, "[p]opulate a public list of other users with whom such user shares a social connection," and

"[c]reate or post content viewable by other users, including content on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users." Va. Code §59.1-575. SB 854 does not regulate all online services that allow users to share and view content. It excludes any "service or application that consists primarily of news, sports, entertainment, ecommerce, or content preselected by the provider and not generated by users" or "interactive gaming." *Id.* And it excludes any "service or application that exclusively provides email or direct messaging services." *Id.*

39. SB 854 imposes several restrictions on access to "social media platforms" that are relevant here.

40. SB 854 requires "social media platforms" to "use commercially reasonable methods … to determine whether a user is a minor." *Id.* §59.1-577.1(B). A "minor" is "any natural person younger than 16 years of age." *Id.* §59.1-577.1(A). In practical effect, this requirement demands that covered websites verify the age of every user before allowing them to access protected First Amendment speech on covered websites because that is the only way that a covered website can comply with the Act's requirement to limit minors' use of the website. Virginia itself interprets this provision as an age verification requirement. Upon signing SB 854, Governor Youngkin demanded in a post on his X account that "[s]tarting 1/1/26, platforms *must* verify age, enforce limits and put parent's back in control." Governor Glenn Youngkin (@GovernorVA), X, https://perma.cc/6KRM-TAYQ (emphasis added).

41. SB 854 requires a "social media platform" to "limit a minor's use" of its service "to one hour per day, per service or application, and allow a parent to give verifiable parental consent to increase or decrease the daily time limit." *Id.* §59.1-577.1(B). In other words, SB 854 requires covered websites to restrict minors under 16 from accessing the website for more than an hour a day unless the minor obtains parental consent to increase that limit. *Id.*

42. SB 854 does not explain how a "social media platform" is supposed to identify who is a minor or what constitutes "verifiable parental consent." *Id.* The only guidance it offers is that social media websites must use "commercially reasonable methods, such as a neutral age screen

14

mechanism." *Id.*  It also requires that social media companies determine the age of all "user[s]," which §59.1-575 defines as essentially anyone visiting the website who does not work for the website.  So SB 854 seemingly requires covered websites to verify the age of every single person that visits their website, including adults.

43.    Virginia Code §59.1-584(A) gives the Attorney General exclusive enforcement authority.  It requires the Attorney General to provide "social media platforms" with "30 days' written notice" of potential violations and give the website the opportunity to cure the problem "within the 30-day period" before "initiating any action." *Id.* §59.1-584(B).  The Attorney General may seek "an injunction to restrain any violations," impose "civil penalties of up to $7,500 for each violation," and recover "reasonable expenses incurred in investigating and preparing the case, including attorney fees." *Id.* §59.1-584(C)-(D).

44.    SB 854 is scheduled to take effect on January 1, 2026.  *Id.* §§59.1-575, 577.1.

## IMPACT ON NETCHOICE MEMBERS

45.    If SB 854 takes effect, it will inflict immediate and severe First Amendment and financial injuries on NetChoice's members.

46.    "Nothing in [the Supreme] Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014).  Plaintiffs need allege only facts sufficient to establish that their conduct is "arguably proscribed by the statute they wish to challenge." *Id.* at 162 (alterations and quotation marks omitted); *see also id.* at 158-59 (explaining that "we do not require a plaintiff to expose himself to liability before bringing suit" (citation omitted)); *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (finding that plaintiffs had standing to bring a pre-enforcement challenge because they "alleged an actual and well-founded fear that the law will be enforced against them"); *Liberty Univ. v. Lew*, 733 F.3d 72, 90 (4th Cir. 2013) (holding that the plaintiff's "injury is imminent" even though the law would not be enforced until a later date because plaintiff "must take measures to ensure compliance in advance of that date"); *Mobil Oil Corp. v. Att'y Gen. of Commonwealth of Va.*, 940 F.2d 73, 76 (4th Cir. 1991) ("We see no reason

to assume that the Virginia legislature enacted this statute without intending it to be enforced. [Plaintiff] has certainly alleged 'an actual and well-founded fear' that the law will be enforced.").

47.    When the plaintiff is the "object" of the challenged law, there is "ordinarily little question" that it has Article III standing to challenge the law.  *Diamond Alt. Energy, LLC v. EPA*, 145 S.Ct. 2121, 2134 (2025).  Several NetChoice members easily satisfy that standard, as they are the direct targets of SB 854.  In fact, the sponsor of SB 854 specifically stated that the "social media platforms that would be subjected to the legislation include Facebook, Instagram, Twitter/X, TikTok, Snapchat, Reddit, Pinterest, and YouTube," among others.  Cameron Thompson, *Virginia Passes Law to Limit Time Teens Spend on Social Media to One Hour a Day*, WTVR (May 12, 2025), https://perma.cc/9LMR-SJTN.

48.    It is little surprise, then, that the law imposes direct financial and First Amendment burdens on several NetChoice members.

49.    For example, YouTube is an "object of" SB 854, *Diamond*, 145 S.Ct. at 2134, as it appears to satisfy each of the criteria in SB 854's definition of "social media platform."

50.    YouTube is a "public … Internet-based application" that "[a]llows users" to "[c]onstruct" a profile, "[p]opulate a public list of other users with whom such user shares a social connection," and "[c]reate or post content viewable by other users, including content on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users."  Va. Code §59.1-575; *see* YouTube Help, *Upload YouTube Videos* (last visited Nov. 12, 2025), https://tinyurl.com/2fety3cv.  YouTube Kids likewise allows users to view content created by certain YouTube users such as filmmakers, teachers, and other family-friendly creators.  *See* YouTube Help, *YouTube Kids* (last visited Nov. 12, 2025), https://tinyurl.com/yhn4aycy.

51.    YouTube likely "has users in the Commonwealth" who are under the age of 16 years old who access its website for more than one hour of use per day.  Va. Code §59.1-575, 577.1(B).

52.    While YouTube restricts minors from viewing sensitive content, YouTube does not

currently restrict minors under age 16 from accessing its website for more than one hour per day. *Id.* §59.1-577.1(B).

53.     YouTube does not "provide[] email or direct messaging services," *id.* §59.1-575, so it cannot invoke that exception to the law's requirements.  YouTube's content also does not "consist primarily of news, sports, entertainment, ecommerce, [] content preselected by the provider," or "interactive gaming." *Id.*  Instead, the vast majority of YouTube's content is user-generated speech.

