**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| NETCHOICE,<br><br>       *Plaintiff*,<br><br>       v.<br><br>JASON S. MIYARES, in his official capacity as Attorney General of the Commonwealth of Virginia,<br><br>       *Defendant*. | Case No. 1:25-cv-02067 |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 4

    A.    Adults and Minors Alike Engage in First Amendment Activity on Online Services Covered by the Act ......................................................... 4

    B.    Parents Have Many Ways to Supervise How Their Minor Children Use the Internet. ................................................................................................ 5

    C.    Virginia Enacts Senate Bill 854 ........................................................... 7

ARGUMENT ............................................................................................................ 8

I.    NetChoice Is Likely To Succeed On Its First Amendment Claim ..................... 9

    A.    SB 854 Restricts a Breathtaking Amount of Core First Amendment Activity ................................................................................................... 9

    B.    SB 854 Triggers Strict Scrutiny ........................................................... 13

    C.    SB 854 Cannot Survive Any Level of Heightened Scrutiny ................ 15

II.    NetChoice Is Likely To Succeed On Its Commerce Clause Claim .................... 19

III.    The Other Preliminary Injunction Factors Overwhelmingly Support Maintaining The Status Quo ............................................................................. 21

CONCLUSION .......................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Johnson*,
    194 F.3d 1149 (10th Cir. 1999) ........................................................................... 20

*Am. Booksellers Found. v. Dean*,
    342 F.3d 96 (2d Cir. 2003) .................................................................................. 20

*Am. Librs. Ass'n v. Pataki*,
    969 F.Supp. 160 (S.D.N.Y. 1997) ........................................................................ 20

*Angelilli v. Activision Blizzard*,
    2025 WL 1184247 (N.D. Ill. Apr. 23, 2025) ......................................................... 14

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004) ...................................................................................... 11, 17

*Ass'n for Accessible Meds. v. Frosh*,
    887 F.3d 664 (4th Cir. 2018) ............................................................................ 20, 21

*Bd. of Educ. v. Pico*,
    457 U.S. 853 (1982) ............................................................................................ 13

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011) ..................................................................................... *passim*

*Centro Tepeyac v. Montgomery Cnty.*,
    722 F.3d 184 (4th Cir. 2013) ............................................................................... 23

*Cincinnati v. Discovery Network*,
    507 U.S. 410 (1993) ............................................................................................ 14

*Citizens United v. FEC*,
    558 U.S. 310 (2010) ............................................................................................ 14

*City of Austin v. Reagan Nat'l Advert. of Austin*,
    596 U.S. 61 (2022) .............................................................................................. 14

*City of Laude v. Gilleo*,
    512 U.S. 43 (1994) ............................................................................................... 5

*Comput. & Commc'ns Indus. Ass'n v. Paxton*,
    747 F.Supp.3d 1011 (W.D. Tex. 2024) ............................................................... 1, 11

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier*,
    2025 WL 1570007 (N.D. Fla. June 3, 2025) .................................................. 1, 11, 18

*Edgar v. MITE Corp.*,
    457 U.S. 624, 640 (1982) ............................................................................... 19, 20

*Elrod v. Burns*,
    427 U.S. 347 (1976) ............................................................................................. 22

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975) ............................................................................... 10, 11, 13

*Free Speech Coal., Inc. v. Paxton*,
    606 U.S. 461 (2025) ..................................................................................... *passim*

*Giovani Carandola, Ltd. v. Bason*,
    303 F.3d 507 (4th Cir. 2002) ........................................................................ 22, 23

*Healy v. Beer Inst.*,
    491 U.S. 324 (1989) ............................................................................................. 19

*Int'l Franchise Ass'n Inc. v. City of Seattle*,
    803 F.3d 389 (9th Cir. 2015) ............................................................................... 22

*Interactive Digit. Software Ass'n v. St. Louis County*,
    329 F.3d 954 (8th Cir. 2003) ............................................................................... 16

*Liberty Univ., Inc. v. Lew*,
    733 F.3d 72 (4th Cir. 2013) ................................................................................. 23

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ..................................................................................... 15, 18

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ................................................................................... 4, 9, 13

*Moshoures v. City of N. Myrtle Beach*,
    131 F.4th 158 (4th Cir. 2025) .............................................................................. 16

*Nat'l Inst. of Fam. Life Adocs. v. Becerra*,
    585 U.S. 755 (2018) ............................................................................................. 15

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ........................................................................... 3, 19, 20, 21

*NetChoice v. Carr*,
    789 F.Supp.3d 1200 (N.D. Ga. 2025) ............................................. 1, 11, 15, 18

*NetChoice, LLC v. Bonta*,
    113 F.4th 1101 (9th Cir. 2024) ......................................................... 1, 11, 18

*NetChoice, LLC v. Griffin*,
  2025 WL 978607 (W.D. Ark. Mar. 31, 2025) .................................................. *passim*

*NetChoice, LLC v. Reyes*,
  748 F.Supp.3d 1105 (D. Utah 2024) ........................................................... *passim*

*NetChoice, LLC v. Yost*,
  716 F.Supp.3d 539 (S.D. Ohio 2024) .......................................................... *passim*

*Okla. Tax Comm'n v. Jefferson Lines, Inc.*,
  514 U.S. 175 (1995) ........................................................................... 19

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) ............................................................................ *passim*

*Pharm. Rsch. & Mfg. of Am. v. Morrisey*,
  760 F.Supp.3d 439 (W. Va. 2024) ............................................................. 22

*PSINet, Inc. v. Chapman*,
  362 F.3d 227 (4th Cir. 2004) ................................................................ 11, 20

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) .......................................................................... 14, 15

*Reno v. ACLU*,
  521 U.S. 844 (1997) .................................................................. 11, 12, 13, 17

*Shaffer v. Heitner*,
  433 U.S. 186 (1977) ........................................................................... 21

*Sorrell v. IMS Health, Inc.*,
  564 U.S. 552 (2011) ........................................................................... 17

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
  588 U.S. 504 (2019) ........................................................................... 20

*TikTok v. Garland*,
  604 U.S. 56 (2025) ........................................................................... 14, 15

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969) ........................................................................... 10

*United States v. Lierman*,
  151 F.4th 530 (4th Cir. 2025) ................................................................. 9

*United States v. Playboy Ent. Grp.*,
  529 U.S. 803 (2000) .......................................................................... 11, 13

*WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*,
553 F.3d 292 (4th Cir. 2009) ................................................................ 8, 21

**Constitutional Provision**

U.S. Const. art. I, §8, cl.3 ............................................................................. 19

**Statutes**

47 U.S.C. §230(a)(4) ..................................................................................... 19

47 U.S.C. §230(b)(1)-(2) .............................................................................. 19

Va Code §59.1-576(A) ............................................................................... 3, 21

