# Exhibit 2

# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

| | |
|---|---|
| **NETCHOICE,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**JASON S. MIYARES, in his official capacity as Attorney General of Virginia,**<br><br>**Defendant.** | **DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

I, Denise Paolucci, declare:

1. I am the co-owner of Dreamwidth Studios, LLC, which operates the website dreamwidth.org. I have co-owned and operated Dreamwidth since the site's inception and have worked in multiple roles for the website, including as the head of the Trust and Safety team, which handles reports of abuse and violations of policy on the site, and head of product development. I make this declaration from personal knowledge and a review of Dreamwidth's records kept in the ordinary course of business.

2. **About Dreamwidth.** Dreamwidth is an open-source social networking, content management, and personal publishing website, in operation since 2009. It is a home for creative artists of all types where users can share their writing, artwork, or innermost thoughts through journals. Users can find others who create the sort of things they enjoy through communities built around hundreds of personalized topics, including geographic communities, book series, movies, sports or any other shared interests. Users can specify who can see their creations with Dreamwidth's fine-grained privacy controls. Dreamwidth, What is Dreamwidth Studios?, https://tinyurl.com/4z7wdcw8 (last visited Nov. 5, 2025).

3. For example, adults and minors alike can join groups that discuss popular TV shows like Dr. Who with other interested watchers. *See* Dreamwidth, Dr. Who Fanfiction, https://tinyurl.com/bdr65fu3 (last visited Nov. 5, 2025). They can debate politics. *See* Dreamwidth, Talk Politics, https://tinyurl.com/2y3upcfn (last visited Nov. 5, 2025). They can discuss history. Dreamwidth, History is Awesome!, https://tinyurl.com/4hrd6mm4 (last visited Nov. 5, 2025). Or they can find community support for their struggles. Dreamwidth, Anxiety Support, https://tinyurl.com/m2vne5vy (last visited Nov. 5, 2025). In short, users

can construct the type of social interactions based on groups they choose to interact with and ideas or subjects that best fit the user's interests.

4. In addition to the social interaction between users, Dreamwidth communicates with our users through the service about important topics of the day, including updates to the site and updates on the litigation Dreamwidth supports through declarations like this one. *See, e.g.*, Dreamwidth, Mississippi Site Block, Plus A Small Restriction on Tennessee New Accounts (Aug. 31, 2025), https://tinyurl.com/57fkt9dj (providing our users with an update on accessing the service in Mississippi and Tennessee). Dreamwidth does not have a mobile application: the only way to access the website is to visit the website at www.dreamwidth.org.

5. Dreamwidth diverges from many of the other social networking services by not offering many features such as an "infinite scroll" system that automatically displays additional content inline as long as the user continues scrolling. While we have extremely limited forms of content recommendation systems (users can choose to search for posts that contain specific terms) we do not display "suggested" or "related" posts when a user is viewing a post or comment. We have a single, limited form of suggesting accounts that a user might be interested in: users can visit a separate page that ranks the accounts most frequently followed by people the user follows.

6. Registering an account requires a user to choose a username, provide an email address, and explicitly agree to the provisions of our Terms of Service. Dreamwidth's registered users can create public profiles that contain multiple pieces of information about themselves; post content to their "Journal" and comment on others' posts; send direct messages to other users, in accordance with the privacy settings those users have chosen; post and comment in shared

2

    community forums known as Communities; and construct, populate, and browse a feed that presents the user with aggregated content posted by other users they have chosen to follow. Dreamwidth operates according to a set of Guiding Principles and a Diversity Statement that encapsulate our business philosophy. *See* https://tinyurl.com/3hsj6jdx; https://tinyurl.com/22ch4tnp.

7. Dreamwidth provides a number of privacy, security, and content-control features, allowing our users a high degree of control over their own data and their own online experience. Our users can choose who sees their content, restrict access to their content in multiple ways, and control the visibility of everything they post to the site, including information they choose to add to their account profile.