54.     Accordingly, YouTube has an "actual and well-founded fear that the law will be enforced against" it. *Am. Booksellers*, 484 U.S. at 393.  "The State has not suggested that the newly enacted law will not be enforced," and there is "no reason to assume otherwise." *Id.*  To the contrary, upon signing the bill, Governor Youngkin posted on his X account that SB 854 would result in "less social media," would empower parents to "push back on daily social media use," and demanded that "[s]tarting 1/1/26, platforms *must* verify age, enforce limits and put parent's back in control."  Governor Glenn Youngkin (@GovernorVA), X, https://perma.cc/6KRM-TAYQ (emphasis added).

55.     Because YouTube is "the object of" SB 854, *Diamond*, 145 S.Ct. at 2134, it would be forced "to take significant and costly compliance measures or risk" potential enforcement against it if SB 854 is not enjoined. *Am. Booksellers*, 484 U.S. at 392.  To avoid the substantial risk of an enforcement action, YouTube would need to implement systems to limit minors under 16 from accessing YouTube for more than one hour a day absent parental consent.  Making such changes to YouTube would be costly and would require a significant amount of budget, resources, and staff investment over many months and possibly longer.  A "pocketbook injury is a prototypical form of injury in fact." *Collins v. Yellen*, 594 U.S. 220, 243 (2021).

56.     SB 854 will also hinder YouTube's ability to communicate with its users, burdening YouTube's own exercise of First Amendment rights.  YouTube curates and disseminates videos to users that YouTube thinks will be particularly relevant or interesting to them, which is a "distinctive expressive offering." *Moody*, 603 U.S. at 738.  YouTube selects the content it disseminates to a particular user based in part on the content the user has interacted with in the

past (via the user's account), as well as based on YouTube's own rules about what content is appropriate.  *See* YouTube Help, *Manage Your Recommendations & Search Results* (last visited Nov. 12, 2025), https://tinyurl.com/536r2wwu; YouTube For Families Help, *Recommended Videos on YouTube Kids* (last visited Nov. 12, 2025), https://tinyurl.com/mryarz36.

57.    By restricting users from accessing more than one hour of content on YouTube, SB 854 burdens both the users' and YouTube's exercise of First Amendment rights.  *See Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 565-66 (2011) ("the 'distinction between laws burdening and laws banning speech is but a matter of degree'" and both must satisfy First Amendment scrutiny (citation omitted)).  A deprivation of the First Amendment right to free speech is a quintessential injury in fact.  *Cooksey v. Futrell*, 721 F.3d, 226, 235-36 (4th Cir. 2013).

58.    Dreamwidth, which is a member of NetChoice, also appears to satisfy each of the criteria set forth in SB 854's definition of "social media platform."

59.    Dreamwidth is a "public … Internet-based application" that "[a]llows users" to "[c]onstruct" a profile, "[p]opulate a public list of other users with whom such user shares a social connection," and "[c]reate or post content viewable by other users, including content on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users."  Va. Code §59.1-575; *see* Dreamwidth Support, *What is Dreamwidth Studios* (last visited Nov. 12, 2025), https://perma.cc/5WJF-VWDA.

60.    Dreamwidth likely "has users in the Commonwealth" who are under the age of 16 years old and access its website for more than one hour of use per day.  Va. Code §59.1-575, 577.1(B).

61.    Dreamwidth does not verify users' ages or restrict minors under age 16 from accessing its website for more than one hour of use per day.  *Id.* §59.1-577.1(B).

62.    While direct messaging is one of Dreamwidth's uses, "email or direct messaging" is not Dreamwidth's "exclusive" function.  *Id.* §59.1-575.  Dreamwidth's content also does not "consist primarily of news, sports, entertainment, ecommerce, or content preselected by the provider," or "interactive gaming."  *Id.*  Instead, the vast majority of Dreamwidth's content is user-

generated speech.

63.    Accordingly, Dreamwidth has an "actual and well-founded fear that the law will be enforced against" it.  *Am. Booksellers*, 484 U.S. at 393.  "The State has not suggested that the newly enacted law will not be enforced," and there is "no reason to assume otherwise."  *Id.*

64.    Because Dreamwidth is "the object of" SB 854, *Diamond*, 145 S.Ct. at 2134, it would be forced "to take significant and costly compliance measures or risk" potential enforcement against it if SB 854 is not enjoined.  *Am. Booksellers*, 484 U.S. at 392.  To avoid the substantial risk of an enforcement action, Dreamwidth would need to implement systems to prevent minors under 16 from accessing Dreamwidth for more than one hour a day absent parental consent. Making such changes to Dreamwidth would be costly and would require a significant amount of budget, resources, and staff investment over many months and possibly longer.  Again, that "pocketbook injury is a prototypical form of injury in fact."  *Yellen*, 594 U.S. at 243.

65.    SB 854 will also hinder Dreamwidth's ability to communicate with its users, burdening Dreamwidth's own exercise of First Amendment rights.  Dreamwidth disseminates content to users, which is a "distinctive expressive offering."  *Moody*, 603 U.S. at 738. Dreamwidth selects the content it disseminates to a particular user based in part on the pages and communities that the user has followed and subscribed to and Dreamwidth's own rules about what content is appropriate. *See* Dreamwidth Support, *What is My Reading Page?* (last visited Nov. 12, 2025), https://tinyurl.com/m8yav3tf.

66.    By restricting users from accessing Dreamwidth for more than one hour per day, SB 854 burdens both the users' and Dreamwidth's exercise of First Amendment rights.  A deprivation of the First Amendment right to free speech is a quintessential injury in fact.

67.    Meta Platforms, Inc., which is also a member of NetChoice, operates Facebook and Instagram, both of which are also "the object[s] of" SB 854, *Diamond*, 145 S.Ct. at 2134, as they appear to satisfy each of the criteria set forth in SB 854's definition of "social media platform."

68.    Facebook and Instagram are "public … Internet-based application[s]" that "[a]llows users" to "[c]onstruct" a profile, "[p]opulate a public list of other users with whom such

user shares a social connection," and "[c]reate or post content viewable by other users, including content on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users." Va. Code §59.1-575; *see* Facebook Help Center, *Share Photos on Facebook* (last visited Nov. 12, 2025), https://tinyurl.com/5jxy2hcb; Instagram Help Center, *Share a Post* (last visited Nov. 12, 2025), https://tinyurl.com/eaz6nwub.