Va. Code §22.1-79.3:1 ................................................................................... 18

Va. Code §59.1-575 ................................................................................ *passim*

Va. Code §59.1-577.1 ...................................................................................... 8

Va. Code §59.1-577.1(A) ................................................................................. 8

Va. Code §59.1-577.1(B) ........................................................................ *passim*

Va. Code §59.1-584(A) ............................................................................... 8, 23

Va. Code §59.1-584(C)-(D) ........................................................................ 8, 22

**Other Authorities**

Alyson Behr, *The Best Parental Control Apps in 2025, Tested by Our Editors*, CNN
Underscored (Jan. 2, 2025), https://perma.cc/XVE4-U9Y9 ............................... 6

Brad Kutner, *Youngkin Signs Democratic-Backed Law to Limit Social Media for Kids*,
WHRO Public Media (May 8, 2025), https://perma.cc/TT55-NZ6A .................... 15

Denise Pauloucci, *Mississippi site block, plus a small restriction on Tennessee new
accounts*, Dreamwidth (Aug. 31, 2025, 12:28 PM), https://perma.cc/PKH9-2468 ................. 5

Eugene Volokh, *Addiction to Constitutionally Protected Activity: Speech, Press, and
Religion*, 75 Emory L.J. (forthcoming 2026), https://perma.cc/LFX6-XMX4 ...................... 17

Governor Glenn Youngkin (@GovernorVA) (May 4, 2025, 4:06 PM), X,
https://perma.cc/6KRM-TAYQ ............................................................................. 8

Instagram, Help Center, *About Supervision on Instagram*, https://perma.cc/39KL-
9GWH (last visited Nov. 19, 2025) ....................................................................... 7

John Gonzalez, New Virginia Law Limits Teens' Social Media to 1 Hour Daily: What
    Parents Should Know, ABC News (May 14, 2025), https://tinyurl.com/3t7y8vbe ............... 16

Meta, *Supervision on Facebook*, https://tinyurl.com/595h985k .................................................... 7

## **INTRODUCTION**

Virginia Senate Bill 854 ("SB 854") is the latest attempt in a long line of government efforts to restrict new forms of constitutionally protected expression based on concerns about their potential effects on minors. *See* 2025 Va. Acts ch. 703, Senate Bill 854. Books, movies, television, rock music, video games, and the Internet have all been accused in the past of posing risks to minors. Today, similar debates rage about "social media" websites. These debates are important, and the government may certainly take part in them. But the First Amendment does not take kindly to government efforts to resolve them. The Constitution instead leaves the power to decide what speech is appropriate for minors where it belongs: with their parents.

Nevertheless, some states have recently taken it upon themselves to try to restrict minors' access to constitutionally protected speech on some of the most popular online services. Courts across the country have rejected those efforts as inconsistent with the First Amendment. *See, e.g.*, *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007, at * 11-13, 21 (N.D. Fla. June 3, 2025); *NetChoice v. Carr*, 789 F.Supp.3d 1200, 1223-27, 1234 (N.D. Ga. 2025); *NetChoice, LLC v. Reyes*, 748 F.Supp.3d 1105, 1120-23, 1134 (D. Utah 2024); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F.Supp.3d 1011, 1032-34, 1044 (W.D. Tex. 2024); *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1117-22, 1125-26 (9th Cir. 2024); *NetChoice, LLC v. Yost*, 716 F.Supp.3d 539, 552-58, 561-62 (S.D. Ohio 2024); *NetChoice, LLC v. Griffin*, 2025 WL 978607, at *17 (W.D. Ark. Mar. 31, 2025). And rightly so. While states certainly have a legitimate interest in protecting minors who use such services, restricting the ability of minors (and adults) to access them via parental consent requirements that require age verification is not a narrowly tailored means of advancing any such interest.

While the state perhaps "has the power to *enforce* parental prohibitions—to require, for example, that the promoters of a rock concert exclude those minors whose parents have advised the promoters that their children are forbidden to attend," "it does not follow that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011). Such laws "are obviously an

1

infringement" on the First Amendment rights of "young people and those who wish to proselytize young people." *Id.* They "do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." *Id.*

Like similar laws that have preceded it, SB 854 violates the First Amendment. The Act requires "social media" websites to "use commercially reasonable" age verification methods to determine which users are minors and bans anyone under 16 from accessing those websites for more than an hour a day without parental consent. Va. Code §59.1-577.1(B). By restricting the ability of minors (and adults, who must now prove their age) to access these websites, Virginia has "with one broad stroke" restricted millions of Virginians "from engaging in the legitimate exercise of First Amendment rights." *Packingham v. North Carolina*, 582 U.S. 98, 107-08 (2017).

Indeed, SB 854 is even more obviously unconstitutional than other state laws that have preceded it. The law does not focus on any particular activity on "social media" that may pose special risk to minors. Nor does it focus on identifying specific means of or forums for communication that those seeking to take advantage of minors have proven more likely to use. Instead, SB 854's definition of "social media platform" appears designed to restrict access to websites that minors especially enjoy using—specifically, websites on which minors spend more than one hour a day. But the Supreme Court has repeatedly explained that the government may not restrict speech just because it is popular. Otherwise, the government could restrict access to the most popular segments of nearly any medium for constitutionally protected speech, be it enticing video games, page-turning novels, binge-worthy TV shows, or marathon movie nights. Burdening protected speech that citizens find especially interesting and want to spend extra time consuming is especially inconsistent with the First Amendment.

In all events, the Commonwealth cannot begin to show that its restrictions are necessary to advance any legitimate interest it may assert. SB 854 prohibits *all* minors under 16 from spending more than one hour on a social media website absent parental consent because (in Virginia's view) *some* minors spend too much time on them. That is akin to restricting all minors from spending more than an hour a day in the library just because the state thinks some spend too much time

reading books, or restricting all minors from accessing Disney+ because the state thinks some spend too much time watching cartoons. Such draconian restrictions are especially unwarranted given that parents already have a wealth of tools at their disposal to protect their children on the Internet—tools that Virginia itself employs when it wishes to restrict minors' access to "social media" in schools. The Commonwealth may wish that more Virginians shared its views about whether and how much minors should use "social media." But while the Commonwealth may take many steps to protect minors from harm, including persuading parents to take advantage of tools to limit their minor children's access to "social media," it may not take matters into its own hands and restrict access itself. After all, "punishing third parties for conveying protected speech to children just in case their parents disapprove of that speech" is not "a proper governmental means of aiding parental authority." *Brown*, 564 U.S. at 802.