8. ***Business model and data sharing.*** Dreamwidth does not accept any form of advertising and does not engage in the sale, trade, or brokering of user data. Our revenue comes entirely from our freemium model, where approximately 20% of our users pay a fee to access extra services and fund the site for the approximately 80% of our active users who use the site on an unpaid basis. We do not accept payment to promote posts, change the order or priority of content, or to target content or posts to a subset of users. We do not offer any algorithmic sorting or display of user timelines that adjusts the display of content based on a prediction that a particular user will be more or less interested in a particular piece of content, and we do not collect or store the data about users' activity that would allow us to make those predictions. Our Privacy Policy (https://tinyurl.com/2ftu4cty) and Guiding Principles promise users that we will collect the minimum amount of personally identifying data about them that is necessary in order to operate the service.

9. Dreamwidth.org has approximately 4 million registered accounts, and has approximately 2 million unique visitors annually. We operate on an extremely limited budget, and are staffed by myself and the company's other co-owner, two part-time employees, and approximately 200 volunteers.

10. Creating an account is necessary to use most of the website's speech-facilitating functionality and to view much of the content, although we do not require visitors to the site to create an account. Primarily, users must create an account to *post* content and to share their expression with an audience of their choosing. Viewing content is more mixed. For example, searching for individual posts that contain certain phrases or keywords is limited to registered users only.

11. But users have a lot of control over who sees and can interact with their content. In accordance with our principles regarding individual control over account settings and content, individual users can choose to restrict visibility of their content only to specific users they have affirmatively granted access to on a per-post basis. Users can choose to restrict the visibility of contact information on their profile only to registered users, to specific users they have affirmatively granted access to the contact information, or to no one at all. Users can choose who can comment on their posts, with the options being all site visitors (including those who do not have an account), registered users only, specific users they have affirmatively granted access to comment to their posts, or no one at all.

12. In addition to the public and private post settings, the owner of a Community can also choose to restrict posts only to members of the Community, and can also either allow any registered user to join the Community to see the content posted to it or only allow registered users they have affirmatively granted access to join the Community. Visitors to the site who

have not created an account can read public posts made by specific users, access an aggregate feed of the most recent public posts made to the site, look up users who have indicated that they are interested in certain topics or keywords, or ask to be shown a random active account. The default setting for content visibility and access permissions—which apply unless a user overrides them for a particular post or for their account as a whole—are for posts to be visible to every site visitor, for registered users only to be able to comment in reply to a post, and for profile contact information to be visible only to registered users.

13. The majority of our users use the ability to change post privacy settings in their account on a per-post basis and post a mixture of publicly available and visibility-restricted content. There is no single prevailing configuration for Community accounts: our users have found a wide range of settings beneficial depending on the purpose of the Community. In any use case, whether a Journal or a Community, visitors to the site who have not registered an account are only able to access a limited subset of the speech available on the site and are only able to contribute to a small subset of discussions happening on the site. Dreamwidth does not track the amount of time per day registered users spend on our service, and we do not track the time visitors without accounts spend on our site either.

14. Dreamwidth does not deliberately target minors as an audience, and our intended audience is adults looking for a social media service that will respect their privacy. In order to ensure compliance with the Children's Online Privacy Protection Act (COPPA), however, we do collect a date of birth from all users at registration. When a user signs up for a Dreamwidth account, they must enter a username, an email address that can be verified through an automatic email link, a password, and a birthdate. The birthdate field displays a notice that "This information is required by law" and "You must enter your real birthdate." In

accordance with COPPA, we have chosen not to create a system that will verify parental consent for children under the age of 13 to maintain an account on the service. Therefore, we do not accept registration from users whose birthdate provided at registration indicates they are under 13 years old.

15. Accounts owned by users whose birthdate indicates they are under the age of 18 have further restrictions placed on those accounts for the purposes of user safety, such as the inability to view any post or account that a user or Dreamwidth itself has marked as inappropriate for viewing by minors and restricted visibility in some search results.

16. Dreamwidth does not collect address or location data of our users, at the time of account registration, login, or posting. We utilize a limited form of our network provider's geolocation service to block connections from certain countries that have been the source of elevated levels of network abuse and certain states that have passed laws requiring social media sites to conduct age verification on their users, but we do not associate that geolocation data with specific accounts and this geolocation and blocking happens before the connection even reaches us. Users are able to voluntarily provide their location information if they choose to do so in order to display it on their profile. Approximately 4,307 Dreamwidth users have chosen to voluntarily identify themselves as residents of Virginia, and at least ten of those users have provided a birthdate indicating they are under the age of 16 as of the date of execution of this declaration. Because we do not store our upstream provider's geolocation data, associate it with individual user accounts, or perform geolocation on our users once their connection reaches our site, this figure does not count users who may be located in the Commonwealth of Virginia but have not chosen to provide their location information on their profiles.