69.     Facebook and Instagram likely "ha[ve] users in the Commonwealth" who are under the age of 16 years old who access their websites for more than hour of use per day.  Va. Code §59.1-575, 577.1(B).

70.     Facebook and Instagram do not currently restrict minors under age 16 from accessing their websites for more than one hour of use per day.  *Id.* §59.1-577.1(B).

71.     While direct messaging is one of Facebook's and Instagram's uses, "email or direct messaging" is not their "exclusive" function.  *Id.* §59.1-575.  Facebook's and Instagram's content also does not "consist primarily of news, sports, entertainment, ecommerce, or content preselected by the provider," or "interactive gaming."  *Id.*  Instead, the vast majority of their content is user-generated speech.

72.     Accordingly, Meta has an "actual and well-founded fear that the law will be enforced against" Facebook and Instagram.  *Am. Booksellers*, 484 U.S. at 393.  "The State has not suggested that the newly enacted law will not be enforced," and there is "no reason to assume otherwise."  *Id.*

73.     Because Facebook and Instagram are "the object[s] of" SB 854, *Diamond*, 145 S.Ct. at 2134, they would be forced "to take significant and costly compliance measures or risk" potential enforcement against them, if SB 854 is not enjoined.  *Am. Booksellers*, 484 U.S. at 392. To avoid the substantial risk of an enforcement action, Meta would need to implement systems to prevent minors under 16 from accessing Facebook and Instagram for more than one hour a day absent parental consent.  Making such changes to Facebook and Instagram would be costly and will require a significant amount of budget, resources, and staff investment over many months and possibly longer.  Again, that "pocketbook injury is a prototypical form of injury in fact."  *Yellen*,

594 U.S. at 243.

74.     SB 854 will also hinder Facebook and Instagram's ability to communicate with their users, burdening Meta's own exercise of First Amendment rights.  Both Facebook and Instagram curate and disseminate content to users that the websites think will be particularly relevant or interesting to each user, which is a "distinctive expressive offering."  *Moody*, 603 U.S. at 738.  Facebook and Instagram select the content they disseminate to a user based in part on the content that the user has interacted with in the past (via the user's account), as well as based on the websites' own rules about what content is appropriate.  *See* Facebook Help Center, *Learn About and Manage Suggested Content in Your Facebook Feed* (last visited Nov. 12, 2025), https://tinyurl.com/yumkra7m; Instagram Help Center, *How Instagram Determines Which Posts Appear As Suggested Posts* (last visited Nov. 12, 2025), https://tinyurl.com/2w97sbcn.

75.     By restricting users from accessing more than one hour of content on Facebook and Instagram, SB 854 burdens both the users' and websites' exercise of First Amendment rights.  A deprivation of the First Amendment right to free speech is a quintessential injury in fact.

76.     Reddit Inc. also appears to satisfy each of the criteria set forth in SB 854's definition of "social media platform."

77.     Reddit is a "public … Internet-based application" that "[a]llows users" to "[c]onstruct" a profile, "[p]opulate a public list of other users with whom such user shares a social connection," and "[c]reate or post content viewable by other users, including content on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users."  Va. Code §59.1-575; *see* Reddit, *How Does Reddit Work?* (last visited Nov. 11, 2025), https://tinyurl.com/2kny8jz8.

78.     Reddit likely "has users in the Commonwealth" who are under the age of 16 years old and use its website for more than one hour of use per day.  Va. Code §59.1-575, 577.1(B).

79.     Reddit does not currently restrict minors under age 16 from accessing its website for more than one hour of use per day.  *Id.* §59.1-577.1(B).

80.     While direct messaging is one of Reddit's primary uses, "email or direct

messaging" is not its "exclusive" function. *Id.* §59.1-575. Reddit's content also does not "consist primarily of news, sports, entertainment, ecommerce, or content preselected by the provider," or "interactive gaming." *Id.* Instead, the vast majority of Reddit's content is user-generated speech.

81.    Accordingly, there is an "actual and well-founded fear that the law will be enforced against" Reddit. *Am. Booksellers*, 484 U.S. at 393. "The State has not suggested that the newly enacted law will not be enforced," and there is "no reason to assume otherwise." *Id.*

82.    Because Reddit is "the object of" SB 854, *Diamond*, 145 S.Ct. at 2134, Reddit would be forced "to take significant and costly compliance measures or risk" potential enforcement against it, if SB 854 is not enjoined. *Am. Booksellers*, 484 U.S. at 392. To avoid the substantial risk of an enforcement action, Reddit would need to implement systems to prevent minors under 16 from accessing Reddit for more than one hour a day absent parental consent. Making such changes to Reddit would be costly and would require a significant amount of budget, resources, and staff investment over many months and possibly longer. Once again, that "pocketbook injury is a prototypical form of injury in fact." *Yellen*, 594 U.S. at 243.

83.    SB 854 will also hinder Reddit's ability to communicate with its users, burdening Reddit's own exercise of First Amendment rights. Reddit curates and disseminates content to users that it thinks will be particularly relevant to them, which is a "distinctive expressive offering." *Moody*, 603 U.S. at 738. Reddit selects the content it disseminates to a particular user based in part on the content that the user has interacted with in the past (via the user's account), as well as based on Reddit's own rules about what content is appropriate. *See* Reddit, *Reddit's Approach to Content Recommendations* (last visited Nov. 11, 2025), https://tinyurl.com/33vk8a8w. By restricting users from accessing more than one hour of content on Reddit, SB 854 burdens both the users' and Reddit's exercise of First Amendment rights. *See Sorrell*, 564 U.S. at 565-66; *Cooksey*, 721 F.3d at 235-36.