SB 854 also violates the Commerce Clause. It directly regulates wholly out-of-state activity. To be sure, SB 854 covers social media websites only if they "conduct business in the Commonwealth or produce products or services that are targeted to residents of the Commonwealth" and have a sufficiently large number of users nationwide. Va Code §59.1-576(A). But once that nexus is met, the law does not limit its reach to users or social media use within Virginia. It extends to wherever Virginians access "social media platforms." SB 854 thus regulates activity—the actual process of verifying parental consent and restricting access to social media for more than one hour a day—that occurs wholly out of state. But state laws that "directly regulate[]" purely out-of-state transactions are and have long been unconstitutional. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023) (emphasis omitted).

The Court should declare SB 854 unconstitutional and enjoin the Attorney General of Virginia from enforcing it against NetChoice's members before January 31, 2026. While SB 854 takes effect on that date, the law requires Attorney General Miyares to provide NetChoice members with notice and a 30-day opportunity to cure before bringing an enforcement action. *See* Va. Code §59.1-584(A). So the earliest the Attorney General could enforce SB 854 is January 31, 2026.

## **BACKGROUND**

A.    **Adults and Minors Alike Engage in First Amendment Activity on Online Services Covered by the Act.**

NetChoice is a nonprofit trade association whose members operate many online services, including (among others) Facebook, Instagram, YouTube, Reddit, and Dreamwidth. These services "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham*, 582 U.S. at 107. "On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos." *Id.* at 104. Instagram allows users to share vacation pictures and informative videos with others. YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions. On Dreamwidth, users can share blog or journal entries or creative work with friends and family. And on Reddit, users can join communities dedicated to shared interests and make their knowledge accessible to each other.

Like adults, minors use these websites to engage in an array of First Amendment activity on a wide range of topics. Minors use these websites to read the news, connect with friends, explore new interests, follow their favorite sports teams, and research their dream colleges. Some use them to hone a new skill or showcase their creative talents, including photography, writing, or other forms of expression. Others use them to raise awareness about social causes and participate in public discussions on salient topics of the day. "Minors, who cannot vote for the lawmakers that represent them, can use social media to make their voices heard on issues that affect them." *Griffin*, 2025 WL 978607, at *13. Still others use them to build communities and connect with those who share similar interests or experiences, which is particularly helpful for minors who feel isolated or marginalized, or are seeking support from others who understand their experiences.

These websites also engage in their own First Amendment activity. For starters, they curate and disseminate third-party speech to their users, which is unquestionably protected First Amendment speech. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 738 (2024). Facebook and Instagram, for example, curate and disseminate third-party content to their users based on their

judgment about what is appropriate for users to see.  Cleland.Decl.¶¶14,17,19.  YouTube likewise disseminates videos to users based on its judgment about what the user may find especially interesting.  Blumenfeld.Decl.¶¶41-42.  Reddit disseminates speech to its users based in part on their users' expressed preferences, including the communities they have joined or visited and the content they view, upvote, and downvote.  Cleland.Decl.¶14.  And Dreamwidth likewise disseminates speech to users on a separate feed suggesting popular communities based in part on what it thinks its users will like and what Dreamwidth has deemed appropriate.  Paolucci.Decl.¶5.  Websites also engage in speech when they disseminate their own speech on the service.  Dreamwidth, for example, posts updates on important topics to their users directly through the service so that users and visitors can stay abreast of issues impacting the service. *See, e.g.*, Denise Pauloucci, *Mississippi site block, plus a small restriction on Tennessee new accounts*, Dreamwidth (Aug. 31, 2025, 12:28 PM), https://perma.cc/PKH9-2468.  And websites also provide the means for users to engage in their own speech, the limitation of which violates the First Amendment. *See, e.g.*, *City of Laude v. Gilleo*, 512 U.S. 43, 55 n.13 (1994) ("[T]he Court has long recognized that by limiting the availability of particular means of communication, content-neutral restrictions can significantly impair the ability of individuals to communicate their views to others.").  Cleland.Decl.¶¶17,19; Blumenfeld.Decl.¶¶41-42; Paolucci.Decl.¶4.

**B.    Parents Have Many Ways to Supervise How Their Minor Children Use the Internet.**

Just as people inevitably have different opinions about what books, television shows, and video games are appropriate for minors, people inevitably have different views about whether and to what degree online services like Facebook, Instagram, YouTube, Reddit, and Dreamwidth are appropriate for minors.  Concerns that new means of communication may be harmful to minors, however, are hardly new.  The same basic concerns have been raised repeatedly in the past about other types of speech and mediums of expression, from "penny dreadfuls" to "motion pictures," "[r]adio dramas," "comic books," and more. *Brown*, 564 U.S. at 797-98.

While the government can certainly participate in those debates, the Supreme Court has

repeatedly rejected government efforts to try to resolve them by decreeing what speech minors may access. After all, "[m]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Id*. at 794-95. And while states have an interest in protecting minors from harm, that interest "does not include a free-floating power to restrict the ideas to which [they] may be exposed." *Id.* In a Nation that values the First Amendment, the preferred response is to let parents decide what constitutionally protected speech their children may access, and how and when they may access it.

Parents have many tools at their disposal to control their children's access to protected speech on the Internet should they choose to do so. Parents can decide whether and when to let their children use computers, tablets, and smartphones in the first place. And those who choose to do so have many ways to control what their children see and do. Device manufacturers (e.g., Apple, Google) offer settings that parents may use to limit the time that their children spend on applications and websites. *See* Cleland.Decl.¶8. And many third-party applications allow parents to control and monitor their children's use of Internet-connected devices and online services. *See, e.g.*, Alyson Behr, *The Best Parental Control Apps in 2025, Tested by Our Editors*, CNN Underscored (Jan. 2, 2025), https://perma.cc/XVE4-U9Y9. Cell carriers and broadband providers (e.g., Verizon, AT&T, and Comcast Xfinity) provide parents with tools to block apps and websites from their children's devices, ensure that they are texting and chatting with only parent-approved contacts, and restrict screen time during certain hours. Cleland.Decl.¶9. Most wireless routers (e.g., NetGear, TP-Link) contain parental control settings as well. *Id.* As do Internet browsers (e.g., Google Chrome, Mozilla Firefox). Cleland.Decl.¶10.

On top of all that, Plaintiff's members have devoted extensive resources to protect minors who use their services and provide their parents with tools to monitor what their children do and see on the Internet. For starters, some prohibit minors under 13 from accessing their main services, while others offer separate experiences geared specifically toward minors. *See* Blumenfeld.Decl.¶¶10-29. On Instagram, parents can review their teens' activity and limit their

ability to send direct messages. Instagram, Help Center, *About Supervision on Instagram*, https://perma.cc/39KL-9GWH (last visited Nov. 19, 2025). And on Facebook, parents can see their teens' usage, privacy settings, content preferences, and the people and pages they have blocked. *See, e.g.*, Meta, *Supervision on Facebook*, https://tinyurl.com/595h985k (last visited Nov. 19, 2025).