17. Because we have users located in the Commonwealth of Virginia and because the features of our site meet the definitions of "social media platform" as set forth in Virginia Code §59.1-575, it is my understanding that Dreamwidth will be required to comply with the Act. Dreamwidth "[a]llows users" to "[c]onstruct" a profile, "[p]opulate a public list of other users with whom such user shares a social connection," and "[c]reate or post content viewable by other users." *Id.* Dreamwidth, for example, permits users to create accounts where they can view and subscribe to content from other users, comment on posts, and upload their own content and posts for others to see. Visitors who do not have an account can view others' content but not post themselves.

18. Dreamwidth has adult and minor users under 16 within the Commonwealth of Virginia who likely use the website for more than one hour per day.

19. While Dreamwidth requires registered users to provide their birth dates upon signup, we do not currently have any form of age assurance or age verification, whether native to the site itself or implemented via a third-party provider, to confirm the information users provide.

20. Dreamwidth does not currently limit minors under 16 from accessing its website for more than one hour per day.

21. Dreamwidth does not currently have any method for collecting parental consent or for verifying that the person giving consent is the minors' parent.

22. And Dreamwidth does not exclusively provide email or direct messaging services. Nor does its content consist primarily of news, sports, entertainment, ecommerce, content preselected by the provider, or interactive gaming. So Dreamwidth cannot invoke SB 854's exceptions to the Act's requirements.

23. We thus cannot comply with the Act without making significant sweeping changes to the site that we do not have the resources to make and without collecting additional personally identifying data about each account that we do not currently collect. The changes the Act would require us to make to the software that runs our site would take months, if not years, of work with our current development capacity. The ongoing support burden the Act would impose upon us would also be impossible for us to meet at our current level of staffing, and we do not have the financial capacity to add more staff.

24. *Age Verification.* To the best of my knowledge, there is no technology—much less any technology available to a site with Dreamwidth's limited resources—that can identify users who are under the age of 16. The only method that can determine a user's age to a sufficient degree of confidence is to require every user, no matter what age they claim to be, to upload government-issued identification, deanonymizing themselves and jeopardizing their privacy. There is no age verification system available that is not a deanonymization and identity verification system.

25. For example, SB 854 would require Dreamwidth to identify whether each visitor to the site from the Commonwealth of Virginia, either a registered user or a visitor to the site, is a "natural person younger than 16 years of age." Va. Code §59.1-577.1(A). Biometric age estimation via facial scan remains highly inaccurate, particularly in estimating the ages of people under 18. The National Institute of Standards and Technology's (NIST) most recent survey of six available facial age estimation systems shows that, in a test population of 96,388 16-year-olds, the overall mean absolute error ranges from +2.73 years to +4.96 years. And in a test population of 97,599 15-year-olds, the overall mean absolute error ranges from +2.61 years to +5.29 years — in other words, commercially available systems

8

can label a 15-year-old as actually being anywhere from 17 to 20 years old. Even using an extremely generous definition of "success" in which an algorithmic age estimation is counted as a success if it is within 1 year of the person's actual age, whether older or younger, NIST found the success rate across 96,388 16-year-olds to be between 2.3% and 29.2%, and the success rate across 97,599 15-year-olds to be between 1.9% and 29.4%. Or, to put it differently, the least accurate age estimation algorithm available cannot identify a 15-year-old's age to be within the range of 14 to 16 years old over 98% of the time, and cannot identify a 16-year-old's age to be within the range of 15 to 17 years old over 97% of the time. Even the most accurate age estimation algorithm still cannot identify a 15-year-old's age to be within the range of 14 to 16 years old, or a 16-year-old's age to be within the range of 15 to 17 years old, over 70% of the time. *See* NIST IR 8525: Face Analysis Technology Evaluation: Age Estimation and Verification, https://tinyurl.com/aewyndsw.