84.    SB 854 will also burden the First Amendment rights of NetChoice members' current and prospective users—an injury that NetChoice and its members may assert on those users' behalf. *See Am. Booksellers*, 484 U.S. at 393; *Fitch*, 134 F.4th at 803-07; *Paxton*,

747 F.Supp.3d at 1029-31; *Yost*, 716 F.Supp.3d at 550-51; *Carr*, 789 F.Supp.3d at 1216; *Uthmeier*, 2025 WL 1570007, at *7-9; *Griffin*, 2025 WL 978607, at *7-9.  In *Virginia v. American Booksellers Association*, 484 U.S. 383 (1988), for example, several organizations of booksellers and two bookstores brought a pre-enforcement First Amendment challenge to a Virginia statute that made it unlawful for booksellers to knowingly display explicit material to minors.  *Id.* at 387-88 & n.3. Virginia argued that the plaintiffs lacked standing to bring their First Amendment challenge because they asserted only the "rights of bookbuyers."  *Id.* at 392-93.  The Supreme Court disagreed.  While "the usual rule is that a party may assert only a violation of its own rights," in "the First Amendment context '[l]itigants … are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'"  *Id.*  The Court therefore had no problem with the booksellers' associations or bookstores "alleg[ing] an infringement of the First Amendment rights of bookbuyers."  *Id.* at 388 n.3, 393 & n.6; *see also Brown*, 564 U.S. 789-90; *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 252-53 (2002) (emphasizing "the rights of adults" to receive speech even though plaintiffs were publishers, not consumers, of adult-oriented materials); *Playboy*, 529 U.S. at 811 (similar).

## CLAIMS FOR RELIEF

### COUNT ONE
### First Amendment
### (42 U.S.C. §1983; *Ex parte Young*; 28 U.S.C. §§2201(a) and 2202)

85.     NetChoice re-alleges and incorporates by reference the preceding paragraphs and allegations as though fully set out herein.

86.     "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104.  Today, those places include the "vast democratic forums of the Internet."  *Id.*  The Supreme Court has therefore held that the First Amendment limits the

government's ability to restrict access to "social media" websites like Facebook and YouTube, even when its ostensible aim is to protect minors.

87. In *Packingham*, for example, the Court held that a North Carolina law that barred convicted sex offenders from accessing "social media" websites violated the First Amendment. The state tried to justify the law on the ground that it served its interest in keeping convicted sex offenders away from minors. *See id.* at 106. While the Court acknowledged the importance of that interest, it nevertheless concluded that the law violated the First Amendment even assuming intermediate scrutiny applied. *Id.* at 107-08. By barring sex offenders from accessing "social networking" websites altogether, the state had "enact[ed] a prohibition unprecedented in the scope of First Amendment speech it burdens." *Id.* at 106-07. Such websites, the Court explained, are for many the principal sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Id.* at 107. For the government to "foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Id.* at 108.

88. That rule applies with full force to efforts to restrict minors' access to such services. The Supreme Court has repeatedly held that "minors are entitled to a significant measure of First Amendment protection," *Erznoznik*, 422 U.S. at 212-13, and "may not be regarded as closed-circuit recipients of only that which the State chooses to communicate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). Courts have therefore routinely invalidated government efforts to protect minors from the purportedly harmful effects of new forms of media by restricting their access to constitutionally protected speech.

89. In *Brown*, for example, the Supreme Court held that a California law that prohibited the sale of violent video games to minors without parental consent violated the First Amendment. 564 U.S. at 804-05. And in *Erznoznik*, the Court explained that just as "the First Amendment strictly limits [the government's] power" when it "undertakes selectively to shield the public from some kinds of speech," it prohibits the government from suppressing speech "to protect the young from ideas or images that a legislative body thinks unsuitable." 422 U.S. at 209, 213-14; *accord*

24

*Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 689-91 (1968) (invalidating ordinance restricting dissemination of films deemed "not suitable for young persons"); *Joseph Burstyn*, 343 U.S. at 501-02 (invalidating law authorizing denial of license to show films deemed "sacrilegious").

90.     Thus, while the government certainly can participate in debates about what speech is appropriate for minors, the Supreme Court has repeatedly rejected government efforts to try to resolve those debates by decreeing what constitutionally protected speech minors can and cannot access.  *See, e.g.*, *Brown*, 564 U.S. at 794-95; *Erznoznik*, 422 U.S. at 213-14.

91.     Unsurprisingly given that body of precedent, courts around the country have enjoined state efforts to restrict minors' access to "social media platforms," including laws that require teens to obtain parental consent to access them.  *See, e.g.*, *Uthmeier*, 2025 WL 1570007, at *21; *Carr*, 789 F.Supp.3d at 1223-27; *Reyes*, 748 F.Supp.3d at 1120-23; *Paxton*, 747 F.Supp.3d at 1032-34; *Bonta*, 113 F.4th at 1117-22; *Yost*, 716 F.Supp.3d at 552-58; *Griffin*, 2025 WL 978607, at *17; *NetChoice v. Bonta*, 770 F.Supp.3d 1164, 1185-93 (N.D. Cal. 2025).

92.     SB 854 should be enjoined for the same reasons.  The provision requiring covered services to restrict minors' access to their websites to one hour absent parental consent, Va. Code §59.1-577.1(B), violates the First Amendment both on its face and as applied to NetChoice members who operate "social media platform[s]" as defined by the Act.

93.     Requiring minors to obtain parental consent before accessing social media websites for more than one hour a day restricts core First Amendment activity.  *See id.*  SB 854 directly restricts minors from accessing websites where users engage in *speech*.  People, including minors, use those websites to gain access to places "where they can speak and listen."  *Packingham*, 582 U.S. at 104.  As numerous courts therefore have concluded, requiring minors to obtain parental consent to access "social media" abridges First Amendment rights.  *See, e.g.*, *Carr*, 789 F.Supp.3d at 1223-27; *Reyes*, 748 F.Supp.3d at 1120-23; *Yost*, 716 F.Supp.3d at 551; *Griffin*, 2025 WL 978607, at *17.

94.     Of course, "parents have traditionally had the power to control what their children

hear and say." *Brown*, 564 U.S. at 795 n.3. But "persons under 18 have [a] constitutional right to speak or be spoken to without their parents' consent." *Id.* So the state perhaps "has the power to *enforce* parental prohibitions—to require, for example, that the promoters of a rock concert exclude those minors whose parents have advised the promoters that their children are forbidden to attend." *Id.* "But it does not follow that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* Otherwise, "it could be made criminal to admit persons under 18 to a political rally without their parents' prior written consent— even a political rally in support of laws against corporal punishment of children, or laws in favor of greater rights for minors." *Id.* It could even "be made criminal to admit a person under 18 to church, or to give a person under 18 a religious tract, without his parents' prior consent." *Id.* Such laws "are obviously an infringement" on the First Amendment rights of "young people and those who wish to proselytize young people." *Id.* They "do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." *Id.* Just as the state would burden First Amendment rights by prohibiting minors from spending more than one hour reading books or perusing newspapers, SB 854 likewise burdens constitutionally protected activity by setting time limits on how long minors can spend speaking and engaging in speech on "social media platform[s]."