### C.    Virginia Enacts Senate Bill 854.

Notwithstanding the long line of cases striking down government efforts to decree what constitutionally protected speech minors may access, and the wealth of tools available to help parents tailor and restrict their minor children's Internet access should they choose to do so, Virginia has taken it upon itself to decide what is appropriate for minors on the Internet. Earlier this year, the state enacted SB 854, which dramatically restricts minors' access to "social media platforms," significantly curtailing their ability to engage in core First Amendment activities on many of the most popular online services.

SB 854 defines "social media platform" as a "public or semipublic Internet-based service or application that has users in the Commonwealth" that "[c]onnects users in order to allow users to interact socially with each other" and "[a]llows users to" "[c]onstruct" a profile, "[p]opulate a public list of other users with whom such user shares a social connection," and "[c]reate or post content viewable by other users, including content on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users." Va. Code §59.1-575. But instead of regulating all online services that allow users to share and view content, SB 854 excludes any "service or application that exclusively provides email or direct messaging services," as well as any "service or application that consists primarily of news, sports, entertainment, ecommerce, [] content preselected by the provider and not generated by users," or "interactive gaming." *Id.*

SB 854 imposes several restrictions on access to "social media platforms" that are relevant here. To begin, SB 854 requires social media platforms to "use commercially reasonable methods … to determine whether a user is a minor." *Id.* §59.1-577.1(B). A "user" is "a person

not acting as an agent" of a social media website. *Id.* §59.1-575. And a "minor" is "any natural person younger than 16 years of age." *Id.* §59.1-577.1(A). In practical effect, this requirement demands that covered websites verify the age of every user before allowing them to access protected First Amendment speech on covered websites because that is the only way that a covered website can comply with the Act's requirement to limit minors' use of the website. Virginia itself interprets this provision as an age verification requirement. Upon signing SB 854, Governor Youngkin demanded in a post on his X account that "[s]tarting 1/1/26, platforms *must* verify age, enforce limits and put parents back in control." Governor Glenn Youngkin (@GovernorVA) (May 4, 2025, 4:06 PM), X, https://perma.cc/6KRM-TAYQ (emphasis added).

Once a social media company determines which users are minors it must "limit a minor's use" of its social media website "to one hour per day, per service or application." Va. Code §59.1-577.1(B). If a minor wishes to adjust that time limit, the minor must obtain "verifiable parental consent." *Id.*

SB 854 gives the Attorney General exclusive authority to enforce the law. *Id.* §59.1-584(A). It requires the Attorney General to provide "social media platforms" with "30 days' written notice" of potential violations and give the website the opportunity to cure the problem before "initiating any action." *Id.* If the violation goes uncured, the Attorney General may seek "an injunction to restrain any violations," impose "civil penalties of up to $7,500 for each violation," and recover "reasonable expenses incurred in investigating and preparing the case, including attorney fees." *Id.* §59.1-584(C)-(D). SB 854 takes effect on January 1, 2026. *Id.* §§59.1-575, 577.1.

## ARGUMENT

To obtain a preliminary injunction, NetChoice must show (1) it "is likely to succeed on the merits"; (2) it "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "that the balance of equities tips in [its] favor"; and (4) "that an injunction is in the public interest." *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (citation omitted).

I.      **NetChoice Is Likely To Succeed On Its First Amendment Claim.**

A.      **SB 854 Restricts a Breathtaking Amount of Core First Amendment Activity.**

"'[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles' of the First Amendment 'do not vary.'" *Moody*, 603 U.S. at 733. And a "fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104. Today, those places include the "vast democratic forums of the Internet." *Id.* The Supreme Court has therefore held that the First Amendment limits the government's ability to restrict access to "social media" websites like Facebook and YouTube, even when its ostensible aim is to protect minors. *Id.* at 106-08.

In *Packingham*, for example, the Court held that a North Carolina law that barred convicted sex offenders from accessing "social media" websites violated the First Amendment. The state tried to justify the law on the ground that it served its interest in keeping convicted sex offenders away from minors. *See* 582 U.S. at 106. While the Court acknowledged the importance of that interest, it nevertheless concluded that the law violated the First Amendment even assuming intermediate scrutiny applied. *Id.* at 107-08. By barring sex offenders from accessing "social networking" websites altogether, the state had "enact[ed] a prohibition unprecedented in the scope of First Amendment speech it burdens." *Id.* at 106-07. Such websites, the Court explained, are for many the principal sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Id.* at 107. For the government to "foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Id.* at 108; *see also United States v. Lierman*, 151 F.4th 530, 533-34 (4th Cir. 2025) (recognizing that Internet services provide a valuable avenue to speak on matters of public concern).

For all the same reasons, the First Amendment limits the government's authority to restrict minors' access to those websites too. The Supreme Court has repeatedly held that "minors are entitled to a significant measure of First Amendment protection," *Erznoznik v. City of Jacksonville*,

422 U.S. 205, 212-13 (1975), and "may not be regarded as closed-circuit recipients of only that which the State chooses to communicate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). Just as "the First Amendment strictly limits [the government's] power" when it "undertakes selectively to shield the public from some kinds of speech," it prohibits the government from suppressing speech "to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. at 209, 213-14. While "a State possesses legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794-95.

Consistent with those principles, the Supreme Court has squarely held that "persons under 18 have [a] constitutional right to speak or be spoken to without their parents' consent." *Id.* at 795 n.3. Of course, "parents have traditionally had the power to control what their children hear and say." *Id.* And the state perhaps "has the power to *enforce* parental prohibitions—to require, for example, that the promoters of a rock concert exclude those minors whose parents have advised the promoters that their children are forbidden to attend." *Id.* "But it does not follow that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* Otherwise, the state could make it "criminal to admit persons under 18 to a political rally without their parents' prior written consent—even a political rally in support of laws against corporal punishment of children, or laws in favor of greater rights for minors—or "to admit a person under 18 to church, or to give a person under 18 a religious tract, without his parents' prior consent." *Id.* Such laws "are obviously an infringement" on the First Amendment rights of "young people and those who wish to proselytize young people." *Id.* They "do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." *Id.*

To be sure, the Supreme Court has recognized some narrow exceptions to those general principles. But it has emphasized that exceptions are rare, and that "only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors]." *Erznoznik*, 422 U.S. at 212-13. The government may, for example, "adjust the

boundaries of an existing category of unprotected speech" like obscenity "to ensure that a definition designed for adults is not uncritically applied to children." *Brown*, 564 U.S. at 794. After all, something that is not obscene for adults may still be obscene for children. *See, e.g.*, *Free Speech Coal., Inc. v. Paxton (FSC)*, 606 U.S. 461, 477-78 (2025). But that does not give the government carte blanche to restrict wide swaths of "fully protected speech," *id.* at 484-85, or "create a wholly new category of content-based regulation that is permissible only for speech directed at children," *Brown*, 564 U.S. at 794.