26. Worse, however, is the disparity in biometric age estimation accuracy across racially based and gendered lines. Each of the algorithms NIST evaluated had significant differences in accuracy across different combinations of racial and gender groups, with each algorithm performing better or worse on a different subset of populations. For instance, looking only at the performance of estimating the age of 15-year-old girls of South Asian descent, the mean average error of each of the six algorithms NIST evaluated was $5.0 \pm 0.3$ years, $1.3 \pm 0.2$ years, $3.9 \pm 0.2$ years, $3.8 \pm 0.2$ years, $2.5 \pm 0.2$ years, and $2.3 \pm 0.3$ years. The mean average error of each of the six algorithms at estimating the age of 15-year-old boys of Eastern European descent was $2.6 \pm 0.3$ years, $-0.1 \pm 0.2$ years, $3.4 \pm 0.3$ years, $2.6 \pm 0.1$ years, $1.2 \pm 0.3$ years, and $0.1 \pm 0.2$ years. This means different combinations of racial and gender backgrounds have their ages estimated more or less accurately based solely on which

9

biometric age estimation provider a site chooses to use, leading to a disparate impact on members of protected classes.

27. Due to Dreamwidth's commitment to diversity, equality, privacy, and safety, a large number of our users are genders other than male and races other than white. For Dreamwidth to implement one of these biometric age estimation systems would not only not satisfy the requirements of SB 854 due to these systems' dismal accuracy rate at estimating age even within a year of a user's actual age — which itself is far from the precision SB 854 requires — but also disproportionately burden our audience along racial and gender lines.

28. Commercially available age verification, age assurance, and age estimation providers also charge significant fees for performing these services. The advice I have received from other sites that have integrated third party verification providers is that a site of Dreamwidth's size and traffic should expect to pay around $1 per verification. The Act does not specify whether we can perform that verification once per registered user account and store only the pass/fail response, but even if we assume doing so would comply with the law, the Act's definition of "user" is not limited to registered users only. To comply with the Act's requirements, Dreamwidth would either need to verify the age of every visitor to the site from the Commonwealth of Virginia, on every visit to the site — which could easily be a cost that exceeded our total operating budget for the year — or prevent visitors from Virginia from accessing the speech of our users without first registering an account, which both we and our users would consider a violation of our commitment to collecting the minimum amount of data about our users as possible.

29. Because we do not perform geolocation on our users, we are also unable to determine which of our users are located in Virginia. The Act will require us to choose one of three options:

either we must a) begin performing and storing geolocation data lookups on every individual user account to determine which users are located in Virginia and must undergo deanonymization and identity verification; b) deanonymize and perform identity verification on all users, no matter where they reside; or c) utilize our network provider's geolocation service to prevent any connection originating in the Commonwealth of Virginia from reaching our servers, to avoid the potential that the person using that connection is under the age of 16.

30. Because people can move at any time and can travel to states they do not reside in, a single deanonymization and identity verification at the time of account creation would be insufficient to comply with the Act. To protect against the possibility that someone under the age of 16 had moved to Virginia after creating an account, or the possibility that a Virginia resident under the age of 16 was creating an account while on vacation to another state or by using a location-concealing VPN service to enhance their online privacy, we would need to perform regular deanonymization and identity verification checks of all users. This will place a significant burden and chilling effect on the speech and conduct of every person who uses Dreamwidth's services, not only people under the age of 16 in Virginia or even only on adult Virginia residents.

31. Dreamwidth's users are extremely privacy conscious. Our users frequently cite our business practices, our commitment to refrain from selling or sharing their personal data, and our refusal to even gather any data that is not directly necessary to provide our services as the reason they have chosen to use our website. For Virginia to force us to begin collecting account-level geolocation data alone, much less to perform deanonymization and identity verification on every account, would alienate our users, violate the promises we have made

11

to them, and be contrary to our principles. We do not want to be forced to collect this data, and our users do not want to be forced to provide it to us.