95.     SB 854 also burdens the First Amendment rights of *adults* to access covered services for more than one hour, as it effectively requires adults to prove their age to do so. SB 854 requires social media websites to "use commercially reasonable methods … to determine whether a user is a minor." Va. Code §59.1-577.1(B). As courts have repeatedly reaffirmed, requiring adults to verify their age before accessing speech significantly burdens First Amendment rights. *See, e.g.*, *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 849, 856; *Carr*, 789 F.Supp.3d at 1224-30 (similar); *Griffin*, 2025 WL 978607, at *7, 17; *Yost*, 716 F.Supp.3d at 552. The Supreme Court reaffirmed this principle just last term, explaining that "submitting to age verification is a burden on the exercise of [First Amendment] right[s]." *FSC*, 606 U.S. at 483. By forcing adults to either surrender sensitive personal information to access protected speech or drastically curtail

their consumption of protected speech, SB 854 "discourage[s] users from accessing" online services and may even "completely bar" some adults from doing so. *Reno*, 521 U.S. at 856.

96.    The unique aspects of online services like Facebook and YouTube only heighten the First Amendment values at stake. While government restrictions on books, magazines, movies, and video games prohibit people from *receiving* speech, SB 854 also restricts users' ability to engage in their own speech and associate with like-minded individuals. *See Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982).

97.    On top of that, SB 854's access restrictions interfere with the First Amendment rights of NetChoice members to disseminate both their own and third-party speech to their users—restricting their own First Amendment rights as well. *See Moody*, 603 U.S. at 731-32, 741; *Uthmeier*, 2025 WL 1570007, at *13, 19; *Carr*, 789 F.Supp.3d at 1223-27; *Reyes*, 748 F.Supp.3d at 1120-23; *Yost*, 716 F.Supp.3d at 551-52. For example, the Act burdens covered websites' ability to curate and disseminate content to their users for more than one hour a day. It also burdens covered websites' ability to speak directly with their users through their services. Virginia has essentially told covered websites that they can speak to minors or unverified adults who use their websites, but only so much. Such heavy-handed state restrictions plainly implicate the First Amendment.

98.    In fact, SB 854 is even more problematic than the laws invalidated in *Brown*, *Erznoznik*, *Ashcroft*, and *Playboy*. Some of those laws at least involved an attempt (albeit an unsuccessful one) to "adjust the boundaries of an existing category of unprotected speech" (like obscenity) "to ensure that a definition designed for adults is not uncritically applied to children." *Brown*, 564 U.S. at 794. But SB 854 does not endeavor to confine its restrictions to anything that even arguably approaches unprotected speech. It instead restricts access to "social media platforms" to just one hour even if all a teenager wants to do is to attend church services on Facebook or view educational materials on YouTube.

99.    Because SB 854 restricts access to large swaths of constitutionally protected speech, it is subject to heightened scrutiny. *See Packingham*, 582 U.S. at 103. Indeed, the

27

sweeping nature of its restrictions demands strict scrutiny.

100.    Laws that "suppress[] a large amount of speech" that citizens "have a constitutional right to receive" and share trigger "strict scrutiny." *FSC*, 606 U.S. at 476-77. The law in *Playboy*, for example, "triggered strict scrutiny because it banned '30 to 50% of all adult programming.'" *Id.* at 487 n.9 (quoting *Playboy*, 529 U.S. at 812). "To prohibit *this much* speech," the Court explained, "is a significant restriction" that demands "strict scrutiny." *Id.* (emphasis original). The law in *Reno* likewise "triggered—and failed—strict scrutiny because it 'effectively *suppresse[d]* a large amount of speech that adults have a constitutional right to receive' and to share." *Id.* (citing *Reno*, 521 U.S. at 874) (emphasis in original). So did the law in *Ashcroft*. *Id.* (citing *Ashcroft*, 542 U.S. at 661-62). If California had restricted minors' access to all video games to one hour out of concern that spending too much time playing some or all games may be harmful to some minors, that would have made the First Amendment violation even more glaring. *See Brown*, 564 U.S. at 794. So too if Jacksonville had prohibited the public display of all movies based on a concern "that motion pictures possess a greater capacity for evil, particularly among the youth of a community, than other modes of expression," *Joseph Burstyn*, 343 U.S. at 502; *see Erznoznik*, 422 U.S. at 217-18.

101.    On top of that, SB 854 discriminates based on content and speaker, triggering strict scrutiny twice over. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Even facially content-neutral laws will "be considered content-based" if they "cannot be justified without reference to the content of the regulated speech." *Id.* at 164 (quotation omitted). And if "there is evidence that an impermissible purpose or justification underpins a facially content-neutral restriction … that restriction may be content based." *City of Austin v. Reagan Nat'l Advert. of Austin*, 596 U.S. 61, 76 (2022).

102.    SB 854 is content based on its face because it singles out "social media platforms" based on the content of the speech that minors may encounter on these services—user-generated

speech, as opposed to "news, sports, entertainment, ecommerce, or content preselected by the provider and not generated by users." Va. Code §59.1-575. The "very basis for the regulation is the difference in content": Websites that have made the editorial choice to facilitate speech and interaction between everyday people are covered, while websites that have made the editorial choice to focus on other speech and speakers are not. *Cincinnati v. Discovery Network*, 507 U.S. 410, 429 (1993). As courts have explained, "[t]he elevation of news, sports, commerce, and provider-generated content over user-generated content is a content-based regulation." *Paxton*, 747 F.Supp.3d at 1032.

103.    SB 854 is also content based because it defines "social media platforms" based on whether they permit users "to interact socially with each other" by posting and viewing content. Va. Code §59.1-575. In other words, SB 854 targets websites "based on the 'social' subject matter 'of the material [they] disseminate[].'" *Reyes*, 748 F.Supp.3d at 1122-23. As many courts have held, "[t]he elevation of … provider-generated content over user-generated content is a content-based regulation." *SEAT v. Paxton*, 765 F.Supp.3d 575, 592 (W.D. Tex. 2025); *Reyes*, 748 F.Supp.3d at 1122-23; *Yost*, 778 F.Supp.3d at 953; *cf. Angelilli v. Activision Blizzard*, 2025 WL 1184247, at *5 (N.D. Ill. Apr. 23, 2025).