Outside of those "relatively narrow and well-defined circumstances," *id.*, courts have routinely struck down government efforts to protect children from the purportedly harmful effects of new forms of media. In *Brown*, for example, the Supreme Court held that a California law that prohibited the sale of violent video games to minors without parental consent violated the First Amendment. 564 U.S. at 804-05. And in *Erznoznik*, the Court explained that just as "the First Amendment strictly limits [the government's] power" when it "undertakes selectively to shield the public from some kinds of speech," it prohibits the government from suppressing speech "to protect the young from ideas or images that a legislative body thinks unsuitable." 422 U.S. at 209, 213-14. Even when the government restricts access to speech that is *not* protected as to minors, courts have struck down such laws if they impede the First Amendment rights of adults. *See Ashcroft v. ACLU*, 542 U.S. 656, 673 (2004); *Reno v. ACLU*, 521 U.S. 844, 874 (1997); *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 812 (2000); *PSINet, Inc. v. Chapman*, 362 F.3d 227, 234-35 (4th Cir. 2004).

Given that long line of precedent, it is unsurprising that courts across the country have concluded that state attempts to restrict minors' access to "fully protected speech," *FSC*, 606 U.S. 484, on "social media platforms"—including parental-consent requirements and time limits similar to those in SB 854—violate the First Amendment. *See, e.g.*, *Uthmeier*, 2025 WL 1570007, at *11-13; *Carr*, 789 F.Supp.3d at 1223-27; *Reyes*, 748 F.Supp.3d at 1120-23; *Paxton*, 747 F.Supp.3d at 1032-34; *Bonta*, 113 F.4th at 1117-22; *Yost*, 716 F.Supp.3d at 552-58; *Griffin*, 2025 WL 978607, at *17. And just like the laws struck down in those cases, SB 854 plainly restricts

core First Amendment activity.  By categorically barring minors under age 16 from accessing a social media website for more than one hour per day absent parental consent, *see* Va. Code §59.1-577.1(B), Virginia has "prevent[ed] … user[s] from engaging in the legitimate exercise of First Amendment rights."  *Packingham*, 582 U.S. at 108.

In fact, SB 854 even more obviously implicates the First Amendment than the laws invalidated in *Brown*, *Reno*, *Ashcroft*, *Playboy*, and *Erznoznik*.  Some of those cases at least involved an attempt to "adjust the boundaries of an existing category of unprotected speech" (like obscenity) "to ensure that a definition designed for adults is not uncritically applied to children." *Brown*, 564 U.S. at 794; *see also FSC*, 606 U.S. at 483-84.  SB 854 does not even endeavor to confine its restrictions to speech that could arguably be said to approach a constitutional line.  It instead restricts minors' ability to access any "social media platform" for more than one hour per day, even if all a minor wants to do is attend online church services, participate in the launch of a presidential campaign, or just communicate with friends and family.   Cleland.Decl.¶¶5-6,12; Blumenfeld.Decl.¶44; Paolucci.Decl.¶3.  Virginia has thus restricted wide swaths of protected First Amendment activity.  Had California restricted access to *all* video games in *Brown* based on a concern that some video games may be harmful to some minors, that would have made the burden on First Amendment rights even more glaring.  *See* 564 U.S. at 793-98; *Packingham*, 582 U.S. at 108-09.

On top of that, by effectively requiring all users to verify their age before accessing covered websites, SB 854 burdens the First Amendment rights of *adults* to access those websites too.  *See* Va. Code §59.1-577.1(B).  As the Supreme Court reaffirmed just this past Term, requiring adults to submit "proof of age" before accessing speech (even speech that is unprotected as to minors) "is a burden on the exercise of [their First Amendment] right[s]."  *FSC*, 606 U.S. at 482-83.  By forcing adults to surrender sensitive personal information to access protected speech, such requirements "discourage users from accessing" speech on the Internet and "completely bar" some adults from doing so.  *Reno*, 521 U.S. at 856.

The unique aspects of online services like Facebook, Instagram, YouTube, Reddit, and

Dreamwidth only heighten the First Amendment values at stake. While restrictions on books, magazines, movies, and video games prohibit people from *receiving* speech, SB 854 also restricts users from *engaging* in their own speech and participating in the exchange of ideas. *See Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982). What is more, SB 854's access restrictions interfere with the First Amendment rights of NetChoice members who curate and disseminate speech to their users. That is quintessential First Amendment activity too. *See Moody*, 603 U.S. at 735-38; *Reyes*, 748 F.Supp.3d at 1120-23; *Yost*, 716 F.Supp.3d at 551-52. And the Act burdens covered websites' ability to speak directly with their users through their services. Cleland.Decl.¶¶17,19; Blumenfeld.Decl.¶¶41-42; Paolucci.Decl.¶¶4-5. Virginia has essentially told covered websites that they can speak to minors who use their websites, but only so much. Such a heavy-handed state restriction plainly implicates the First Amendment.

### B.    SB 854 Triggers Strict Scrutiny.

While SB 854, at a minimum, must survive intermediate scrutiny, its sweeping restrictions demand strict scrutiny twice over. As the Supreme Court recently explained, laws that "suppress[] a large amount of speech" that citizens "have a constitutional right to receive" and share trigger "strict scrutiny." *FSC*, 606 U.S. at 476-77. The law in *Playboy*, for example, "triggered strict scrutiny because it banned '30 to 50% of all adult programming.'" *Id.* at 487 n.9 (citing *Playboy*, 529 U.S. at 812). "To prohibit *this much* speech is a significant restriction" warranting "strict scrutiny." *Id.* The law in *Reno* likewise "triggered—and failed—strict scrutiny because it 'effectively *suppresse[d]* a large amount of speech that adults have a constitutional right to receive' and to share." *Id.* at 487 (citing *Reno*, 521 U.S. at 874). So too in *Ashcroft*. *Id.* (citing *Ashcroft*, 542 U.S. at 661-62). That makes sense. Again, had California restricted minors' access to *all* video games in *Brown*, 564 U.S. at 794, or had Jacksonville prohibited the public display of *all* movies in *Erznoznik*, 422 U.S. at 217-18, the First Amendment burdens would have been even more severe. SB 854 thus triggers strict scrutiny given the sheer amount of fully protected First Amendment activity that it restricts.

SB 854 also discriminates on the basis of content and speaker, triggering strict scrutiny

13

twice over.  "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *TikTok v. Garland*, 604 U.S. 56, 70-71 (2025).  Facially content-neutral laws will nevertheless "be considered content-based" if they "cannot be justified without reference to the content of the regulated speech."  *Reed*, 576 U.S. at 164.  And if "there is evidence that an impermissible purpose or justification underpins a facially content-neutral restriction … that restriction may be content based."  *City of Austin v. Reagan Nat'l Advert. of Austin*, 596 U.S. 61, 76 (2022).