32. Because of our strong commitment to privacy and anonymity, a large percentage of our userbase consists of marginalized people who experience heightened personal security concerns online. A non-exhaustive list of these groups include: (a) Russian or Chinese activists protesting their government s human rights abuses, who are comfortable using our site because we do not cooperate with their government s mandated censorship and do not require them to provide us personally identifying information that may be discoverable by their government; (b) disabled people who are looking for community or seeking to share information on their conditions; who are comfortable using our site because we do not require them to provide us personally identifying information that may be used against them by doctors, insurance companies, employers, etc. and because we employ significant effort to make sure the site is accessible to multiple conflicting disability access needs; (c) blind people who can use our site easily because of the significant effort we employ to ensure the site is one of the most screenreader-accessible products on the internet and because we minimize the steps it takes to create an account; (d) people of marginalized genders and sexualities, who are comfortable using our site because we do not accept advertising and therefore are not affected by companies who are more likely to treat LGBTQ content as age-inappropriate while heterosexual content is treated as acceptable. These groups, and many others, rely on our promise of privacy and anonymity to feel comfortable engaging in online speech. If Dreamwidth is forced to impose an identity verification requirement, it will have a significant chilling effect on these groups' willingness to engage in online speech. Our users frequently cite our commitment to preserving and defending their ability to speak

anonymously and our refusal to engage in data brokering practices as a primary reason they use Dreamwidth rather than any other service.

33. ***Compliance Burdens.*** I understand that SB 854 authorizes the Attorney General to enforce the law's requirements against covered "social media websites" that fail to comply with the law within 30 days of being notified that they are allegedly violating its requirements. Dreamwidth must therefore comply with the law's requirements or face an enforcement action. That would be very difficult for Dreamwidth to do. Dreamwidth does not have any full-time employees. In addition to myself and my co-owner, both of whom operate Dreamwidth in our spare time, we have two part-time employees. We depend on a pool of approximately 200 volunteers, all of whom donate their time to make programmatic improvements to the site, provide technical support on a peer-to-peer basis, and protect the community from spam and malicious traffic. We do not have the resources to add more employees. Because we are funded only by the users who choose to pay us, not by advertising, our budget is severely constrained and we are unable to absorb additional expenses. We do not have the capacity to build an identity verification system, and we not only do not have the financial resources to engage a third-party service to do it on our behalf but also object to that practice because it inherently involves the transfer of user data to a third party, something that is against our Guiding Principles.

34. To even try to comply with a 30-day notice from the Attorney General, Dreamwidth would have to immediately start making changes to its website to implement the burdensome age verification, parental consent, and time limitation requirements. It would be nearly impossible to make such costly changes in a short 30-day span from notice until

13

Dreamwidth would become liable for an alleged violation. But, as discussed above, Dreamwidth lacks the resources to make such changes.

35. And implementing a parental verification system poses other problems. From my twenty-two-year career in online Trust and Safety, both at Dreamwidth and at prior jobs, I know that confirming a parent-child relationship is significantly complicated, difficult to do accurately, and prone to multiple forms of "social engineering" attempts by unrelated third parties to coerce a site into disclosing protected user information. First, there is a problem of social engineering. Second, there is a problem of establishing and verifying familial relationships. For instance, because COPPA governs a website's ability to collect data on minors under the age of 13, a relatively common social engineering vector adopted by parties who maliciously wish to fool a website into closing a user's account is to write to the website and falsely claim the user is under the age of 13 and does not have parental consent to hold an account, even though the user is over the age of majority. Likewise, a relatively common social engineering vector adopted by parties who maliciously wish to obtain nonpublic information about a user's account is to write to the website and falsely claim to be the user's parent, requesting access to nonpublic data about the account.

36. Section 59.1-577.1(B) codifies these problems by requiring websites to verify parental consent to engage with the speech available on the site for more than one hour per day, and will provide malicious third parties unrelated to a user the ability to presumptively challenge the age and identity of any user. This not only creates a "heckler's veto" over any speech that proves unpopular or socially disfavored, allowing anyone the ability to force us to deanonymize any user whose speech offends someone and force them to prove that they are an adult, but will dramatically increase our support burden necessary to create and

administer the system for these age challenges. We do not have the capacity to accept this additional support burden, nor do we have the financial resources necessary to increase staffing to increase that capacity.

37. From my twenty-two-year career in online Trust and Safety, I also know that familial relationships are often far more complicated than conventional wisdom believes, and identifying which person is a minor's parent or guardian with legal decision-making authority is often not a simple task. For instance, if a minor has two divorced parents who disagree about whether their minor child should be permitted to access a website for longer than Virginia's state-imposed limitation, the website must confirm the legal relationship between the parties and the minor involved, and determine which of the people at hand has the legal decision-making authority to provide sufficient parental consent. In a particularly contentious divorce, this can require a website to review divorce decrees, examine legal paperwork, and determine the authenticity and provenance of the documents supplied to them. Because someone who lives in Virginia may have obtained their divorce from any one of the thousands of court systems across the United States, or even from another country, before moving to Virginia, this would require us to become experts in authenticating and interpreting court documents from anywhere in the world to verify which parent has legal authority to provide parental consent. We do not have the capacity to perform this authentication, nor do we have the financial resources necessary to increase staffing to increase that capacity.