104.    SB 854's speaker distinctions reinforce the conclusion that it is content based. Courts are deeply skeptical of laws that "distinguish[] among different speakers," as a speaker and her speech are so often "interrelated" that "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). That principle has particular force when a law singles out for disfavored treatment some but not all in the business of disseminating speech. *See Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 234 (1987); *Minneapolis Star*, 460 U.S. at 591-92.

105.    SB 854 facially "distinguish[es] among different speakers." *Citizens United*, 558 U.S. at 340. The definition of "social media platform" singles out a subset of online services for disfavored treatment, while exempting others. And those speaker distinctions are an obvious proxy for content discrimination. *Reed*, 576 U.S. at 163-64. While the law purports to address the

amount of time that minors spend on social media, it does not restrict access to all mediums that employ similar features to engage their audience. The law leaves services like Disney+, Hulu, and Roblox uncovered, even though many minors spend hours on those services each day, and even though they lead to the same alleged harm that SB 854 purports to address. Such "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes," rather than disfavoring content. *NIFLA v. Becerra*, 585 U.S. 755, 774 (2018). The state's only possible justification for restricting access to services like Facebook, Instagram, YouTube, Reddit, and Dreamwidth while leaving many other mediums for speech untouched is its apparent belief that the covered websites deliver *content* that the state thinks is particularly harmful.

106.    SB 854 cannot satisfy any level of heightened scrutiny, let alone strict scrutiny. Strict scrutiny requires Virginia to demonstrate that SB 854 is "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). Intermediate scrutiny requires it to show that SB 854 is "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06. The state's interest must be "unrelated to the suppression of free speech." *FSC*, 606 U.S. at 495-96. And its chosen solution may not "burden substantially more speech than necessary to further those interests." *Id*. at 496. SB 854 flunks both levels of scrutiny.

107.    To the extent Virginia seeks to justify SB 854's restrictions on the theory that it "puts parents back in the driver's seat," Brad Kutner, *Youngkin Signs Democratic-backed Law to Limit Social Media for Kids*, WHRO Public Media (May 8, 2025), https://perma.cc/TT55-NZ6A, that argument fails. The Supreme Court has expressed serious "doubts that punishing third parties for conveying protected speech to children just in case their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Brown*, 564 U.S. at 802; *see also Moshoures v. City of North Myrtle Beach*, 131 F.4th 158, 169 (4th Cir. 2025). Far from "support[ing] … what some parents of the restricted children actually want," SB 854's "entire effect is only in support of what the State thinks parents *ought* to want," which is not a permissible

ground for government interference with First Amendment rights. *Brown*, 564 U.S. at 804.

108.    Nor can Virginia justify SB 854 on the theory that it has an important interest in protecting minors from alleged "addiction" to social media. *See* John Gonzalez, *New Virginia Law Limits Teens' Social Media to 1 Hour Daily: What Parents Should Know, ABC News* (May 14, 2025), https://tinyurl.com/3t7y8vbe. While protecting minors is certainly a laudable goal, in this context that interest is plainly related "to the suppression of free speech." *FSC*, 606 U.S. at 471. After all, SB 854 does not regulate "addiction" to *nonspeech* products like drugs or gambling. It seeks to protect minors from alleged "addiction" to websites where they access, engage in, and interact with *speech*. *See* Va. Code §59.1-575.

109.    The Commonwealth has no legitimate interest in restricting access to speech just because minors find it especially appealing. *See Sorrell*, 564 U.S. at 576. Virginia could not, for example, validly restrict minors from accessing Disney+ because it offers too many shows that "contain … catchy jingles" or end in cliffhangers. *Id.* at 578. Nor could it validly restrict access to books that are page-turners or use shorter chapters to keep readers more engaged. In *Brown*, California did not even try to justify its law on the theory that it had an interest in preventing minors from addiction to video games. 564 U.S. at 799-804. For good reason. As the Supreme Court has repeatedly made clear, "the fear that speech might persuade provides no lawful basis for quieting it." *Sorrell*, 564 U.S. at 576. Burdening access to protected speech citizens find especially interesting is especially inconsistent with the First Amendment.

110.    In all events, SB 854 is not a narrowly tailored means of addressing a legitimate state interest. Even under intermediate scrutiny, SB 854 must not "burden substantially more speech than necessary to further [its] interests." *FSC*, 606 U.S. at 495-96. Unlike laws that restrict access to websites that contain content that is unprotected as to minors, *see id*. at 467-68, SB 854 restricts "with one broad stroke" access to services that for many are valuable sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107. And it has the practical effect of hindering adults' access to those services, even though Virginia has no legitimate reason to do so. *See Ashcroft*, 542

U.S. at 663; *Reno*, 521 U.S. at 856-57.

111.    Conversely, SB 854 is "wildly underinclusive when judged against" any of the justifications the state has proffered. *Brown*, 564 U.S. at 802. The Act leaves many online services with materially indistinguishable content and functionality uncovered. The law exempts services like Disney+, Hulu, and Roblox, even though minors likely use these services as much or more than social media, and even though minors often encounter similar content on those services (*e.g.*, movies and clips of TV shows on YouTube). Virginia is "perfectly willing" to let minors access these other services to their hearts' content even if no "parent … says it's OK." *Id.*

112.    On top of that, Virginia has "too readily forgone options that could serve its interests just as well, without substantially burdening" protected speech. *McCullen*, 573 U.S. at 490; *see Packingham*, 582 U.S. at 107. To survive intermediate scrutiny, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests." *McCullen*, 573 U.S. at 495. Parents already have many tools to protect their minors on the Internet, including refusing to give them Internet-connected devices at all. Parents also already have ample tools at their disposal to restrict minors' access to "social media platforms"—which, unlike the services in those cases, involve speech that is constitutionally *protected* as to minors—should they want to do so. *See, e.g.*, *Bonta*, 113 F.4th at 1121; *Reyes*, 748 F.Supp.3d 1126-30; *Yost*, 716 F.Supp.3d at 560; *Carr*, 789 F.Supp.3d at 1230; *Uthmeier*, 2025 WL 1570007, at *18-19. In fact, Virginia uses such tools itself when it comes to limiting minors' access to "social media" in schools, including by restricting the use of cell phones during instruction time. *See* Va. Code § 22.1-79.3:1. The state has not explained why parents could not adopt a similar approach to limit social media use outside school.