SB 854 is content based on its face because it defines "social media platforms" based on whether a service allows users "to interact socially with each other" by posting and viewing content.  Va. Code §59.1-575.  And SB 854 exempts "news, sports, entertainment, ecommerce, or content preselected by the provider and not generated by users."  *Id.*  In other words, SB 854 targets websites "based on the 'social' subject matter 'of the material [they] disseminate[].'"  *Reyes*, 748 F.Supp.3d at 1122-23.  As many courts have held, "[t]he elevation of … provider-generated content over user-generated content is a content-based regulation."  *Students Engaged in Advancing Tex. v. Paxton*, 765 F.Supp.3d 575, 592 (W.D. Tex. 2025); *Reyes*, 748 F.Supp.3d at 1122-23; *Yost*, 778 F.Supp.3d at 953; *cf. Angelilli v. Activision Blizzard*, 2025 WL 1184247, at *5 (N.D. Ill. Apr. 23, 2025).  That makes sense, as the "very basis for the regulation is the difference in content":  Websites that have made the editorial choice to facilitate speech and interaction between users are covered, while websites that have made the editorial choice to focus on other speech and speakers are not.  *Cincinnati v. Discovery Network*, 507 U.S. 410, 429 (1993).

SB 854's speaker distinctions reinforce the conclusion that SB 854 is content based.  Courts are deeply skeptical of laws that "distinguish[] among different speakers," as "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content."  *Citizens United v. FEC*, 558 U.S. 310, 340 (2010).  The definition of "social media platform" singles out a subset of online services for disfavored treatment, while exempting others.  And those speaker

14

distinctions are an obvious proxy for content discrimination. *Reed*, 576 U.S. at 163-64. While SB 854 appears to address supposed overuse of "social media" websites, it does not restrict access to all mediums that minors enjoy using. The law appears to leave services like Disney+, Hulu, and Roblox uncovered, even though many minors spend hours on those services each day. Va. Code §59.1-575; *Reyes*, 748 F.Supp.3d at 1128 & n.157. Email and direct messaging services often include time-consuming features too, yet SB 854 exempts them from coverage, no matter how long minors spend on them. Va. Code §59.1-575. Such "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes," rather than disfavoring content on the covered services. *Nat'l Inst. of Fam. Life Adocs. v. Becerra*, 585 U.S. 755, 773-74 (2018). The only conceivable reason that Virginia targets online services like Instagram, Facebook, YouTube, Reddit, and Dreamwidth, while leaving other mediums untouched, is because the former contains *content*—namely, speech in which peers "interact socially with each other within [the] service or application," Va. Code §59.1-575—that the Commonwealth thinks is especially problematic. While that may be "a different flavor of content-based regulation," *Carr*, 789 F.Supp.3d at 1222, it is a content-based regulation nonetheless.

### C.    SB 854 Cannot Survive Any Level of Heightened Scrutiny.

SB 854 cannot satisfy any level of heightened scrutiny, let alone strict scrutiny. Strict scrutiny requires Virginia to demonstrate that SB 854 is "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). Intermediate scrutiny requires it to demonstrate that SB 854 is "narrowly tailored to serve a significant governmental interest," *Packingham*, 582 U.S. at 105-06, that is "unrelated to the suppression of free expression," *TikTok*, 604 U.S. at 73. Virginia cannot make either showing.

To the extent Virginia seeks to justify SB 854's restrictions on the theory that it "puts parents back in the driver's seat," Brad Kutner, *Youngkin Signs Democratic-Backed Law to Limit Social Media for Kids*, WHRO Public Media (May 8, 2025), https://perma.cc/TT55-NZ6A, that argument fails. In *Brown*, the Supreme Court expressed "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a

15

proper governmental means of aiding parental authority."  564 U.S. at 802.  "Accepting that position would largely vitiate the rule that only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to minors."  *Id.* (brackets omitted).  Simply put, "the government cannot silence protected speech by wrapping itself in the cloak of parental authority."  *Interactive Digit. Software Ass'n v. St. Louis County*, 329 F.3d 954, 960 (8th Cir. 2003).  To accept such an interest "would be to invite legislatures to undermine the First Amendment rights of minors willy-nilly under the guise of promoting parental authority."  *Id.*; *see also Moshoures v. City of N. Myrtle Beach*, 131 F.4th 158, 169 (4th Cir. 2025).

To the extent Virginia seeks to justify SB 854 on the ground that it helps protect minors from "predators," that does not work either, as the law is radically over-restrictive judged by that interest.  Rumenap.Decl.¶¶5-11.  In *Packingham*, North Carolina argued that barring convicted sex offenders from accessing "social media" was necessary to protect minors from predators.  582 U.S. at 106.  The Court acknowledged the importance of that interest, but it nevertheless concluded that the law could not withstand even intermediate scrutiny because the state had narrower ways to achieve its goals*.  Id.* at 108.  If the First Amendment prohibits barring *convicted sex offenders* from using websites, laws restricting minors from accessing those same websites cannot possibly be narrowly tailored.  And the state allows minors unfettered access to the same services "so long as one parent … says it's OK," which again raises serious doubts that SB 854 is really motivated by concerns about potential predators.  *Brown*, 564 U.S. at 802; *see also Yost*, 716 F.Supp.3d at 558; *Griffin*, 2025 WL 978607 at *11.

Nor can Virginia justify SB 854 on the theory that it has an important interest in protecting minors from alleged dangers of social media such as "addiction."  *See* John Gonzalez, New Virginia Law Limits Teens' Social Media to 1 Hour Daily: What Parents Should Know, ABC News (May 14, 2025), https://tinyurl.com/3t7y8vbe.  While protecting minors is certainly a laudable goal, in this context that interest is plainly related "to the suppression of free speech."  *FSC*, 606 U.S. at 471.  After all, SB 854 does not regulate "addiction" to *nonspeech* products like drugs or gambling.  It seeks to protect minors from alleged "addiction" to websites where they access,

engage in, and interact with *speech*. *See* Va. Code §59.1-575. The Commonwealth has no legitimate interest in restricting access to speech just because minors find it especially appealing. *See Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 576 (2011). It could not validly restrict access to Disney+ because it offers too many shows that "contain … catchy jingles," *id.* at 578, any more than it could restrict access to books that contain especially compelling stories. In *Brown*, California did not even try to justify its law on the theory that it had an interest in preventing minors from addiction to video games. 564 U.S. at 799-804. For good reason. As the Supreme Court has repeatedly made clear, "the fear that speech might persuade provides no lawful basis for quieting it." *Sorrell*, 564 U.S. at 576. Burdening access to protected speech citizens find especially interesting is especially inconsistent with the First Amendment. *Id.*; *see also* Eugene Volokh, *Addiction to Constitutionally Protected Activity: Speech, Press, and Religion*, 75 Emory L.J. __ (forthcoming 2026 (manuscript at 2-9), https://perma.cc/LFX6-XMX4.