38. There is also no national identity database that allows someone to verify a minor's identity, the legal relationship between a parent and a minor, or which parent has the authority to make binding decisions for a minor. So there is no way to verify a user's identity beyond

15

requiring the upload of government-issued identifying documents with corroborating photo or video confirmation, and many minors do not have photo ID. There is thus no way for a website to authenticate or verify that the documents uploaded for identity verification purposes belong to the person who is uploading them, that the person who controls the account is the same person who provided the identifying documents, or that the documents are legitimate and not a forgery. Disputes about the identity of an account holder, their age, or the legal relationship between them and the person claiming to be their parent are complex, time-consuming, costly to investigate and resolve, and unfortunately common. The Act would only increase their number. We do not have the capacity to accept this additional support burden, nor do we have the financial resources necessary to increase staffing to increase that capacity.

39. Additionally, there are technical problems with tracking the daily elapsed time a user spends on the website, particularly if tracking that time must be done accurately (as would have to be done here, given that the Act requires us to prevent access to our service after a minor spends one hour on the site). Accurately determining the time spent on the service would be difficult enough for users accessing the service while the user is logged in to their account. But the Virginia law does not distinguish between a user logged into an account versus a user who can otherwise visit the site and read the content available while logged out. Additional difficulties arise when determining whether a user is actively participating on the page while it is open. Dreamwidth is a web-only site without a mobile application, but users might have a Dreamwidth tab open in a web browser for hours, days, or weeks at a time before they return to it and actually engage with the speech available to them. As previously discussed, the issues are further complicated where the Act appears to

16

contemplate that we would need to verify minor users who are viewing the site without first registering an account, in order to impose the state-mandated time limit.

40. Because of the uncertainty and vagueness of the Act, the impossibility of determining to any degree of certainty which users are residents of Virginia without collecting additional personal data we do not currently collect, and the impossibility of determining which users are under the age of 16 without deanonymizing and forcibly identifying every user of our site, the Act will force us to err on the side of caution, require us to restrict access to the site beyond the restrictions we wish to place, require us to force our users to provide us significantly more personally-identifying data than we want to collect or they want us to have, require us to track more behavioral data than we want to track, and generally require us to place significant burdens on the speech, conduct, and anonymity of both adults and minors, all in order to avoid the possibility of the significant fines and legal action that would jeopardize our ability to continue to offer the service at all.

41. SB 854 also seemingly applies to actions taken wholly outside the Commonwealth of Virginia. I understand that the Act covers entities "that conduct business in the Commonwealth or produce products or services that are targeted to residents of the Commonwealth" and that have a sufficiently large number of users. Va Code Ann. §59.1-576(A). But once a company meets that requirement, the Act does not limit its reach to conduct within the Commonwealth. So the Act likely applies to Virginians accessing a covered entity from outside Virginia. Not only that, but the Act seemingly requires Dreamwidth's employees and volunteers wholly outside the Commonwealth to verify users' ages and parental consent as well as impose time limitations—all activities that occur outside the Commonwealth's borders.

42. If the law is allowed to take effect, we will have to determine whether it would even be possible to continue operations in Virginia under the requirements of the new law or whether to, out of fear of enforcement, restrict access to the service for some users, as we have in other states like Mississippi and Tennessee when similar laws were allowed to go into effect. Dreamwidth, Mississippi Site Block, Plus A Small Restriction on Tennessee New Accounts (Aug. 31, 2025), https://tinyurl.com/57fkt9dj. As with the similar law in Mississippi, the Walker Montgomery Protecting Children Online Act, our choice would be to block access to Dreamwidth from the Commonwealth of Virginia if the Act is allowed to take effect unchanged, rather than to contradict our operating principles.

\* \* \*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 20th day of November, 2025, in Baltimore, MD.

*Denise Paolucci*
Co-Owner, Dreamwidth Studios, LLC