113.    To be sure, parents may not always choose to utilize those tools how Virginia wishes they would. But to the extent Virginia is concerned that parents do not understand how to utilize them, it "cannot show that the Act's restrictions meet a substantial need of parents who wish to restrict their children's access … but cannot do so." *Brown*, 564 U.S. at 803. Instead, Virginia chose the bluntest possible instrument: an arbitrary one-hour restriction on access for teens and

onerous age-verification restrictions for adults. That is the antithesis of narrow tailoring.

114.    At bottom, the law really seems to be animated by Virginia's concern that minors are spending what the state views as "too much" time on "social media platforms." In a word, SB 854 is an internet-rationing statute that restricts minors in Virginia from accessing speech that their peers in other states may access. It is highly doubtful that the state has a legitimate interest in restricting minors' ability to access and interact with protected speech just because it thinks they are spending too much time doing so. Some minors undoubtedly spend more than one hour a day reading graphic novels, playing video games, watching movies, or binging television series. That hardly empowers Virginia to insert itself into homes throughout the state and second-guess the parenting choices of its residents about what content and in what quantity is appropriate for their minor children. Just as Virginia could not restrict minors from visiting the library because some might come across *Fifty Shades of Grey*, or because some might spend more than one hour a day reading *The Hunger Games*, Virginia may not restrict minors from accessing "social media" websites just because some minors may spend more time on them than the Commonwealth thinks they should.

115.    Unless declared invalid and enjoined, SB 854's severe time limit and age-verification requirements will unlawfully deprive NetChoice's members and their users of fundamental First Amendment rights and will cause them irreparable harm.

### COUNT TWO
### Unconstitutional Vagueness
### (42 U.S.C. §1983; *Ex parte Young*; 28 U.S.C. §§2201(a) and 2202)

116.    NetChoice re-alleges and incorporates by reference the preceding paragraphs and allegations as though fully set out herein.

117.    "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304

(2008).  "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."  *Fox*, 567 U.S. at 253-54.  After all, vague laws risk chilling would-be speakers by forcing them "to 'steer far wider of the unlawful zone'" than they would "if the boundaries of the forbidden areas were clearly marked."  *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).  So when a law "reaches a substantial amount of constitutionally protected conduct," *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 (1982), it must speak "only with narrow specificity," *NAACP v. Button*, 371 U.S. 415, 433 (1963).

118.    SB 854 fails to speak with the requisite specificity.  The Act's primary provision governing the scope of its coverage defines "[s]ocial media platform" as a "public … Internet-based application" that "[c]onnects users in order to allow users to interact socially" and "[a]llows users" to "[c]onstruct" a profile, "[p]opulate a public list of other users with whom such user shares a social connection," and "[c]reate or post content viewable by other users, including content on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users."  Va. Code §59.1-575.  These criteria are riddled with ambiguities, rendering both the definition and the operative provisions that employ it unconstitutionally vague.

119.    For one thing, it is unclear whether SB 854 applies to all users of "social media platform[s]" or only those that have accounts on those "platform[s]."  SB 854 requires "social media platforms" to "determine whether a *user* is a minor."  *Id.* §59.1-577.1(B) (emphasis added). And §59.1-575 defines a "user" as "a person not acting as an agent of a controller or processor." So SB 854's seems to cover every single website visitor.  But §59.1-575 elsewhere discusses "users" as those that "social media platforms" "[c]onnect" and allow "to interact socially with each other."  It is thus unclear whether a "user" covers every single person that may visit a website or only those who have accounts.

120.    SB 854 is vague in other ways as well.  For example, SB 854 requires covered websites to "limit a minor's use … to one hour a day," *id.*, but does not specify whether minors must be restricted from posting alone, from viewing content, or from accessing the website at all.

SB 854 also fails to explain what "commercially reasonable methods" are or what constitutes "verifiable parental consent." *Id.*; *Carr*, 789 F.Supp.3d at 1231 (holding that the use of "commercially reasonable" age verification efforts was unconstitutionally vague because what is reasonable will differ and permits "disparate enforcement"). How must a website verify a user's age? And how should a website verify parental consent? SB 854 does not say.

121.    Unless SB 854 is declared invalid and enjoined as to NetChoice's members, SB 854 will unlawfully deprive NetChoice's members and users of their fundamental First Amendment and Due Process rights and will cause them irreparable harm.

**COUNT THREE**
**Commerce Clause**
**(42 U.S.C. §1983; *Ex parte Young*; 28 U.S.C. §§2201(a) and 2202)**

122.    NetChoice re-alleges and incorporates by reference the preceding paragraphs and allegations as though fully set out herein.

123.    The Constitution vests Congress with the power to "regulate Commerce … among the several States." U.S. Const. art. I, §8, cl.3. This affirmative grant of power also includes a "negative command, known as the dormant Commerce Clause," under which states may not directly regulate out-of-state parties' out-of-state commerce or discriminate against interstate commerce. *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995). Consistent with the Framers' "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres," *Healy v. Beer Inst.*, 491 U.S. 324, 335-36 (1989), the Supreme Court has long held that the Commerce Clause prohibits any state from "directly regulat[ing]"—that is, imposing liability based upon—conduct and transactions that take place "'wholly outside the State.'" *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 640, 642 (1982) (plurality opinion)).

124.    The Commerce Clause concerns are heightened by the interstate nature of the Internet. Congress recognized long ago that the Internet has "flourished, to the benefit of all Americans, with a minimum of government regulation." 47 U.S.C. §230(a)(4). To "promote the

35

continued development of the Internet," Congress declared it "the policy of the United States" to "preserve the vibrant and competitive free market that presently exists for the Internet … unfettered by Federal or State regulation." *Id.* §230(b).  That hands-off federal policy has worked:  The Internet has grown tremendously over the past few decades, fostering "a revolution of historic proportions." *Packingham*, 582 U.S. at 105.  It has facilitated trillions of dollars in commerce, provided hundreds of millions of Americans with access to information, and helped billions of people across the globe communicate almost instantaneously.

125.    State laws like SB 854 threaten to fragment the Internet—harming commerce and the free flow of information alike.  Because the Internet is an inherently borderless technology, "[h]aphazard and uncoordinated state regulation can only frustrate the growth of cyberspace," which is why the "Internet … requires a cohesive national scheme of regulation." *Am. Libraries Ass'n v. Pataki*, 969 F.Supp.160, 182-83 (S.D.N.Y. 1997); *see also PSINet, Inc. v. Chapman*, 362 F.3d 227, 239-41 (4th Cir. 2004) (holding unconstitutional a Virginia law that would prohibit Internet providers from hosting content that was explicit for minors due to the interstate nature of the Internet); *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103-04 (2d Cir. 2003) (predicting that "the internet will soon be seen as falling within the class of subjects that are protected from State regulation because they 'imperatively demand[] a single uniform rule'"); *ACLU v. Johnson*, 194 F.3d 1149, 1160-61 (10th Cir. 1999) (similar).