In all events, SB 854 is not a narrowly tailored means of addressing any legitimate state interest. Even under intermediate scrutiny, SB 854 must not "burden substantially more speech than necessary to further [its] interests." *FSC*, 606 U.S. at 496-97. Unlike laws that restrict access to websites that contain content that is *unprotected* as to minors, *id.* at 470-71, SB 854 restricts "with one broad stroke" access to services that for many are valuable sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107. SB 854, for instance, would bar a 15-year-old from spending more than one hour a day on YouTube watching online church services, even if the minor does not spend time on YouTube otherwise. It would prevent a 15-year-old interested in becoming an attorney from watching proceedings in the Fourth Circuit, which streams its oral arguments live on YouTube. And it would require a 14-year-old to obtain parental consent before spending an hour watching a candidate's speech or a political debate on Facebook, even if the minor does not use social media otherwise. SB 854 also has the practical effect of hindering adults' access to those services, even though Virginia has no legitimate reason to do so. *See Ashcroft*, 542 U.S. at 663; *Reno*, 521 U.S. at 856-57. That is breathtakingly overinclusive measured against *any* interest

17

the Commonwealth could assert.

SB 854 flunks narrow tailoring in other ways as well. Virginia has "too readily forgone options that could serve its interests just as well, without substantially burdening" protected speech. *McCullen*, 573 U.S. at 490; *see Packingham*, 582 U.S. at 107. To survive intermediate scrutiny, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests." *McCullen*, 573 U.S. at 495. Parents already have ample tools at their disposal to protect minors on the Internet and social media websites should they choose to do so. *See, e.g.*, *Carr*, 789 F.Supp.3d at 1230; *Uthmeier*, 2025 WL 1570007, at *18; *Griffin*, 2025 WL 978607, at *3-5; *Bonta*, 113 F.4th at 1121; *Reyes*, 748 F.Supp.3d 1126-30; *Yost*, 716 F.Supp.3d at 560. In fact, Virginia uses such tools itself when it comes to limiting minors' access to "social media" in schools, including by restricting the use of cell phones during instruction time. *See* Va. Code §22.1-79.3:1. The Commonwealth has not explained why parents could not adopt a similar approach to limit social media use outside school. To be sure, parents may not always choose to utilize those tools how Virginia wishes they would. But to the extent Virginia's true goal is to impose "what the State thinks parents *ought* to want," that is not a permissible reason for the government to interfere with First Amendment rights. *Brown*, 564 U.S. at 804.

At bottom, SB 854 seems to be animated by Virginia's concern that minors are spending what the Commonwealth views as too much time on social media. In a word, SB 854 is an Internet-rationing statute that restricts minors in Virginia from accessing speech that their peers elsewhere may access. The Commonwealth has no legitimate interest in restricting minors' ability to access and interact with protected speech just because it thinks they are spending too much time doing so. Some minors undoubtedly spend more than one hour a day reading graphic novels, playing video games, watching movies, or binging television shows. That hardly empowers Virginia to insert itself into homes throughout the Commonwealth and second-guess the parenting choices of its residents about what content and in what quantity is appropriate for their minor children. Just as Virginia could not restrict minors from visiting the library because some might come across

18

*Fifty Shades of Grey*, or because some might spend more than one hour reading *The Hunger Games*, Virginia may not restrict minors from accessing "social media" websites because some minors may spend more time on them than the Commonwealth thinks they should.

## II.    NetChoice Is Likely To Succeed On Its Commerce Clause Claim.

NetChoice is also likely to succeed on the merits of its Commerce Clause claim. The Constitution vests Congress with the power to "regulate Commerce … among the several States." U.S. Const. art. I, §8, cl.3. This affirmative grant of power includes a "negative command, known as the dormant Commerce Clause," under which states may not directly regulate out-of-state parties' out-of-state commerce. *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995). Consistent with the Framers' "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres," *Healy v. Beer Inst.*, 491 U.S. 324, 335-36 (1989), the Supreme Court has long held that the Commerce Clause prohibits any state from "directly regulat[ing]"—that is, imposing liability based upon—conduct and transactions that take place "wholly outside the State." *Ross*, 598 U.S. at 376 n.1 (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 640, 642 (1982) (plurality opinion)). That bedrock principle applies to all arenas, but Commerce Clause concerns are heightened in this context given the interstate nature of the Internet. Congress recognized long ago that the Internet has "flourished, to the benefit of all Americans, with a minimum of government regulation." 47 U.S.C. §230(a)(4). And to "promote the continued development of the Internet," Congress declared it "the policy of the United States" to "preserve the vibrant and competitive free market that presently exists for the Internet … unfettered by Federal or State regulation." *Id.* §230(b)(1)-(2). That hands-off federal policy has worked: The Internet has grown tremendously over the past few decades, fostering "a revolution of historic proportions." *Packingham*, 582 U.S. at 105. It has facilitated trillions of dollars in commerce, provided hundreds of millions of Americans with access to information, and helped billions of people across the globe communicate almost instantaneously. State laws like SB 854 threaten to fragment the Internet—harming commerce and the free flow of information

19

alike—and creating exactly the kind of "economic Balkanization" the Constitution was designed to prevent. *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 517 (2019). Because the Internet is an inherently borderless technology, "[h]aphazard and uncoordinated state regulation can only frustrate the growth of cyberspace." *Am. Librs. Ass'n v. Pataki*, 969 F.Supp. 160, 182-83 (S.D.N.Y. 1997); *see also Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103-04 (2d Cir. 2003) (invalidating a similar law, and predicting that "the internet will soon be seen as falling within the class of subjects that are protected from State regulation because they 'imperatively demand[] a single uniform rule'"); *ACLU v. Johnson*, 194 F.3d 1149, 1160-61 (10th Cir. 1999) (similar).