126.    Applying those principles, SB 854 violates the Commerce Clause.  By its plain text, SB 854 directly regulates wholly out-of-state conduct.  SB 854 covers entities "that conduct business in the Commonwealth or produce products or services that are targeted to residents of the Commonwealth" and that have a sufficiently large number of users.  Va Code Ann. §59.1-576(A).  Once that nexus is met, the law does not limit its reach to conduct within the Commonwealth.  It instead applies to Virginians accessing "social media platform[s]" outside the Commonwealth.  SB 854 also requires covered websites to perform actions wholly outside the state—i.e., the actual process of age verification and placing time restrictions on accounts.

127.    As the Supreme Court recently explained, while laws that regulate in-state conduct

that has effects outside the state may typically pass constitutional muster, state laws that "directly regulate[]" purely out of state transactions are another matter. *Ross*, 598 U.S. at 376 & n.1. Indeed, both the Supreme Court and this Court have long held the latter unconstitutional. *See, e.g.*, *Edgar*, 457 U.S. at 640, 642 (plurality opinion) (explaining that the Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders"); *Ass'n of Accessible Medicines v. Frosh*, 887 F.3d 664, 669, 670-72 (4th Cir. 2018) (holding a Maryland law unconstitutional because it regulated "conduct that occur[red] entirely outside Maryland's borders"). As those and other cases have recognized, state efforts to "assert extraterritorial jurisdiction over persons or property" outside their borders "offend sister States and exceed the inherent limits of the State's power." *Shaffer v. Heitner*, 433 U.S. 186, 197 (1977). *Ross* did not purport to disturb those long-standing principles. *See* 598 U.S. at 376 & n.1.

128.    Just like the laws in *Edgar* and *Frosh*, SB 854 has the "specific impermissible extraterritorial effect" of regulating exclusively out-of-state activity. *See Ass'n for Accessible Medicines v. Ellison*, 140 F.4th 957, 961 (8th Cir. 2025). Under the plain text of SB 854, "social media platforms" (which are typically out-of-state entities) must verify the age of any Virginian and/or limit their access to one hour—both themselves out-of-state activities—regardless of whether that Virginian accesses the service from somewhere outside Virginia. There is no limitation that covered services' "use" or the "user" must be located in Virginia. *See* Va. Code §59.1-575, 577.1(B); *Johnson*, 194 F.3d at 1161 (enjoining a state regulation prohibiting the online distribution of content harmful to a minor because "the text of the statute itself … contain[ed] no express limitation confining it to communications which occur wholly within [the state's] borders").

129.    That is a textbook violation of the Commerce Clause. Virginia has no right to regulate wholly out-of-state activity.

130.    SB 854, on its face and as applied, should be declared unconstitutional, and its enforcement should be enjoined, as it threatens Plaintiff and its members with irreparable injury for which there is no adequate remedy at law.

## COUNT FOUR
## EQUITABLE RELIEF

131.    NetChoice re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

132.    SB 854 violates federal law and deprives Plaintiff's members and their users of enforceable federal rights.  Federal courts have the power to enjoin unlawful actions by state officials.  *See Ex parte Young*, 209 U.S. 123 (1908); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

133.    This Court can and should exercise its equitable power to enter a preliminary injunction enjoining Attorney General Miyares, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing the provisions of SB 854 that will be codified at Va. Code §59.1-577.1(B) against NetChoice members who operate "social media platforms" as defined by the Act.

134.    This Court can and should exercise its equitable power to enter a permanent injunction enjoining Attorney General Miyares, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing §59.1-577.1(B) against NetChoice members who operate "social media platforms" as defined by the Act.

## COUNT FIVE
## DECLARATORY RELIEF

135.    NetChoice re-alleges and incorporates by reference the preceding paragraphs and allegations as though fully set out herein.

136.    Section 59.1-577.1(B) violates federal law and deprives Plaintiff's members and their users of enforceable federal rights.

137.    With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. §2201(a).  And they have the power to grant "[f]urther and necessary or proper relief based on a declaratory judgment or decree … after reasonable notice and hearing, against any adverse party whose rights have been determined by

such judgment." *Id.* §2202.

138.    This Court can and should exercise its power under §§2201(a) and 2202 to enter a declaration that §59.1-577.1(B) on its face violates the United States Constitution and is therefore void and unenforceable, or, in the alternative, that it is unconstitutional as applied to NetChoice members who operate "social media platforms" as defined by the Act.

## PRAYER FOR RELIEF

NetChoice prays for the following relief from the Court:

1.    A declaration, pursuant to 28 U.S.C. §§2201(a) and 2202, that §59.1-577.1(B) on its face violates the United States Constitution and is therefore void and unenforceable, or, in the alternative, that it is unconstitutional as applied to NetChoice members who operate "social media platforms" as defined by the Act.

2.    A preliminary injunction enjoining Attorney General Miyares, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing the provisions of SB 854 that will be codified at §59.1-577.1(B) against NetChoice members who operate "social media platforms" as defined by the Act.

3.    A permanent injunction enjoining Attorney General Miyares, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing §59.1-577.1(B) against NetChoice members who operate "social media platforms" as defined by the Act.

4.    Such costs and reasonable attorneys' fees to which NetChoice may be entitled by law, including under 42 U.S.C. §1988.

5.    Any further relief that the Court deems just and proper.

Respectfully submitted,

Paul D. Clement* (Virginia Bar #37915)
Erin E. Murphy** (Virginia Bar #73254)
James Y. Xi* (D.C. Bar #1617537)
Barrett L. Anderson* (Texas Bar #24132531)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
barrett.anderson@clementmurphy.com

**application for admission forthcoming
*pro hac vice forthcoming

_/s/Craig Reilly_
Craig Crandall Reilly (Virginia Bar #20942)
LAW OFFICE OF CRAIG C. REILLY
429 North Saint Asaph Street
Suite 501
Alexandria, VA 22314
(703) 549-5355
Fax: (703) 549-5355
craig.reilly@ccreillylaw.com

*Counsel for Plaintiff NetChoice*

November 17, 2025