As the Supreme Court has explained, while laws that regulate in-state conduct will typically pass constitutional muster even if they have indirect, out-of-state effects, state laws that "directly regulate[]" purely out-of-state transactions are another matter. *Ross*, 598 U.S. at 376 n.1. Indeed, both the Supreme Court and the Fourth Circuit have long held that laws directly regulating purely out-of-state conduct violate the Commerce Clause. *See, e.g.*, *Edgar*, 457 U.S. at 640-43 (plurality opinion) (explaining that the Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State"). In *PSINet v. Chapman*, for example, the Fourth Circuit held unconstitutional a Virginia law that prohibited Internet providers from hosting content that was explicit for minors. 362 F.3d at 239-41. The court reasoned that, "[g]iven the broad reach of the Internet, it is difficult to see how a blanket regulation of Internet material … can be construed to have only a local effect." *Id.* at 240. And in *Ass'n for Accessible Meds. v. Frosh* (*AAM*), 887 F.3d 664 (4th Cir. 2018) the Fourth Circuit held unconstitutional a Maryland law that directly regulated the prices charged in out-of-state wholesale sales of certain off-patent and generic drugs. *Id.* at 671. The court reasoned that, even though the statute's text defined the covered drugs as those "made available for sale in [Maryland]," that language did "not limit the Act's application to sales that actually occur within Maryland." *Id.* Instead, the law "target[ed] conduct that occur[red] entirely outside Maryland's borders." *Id.* Indeed, the Maryland law in *AAM* could be enforced

"against parties to a transaction that did not result in a single pill being shipped to Maryland." *Id.*

Just like the laws in *Edgar*, *Chapman*, and *AAM*, SB 854 directly regulates wholly out-of-state commercial activity. The Act covers social media websites "that conduct business in the Commonwealth or produce products or services that are targeted to residents of the Commonwealth" and that have a sufficiently large number of users nationwide. Va Code §59.1-576(A). Once that nexus is met, however, the law does not limit its reach to conduct within Virginia. It instead applies whenever Virginians access "social media platform[s]" *from anywhere*. Under its plain text, moreover, "social media platforms" (which are typically out-of-state entities) must verify parental consent (and thus the user's age) of any Virginian and/or limit their access to one hour—both out-of-state activities—regardless of whether that Virginian accesses the service from somewhere outside the Commonwealth. There is no limitation that the "use" of the covered service or the "user" must be located in Virginia. *See* Va. Code §59.1-575, 577.1(B); *see also, e.g.*, *Johnson*, 194 F.3d at 1161 (enjoining a state regulation prohibiting online distribution of content harmful to a minor because "the text of the statute itself … contain[ed] no express limitation confining it to communications which occur wholly within [the state's] borders"). SB 854 thus runs headlong into the Commerce Clause. *See Ross*, 598 U.S. at 376 n.1; *AAM*, 887 F.3d 664.

Virginia has no right to regulate wholly out-of-state activity just because it involves one of its residents. And the Commonwealth's attempts to "assert extraterritorial jurisdiction over persons or property" outside Virginia's borders through SB 854 will "offend sister States and exceed the inherent limits of the [Commonwealth's] power" if permitted to go into effect. *Shaffer v. Heitner*, 433 U.S. 186, 197 (1977). SB 854 is thus also unconstitutional under the Commerce Clause and will irreparably harm NetChoice's members.

## III.    The Other Preliminary Injunction Factors Overwhelmingly Support Maintaining The Status Quo.

The other preliminary injunction factors favor maintaining the status quo while this case is litigated to final judgment. Irreparable harm "is 'inseparably linked' to the likelihood of success on the merits," which NetChoice has shown. *Musgrave*, 553 F.3d at 298 (citation omitted). SB

854 will impose significant irrecoverable compliance costs on NetChoice's members if it takes effect. *See Pharm. Rsch. & Mfg. of Am. v. Morrisey*, 760 F.Supp.3d 439, 462 (W. Va. 2024). Moreover, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520-21 (4th Cir. 2002) (quoting same). And the harm here is not just to NetChoice's members, but to millions of Virginian minors who will be cut off from vital channels of communication, education, and self-expression that their peers in other states may still access. SB 854 will also impose burdensome age verification on millions of adults just to access protected speech. If the Attorney General is not enjoined from enforcing the law, SB 854's restrictions will cause an irreparable loss of First Amendment freedoms on a massive scale.

Not only that, but covered services will face irreparable harm from SB 854 in the form of unconstitutional extraterritorial regulation by Virginia. *See Int'l Franchise Ass'n Inc. v. City of Seattle*, 803 F.3d 389, 411-12 (9th Cir. 2015) (holding that a state law violating the Commerce Clause, among other constitutional provisions, that "put[] plaintiffs at a competitive disadvantage constitute[d] irreparable harm"). State regulations that extend beyond its borders subject national companies (especially Internet-based websites that utilize borderless technology) to a confusing and conflicting patchwork of laws, inflicting severe competitive disadvantages owing from the need to comply with varying state laws.

The harms here are especially acute because SB 854 imposes severe sanctions of up to $7,500 in civil penalties per uncorrected violation alongside reasonable costs for the investigation and attorney fees. Va. Code §59.1-584(C)-(D). And complying with SB 854's burdensome requirements would require significant changes to existing services and impose significant costs that cannot be recouped at the conclusion of this lawsuit. *See* Blumenfeld.Decl.¶¶40,47; Paolucci.Decl.¶¶28,34,38; Cleland.Decl.¶¶14-15,17-18,24. Unless the Attorney General is preliminary enjoined from enforcing SB 854 while the lawsuit proceeds, Plaintiff's members who are covered by the law will face a perilous choice between exposing themselves to massive liability for disseminating speech to minors and unverified adults, which is sufficient to chill the speech of

22

even the most stout-hearted, or taking costly and burdensome steps that will drastically curtail access to their services—all before a court decides the merits of their claims. *See Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 90 (4th Cir. 2013). These harms are both severe and irreparable.

The balance of equities and the public interest also favor an injunction. "[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Bason*, 303 F.3d at 521. In fact, "upholding constitutional rights surely serves the public interest." *Id.* And "when there is a likely First Amendment violation," the balance of equities and public interest prongs are established. *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013). As such, maintaining the status quo until the constitutional problems with SB 854 can be fully adjudicated will cause little if any harm to the Commonwealth.

## <u>CONCLUSION</u>

The Court should preliminarily enjoin the Virginia Attorney General, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing SB 854 against NetChoice's members. NetChoice respectfully requests that this Court issue a decision before January 31, 2026. While SB 854 takes effect on January 1, 2026, the law requires Attorney General Miyares to provide NetChoice members with notice and a 30-day opportunity to cure before bringing an enforcement action. *See* Va. Code §59.1-584(A). So the earliest the Attorney General can bring an enforcement action is January 31, 2026.

Respectfully submitted,

*/s/Craig Reilly*

Paul D. Clement* (Virginia Bar #37915)
Erin E. Murphy** (Virginia Bar #73254)
James Y. Xi* (D.C. Bar #1617537)
Barrett L. Anderson* (Texas Bar #24132531)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
barrett.anderson@clementmurphy.com

**application for admission forthcoming
*pro hac vice forthcoming

Craig Crandall Reilly (Virginia Bar #20942)
LAW OFFICE OF CRAIG C. REILLY
429 North Saint Asaph Street
Suite 501
Alexandria, VA 22314
(703) 549-5355
Fax: (703) 549-5355
craig.reilly@ccreillylaw.com

*Counsel for Plaintiff NetChoice*

November 21, 2025

24