**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| NETCHOICE,<br><br>        *Plaintiff*,<br><br>v.<br><br>JASON S. MIYARES, in his official capacity as Attorney General of the Commonwealth of Virginia,<br><br>        *Defendant.* | Civil Action No. 1:25-cv-02067 |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

FACTUAL BACKGROUND..............................................................................3

    A.    Social media has caused a public-health crisis among Virginia's youth .............................................................................................3

    B.    Virginia takes action to protect its children by imposing an adjustable, one-hour default per social media platform per day............................6

LEGAL STANDARD........................................................................................8

ARGUMENT ...................................................................................................10

I.    NetChoice cannot show a likelihood of success on the merits. .........................10

    A.    NetChoice lacks standing to challenge SB 854 ...................................10

        1.    NetChoice lacks associational standing because individual participation of its members is required....................................10

        2.    NetChoice lacks standing to advance the free-speech rights of Virginia's children or adults ................................11

    B.    SB 854 does not violate the First Amendment. ..................................12

        1.    SB 854 is a content-neutral time, place, and manner restriction subject to no more than intermediate scrutiny..........................13

            i.    SB 854 does not dictate the content of speech or permitted viewpoints, and it draws permissible, content-neutral lines between social media platforms and other forums...............................14

            ii.    SB 854 is not subject to strict scrutiny simply based on its use of a default time limit on exposure to platforms .............................................................17

        2.    SB 854 readily survives intermediate scrutiny .........................18

            i.    SB 854 serves the Commonwealth's significant interests in protecting its children from addiction and empowering parents. ...........................19

            ii.    SB 854 is narrowly tailored to advance the Commonwealth's interests, imposing a one-hour default rather than a total ban ............................20

            iii.    SB 854 leaves open ample alternative channels of communication...............................................23

    C.    SB 854 does not violate the dormant Commerce Clause.......................24

i

II.     The social media platforms will not suffer irreparable harm absent an injunction. ...........................................................................................................27

III.   The balance of the equities and the public interest weigh strongly against a preliminary injunction.........................................................................................29

CONCLUSION....................................................................................................................30

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Abbot v. Perez*,
585 U.S. 579 (2018)...................................................................................29

*Am. Booksellers v. Webb*,
919 F.2d 1493 (11th Cir. 1990) ..........................................................13, 14

*Am. Dairy Queen Corp. v. Brown-Port Co.*,
621 F.2d 255 (7th Cir. 1980) ....................................................................28

*Am. Fed'n of Tchrs. v. Bessent*,
152 F.4th 162 (4th Cir. 2025) .................................................8, 9, 10, 30

*Am. Hosp. Ass'n v. Harris*,
625 F.2d 1328 (7th Cir. 1980) ..................................................................29

*Ashcroft v. ACLU*,
542 U.S. 656 (2004)...................................................................................18

*Ass'n for Accessible Meds. v. Frosh*,
887 F.3d 664 (4th Cir. 2018) ....................................................................25

*Ass'n for Accessible Meds. v. Raoul*,
__ F. Supp. 3d __, 2025 WL 2764558 (N.D. Ill. Sept. 26, 2025)............25

*Brown v. Ent. Merchants Ass'n*,
564 U.S. 789 (2011)...............................................................13, 15, 21, 22

*City of L.A. Police Dep't v. United Reporting Publ'g Co.*,
528 U.S. 32 (1999).....................................................................................12

*Comput. & Commc'ns Indus. Ass'n v. Paxton*,
747 F. Supp. 3d 1011 (W.D. Tex. 2024)..............................................14, 22

*Computer & Commc'ns Indus. Ass'n v. Uthmeier*,
2025 WL 1570007 (N.D. Fla. June 3, 2025) ...........................................21

*Computer & Commc'ns Indus. Ass'n v. Uthmeier*,
2025 WL 3458571 (11th Cir. Nov. 25, 2025)...............16, 19, 20, 21, 23, 28, 29, 30

*Courthouse News Serv. v. Smith*,
126 F.4th 899 (4th Cir. 2025) ..............................................13, 14, 20, 23

*E.K. by & through Keeley v. Dep't of Def. Ed. Activity*,
__ F. Supp. 3d __, 2025 WL 2969560 (E.D. Va. Oct. 25, 2025) .............................................8

*Elrod v. Burns*,
427 U.S. 347 (1976)..............................................................................................28

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975).........................................................................................17, 22

*Free Speech Coal., Inc. v. Att'y Gen.*,
974 F.3d 408 (3d Cir. 2020)...................................................................................11

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025)................................................................................13, 18, 26

*Freedom Holdings, Inc. v. Spitzer*,
408 F.3d 112 (2d Cir. 2005).....................................................................................29

*Friends for Am. Free Enter. Ass'n v. Wal-Mart Stores, Inc.*,
284 F.3d 575 (5th Cir. 2002) ...................................................................................11

*Ginsberg v. State of N.Y.*,
390 U.S. 629 (1968)............................................................................................21

*Globe Newspaper Co. v. Superior Court*,
457 U.S. 596 (1982)............................................................................................19

*Google, Inc. v. Hood*,
822 F.3d 212 (5th Cir. 2016) ..................................................................................28

*Hebb v. City of Asheville*,
145 F.4th 421 (4th Cir. 2025) ....................................................................13, 20, 23, 24

*Hulbert v. Pope*,
70 F.4th 726 (4th Cir. 2023) .....................................................................13, 15, 16, 19

*Johnson v. Quattlebaum*,
664 F. App'x 290 (4th Cir. 2016) ..............................................................................9

*Just Puppies, Inc. v. Brown*,
123 F.4th 652 (4th Cir. 2024) ........................................................................24, 25, 26

*McCullen v. Coakley*,
573 U.S. 464 (2014)...............................................................................13, 14, 15, 20

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)..........................................................................9, 11, 14, 19, 27

iv

*N. Va. Hemp & Agric., LLC v. Virginia*,
125 F.4th 472 (4th Cir. 2023) ..................................................25

*N. Va. Hemp & Agric. LLC v. Virginia*,
700 F. Supp. 3d 407 (E.D. Va. 2023) ..........................................27

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023) ..........................................24, 25, 26, 30

*NetChoice v. Bonta*,
761 F. Supp. 3d 1202 (N.D. Cal. 2024) .......................................11

*NetChoice v. Brown*,
2025 WL 3267786 (D. Md. Nov. 24, 2025) ...................................28

*NetChoice v. Skrmetti*,
2025 WL 1710228 (M.D. Tenn. June 18, 2025).....................21, 28, 29

*NetChoice, LLC v. Bonta*,
152 F.4th 1002 (9th Cir. 2025) ..........................................11, 14

*NetChoice, LLC v. Fitch*,
2025 WL 2078435 (5th Cir. July 17, 2025).....................................21

*NetChoice, LLC v. Reyes*,
748 F. Supp. 3d 1105 (D. Utah 2024).........................................14

*New York v. Ferber*,
458 U.S. 747 (1982) ............................................................19

*Outdoor Amusement Bus. Ass'n, Inc. v. DHS*,
983 F.3d 671 (4th Cir. 2020) ..................................................11

*Packingham v. North Carolina*,
582 U.S. 98 (2017)..........................................................13, 22

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970)..............................................................24

*PSINet, Inc. v. Chapman*,
362 F.3d 227 (4th Cir. 2004) ..................................................27

*Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*,
872 F.2d 75 (4th Cir. 1989) ....................................................27

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)..........................................................14, 17

*Reno v. ACLU*,
    521 U.S. 844 (1997) ............................................................................18

*Schleifer by Schleifer v. City of Charlottesville*,
    159 F.3d 843 (4th Cir. 1998) ............................................................20

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
    467 U.S. 947 (1984) ............................................................................12

*TikTok Inc. v. Garland*,
    604 U.S. 56 (2025) ......................................................................17, 23

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ............................................................................29

*Turner Broad. Sys., Inc. v. F.C.C.*,
    512 U.S. 622 (1994) ................................................................15, 16, 17

*United States v. Hansen*,
    599 U.S. 762 (2023) ............................................................................26

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) ............................................................................18

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ......................................................................13, 19

*Warth v. Seldin*,
    422 U.S. 490 (1975) ............................................................................12

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) ........................................................................9, 26

*Williams-Yulee v. Florida Bar*,
    575 U.S. 433 (2015) ............................................................................23

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................8, 28

**Statutes**

Ark. Code § 4-88-1402 ..............................................................................6

Fla. Stat. § 501.1736 ..................................................................................6

O.C.G.A. § 39-6-2 ......................................................................................6

Ohio Rev. Code § 1349.09............................................................................6

Va. Code § 59.1-575 ....................................................................................................7, 16

Va. Code § 59.1-577.1 ..................................................................................................6, 7

Va. Code § 59.1-584 .........................................................................................................8

**Other Authorities**

82 C.J.S. Statutes § 362 (2025)..........................................................................................26

Amanda Raffoul *et al.*, *Social Media Platforms Generate Billions of Dollars in*
*Revenue from U.S. Youth: Findings from a Simulated Revenue Model*,
18 PLoS One 1 (2023) ....................................................................................................3

**INTRODUCTION**

Virginia's children are in crisis. Social media companies have designed their platforms to be addictive, and adolescents—particularly susceptible to addiction—often find themselves unable to log off. Although social media can benefit some kids in small doses, excessive screen time has contributed to never-before-seen rates of anxiety, depression, self-harm, and suicide among children. The numbers are so severe that the Biden Administration's Surgeon General declared a national public-health crisis and urged regulators to limit children's consumption of social media. Ex. A at 3–4, 15, U.S. Surgeon General's Advisory, *Social Media and Youth Mental Health* (2023) ("Advisory"). Seeing these same harms at home, Virginia's elected leaders took action to address this crisis in a considered and bipartisan manner. After careful evaluation over multiple years, with input from parents and children and also industry—some of which supported this regulation—the General Assembly unanimously passed, and the Governor signed, SB 854. This law protects children and empowers parents by requiring social media platforms to take the modest steps of verifying the age of the user and setting a default one-hour per day usage limit for children under 16 that can be adjusted by parents.

Now, NetChoice—a trade association of companies that maintain and profit from social media platforms and children's use of them—challenges the reasonable and common-sense balance struck by SB 854. NetChoice contends that SB 854 is unconstitutional primarily because it infringes on the speech of Virginia's children and, incidentally, the speech of Virginia's adults. But NetChoice can only rely on injuries to *its members* to establish standing to sue, and the vast majority of speech that occurs on social media platforms is from *the users*, not the platforms themselves. Not a single Virginian child or adult has come before this Court asking to enjoin SB 854, and NetChoice cannot speak for them or assert their First Amendment rights.

The relief NetChoice seeks is extraordinary: it attempts to mount a facial, pre-enforcement challenge to SB 854 and seeks a preliminary injunction to block a duly enacted law of Virginia before it is ever applied to anyone. To succeed on this challenge, NetChoice must surmount the high hurdle of showing SB 854 has unconstitutional applications that substantially outweigh its constitutional applications. NetChoice utterly fails in this regard; it has not shown even a single infringement on its members' constitutional rights. Despite NetChoice's hand waving at historical book bans and the like, SB 854 stops no speech whatsoever. It is a reasonable, content-neutral time, place, and manner regulation on the amount of access children have to a forum.

NetChoice bears the burden of satisfying all the preliminary injunction factors, but it falls well short. NetChoice has not shown a likelihood of success on the merits for either its First Amendment or Commerce Clause claims. As for the First Amendment, SB 854 is subject to at most intermediate scrutiny. Virginia has a significant interest in protecting its vulnerable youth from mental health issues, and the statute's parentally adjustable default is a narrowly tailored solution to the public-health crisis, ensuring that Virginia's kids and teens can still meaningfully access social media while protecting against the dangers of overuse. SB 854 also does not run afoul of the dormant Commerce Clause. The statute properly imposes limitations on the in-state offering of a product to Commonwealth residents. Nothing about that exceeds Virginia's power to regulate.

Nor has NetChoice carried its burden on the other preliminary-injunction factors. NetChoice can show no irreparable harm to its members, as it is has not shown a First Amendment violation and any costs of complying with the age-verification requirement are not irreparable as a matter of law. By contrast, Virginia suffers irreparable harm if it is not able to enforce its own public-health laws. And the public interest clearly weighs against any injunction since SB 854 protects the health of children. NetChoice suggests that a preliminary injunction is a foregone

conclusion here, because other courts (whose decisions are not binding on this Court) have enjoined other social media laws. Br. 1. But NetChoice conveniently omits those cases going the other way, and shortly after filing, the Eleventh Circuit overturned their lead case. *See infra* p. 21. NetChoice also ignores that SB 854 differs significantly from the laws considered by those other courts. This case can and should be resolved on a normal timetable and on an actual record, rather than speculation. This is the Rocket Docket, after all. Had NetChoice filed suit immediately after the law was passed, instead of waiting six months, it could have had an answer on the merits already, rather than asking for a preliminary injunction just weeks before the law takes effect.

The Constitution does not leave the Commonwealth and its parents at the mercy of social media companies to fight the ever-rising rates of anxiety and depression among Virginia's children. This Court should decline to issue a preliminary injunction, allow SB 854 to go into effect, and adjudicate the merits of this dispute in the normal course.

## FACTUAL BACKGROUND

### A.    Social media has caused a public-health crisis among Virginia's youth.

Social media is addictive to children, with complex algorithms that customize content, autoplay and infinite scrolling that ensure that a user never reaches the end of her feed, and push notifications and public validation, such as likes and shares, that keep users coming back for more. Nelson Decl. ¶ 12; Advisory at 9. Platforms profit from and encourage this addiction; the more eyes (i.e., users) that a platform has on it, and the longer those users scroll, the more the platform earns in advertising dollars. *See, e.g.*, Amanda Raffoul *et al.*, *Social Media Platforms Generate Billions of Dollars in Revenue from U.S. Youth: Findings from a Simulated Revenue Model*, 18 PLoS One 1, 1–2 (2023) (estimating that platforms make over $11 billion in ad revenue each year from young users). These addictive features work; 95% of teens use social media, and they spend,

3

on average, *nearly 5 hours a day on various platforms*. Nelson Decl. ¶¶ 11–16; Ex. B, Va. Exec. Order 33, *Establishing Cell Phone-Free Education to Promote the Health & Safety of Virginia's K-12 Students* at 1 (July 9, 2024); *see* Nelson Decl. ¶ 16 (noting that 9% of teens use their phones for 10-plus hours a day).

In moderation, social media can "have benefits for some children and adolescents," providing online communities where children can express themselves and meet others with shared interests. Advisory at 4, 6; Nelson Decl. ¶ 30. But used in excess, social media poses "a profound risk of harm to the mental health and well-being of children and adolescents." Advisory at 4. "[A]dolescence is a vulnerable period of brain development," as children are forming their "identities and sense of self-worth," gaining foundational knowledge and skills that will carry them through life, and learning how to have healthy and fulfilling relationships with peers. Advisory at 5; Nelson Decl. ¶ 13. Social media can disrupt all this. Just as children are attracted to bright colors and catchy music, they have "heightened emotional sensitivity to" social media's barrage of content and social interaction. Advisory at 5; Nelson Decl. ¶ 14. Kids stay on platforms hour after hour, looking for the next dopamine boost and not wanting to "miss[] out" on the next new trend. Advisory at 10; Nelson Decl. ¶ 12(d). This constant activity can literally rewire children's brains, causing "distinct changes" in the parts that are key to "impulse control, emotional regulation, and . . . social behavior"—changes similar to those "seen in individuals with substance use or gambling addictions." Advisory at 5, 9; Nelson Decl. ¶ 15.

The impacts of this addiction are severe. Children who spend too much time on social media suffer from "loss of sleep," higher "obesity rates," impaired "cognitive function," and lower "academic performance." Ex. C, Va. Exec. Order 43, *Empowering and Supporting Parents to Protect Their Children from Addictive Social Media & Establishment of the Reclaiming Childhood*

*Task Force* at 2 (Nov. 21, 2024); Nelson Decl. ¶ 25. The mental health harms are even more devastating. Study after study has tied social media, especially excessive use, to "lower self-esteem," "greater loneliness," "body image issues," "disordered eating," "ADHD," and higher rates of anxiety and depression. Nelson Decl. ¶ 20 (collecting studies). Those mental health disorders are now at an all-time high among Virginia's children. Ex. C, EO 43, at 2. Over 77% of Virginia teens spend more than 3 hours a day on screens, and 40% spend over 5 hours. Nelson Decl. ¶ 11. Not coincidentally, 40% "feel sad or hopeless for extended periods of time," and "one in three suffer from anxiety." *Id.*; *see* Ex. C, EO 43, at 1. "One in five has engaged in self-harm," and "20% have seriously considered suicide." Nelson Decl. ¶ 19. Children recognize that social media is harming them, but many are unable to stop using it on their own. *Id.* ¶ 28. And social media companies know that their platforms pose significant risks to children. Many offer parental controls and limit the content that young users can see; TikTok, for instance, voluntarily imposes a 60-minute daily default for its young users. Ex. D, Cormac Keenan, *New Features for Teens and Families on TikTok*, TikTok (Mar. 1, 2023). But these voluntary measures are frequently not enough for parents and kids to moderate social media use. Nelson Decl. ¶¶ 26–28.

To combat this epidemic, Virginia has engaged in broad and bipartisan efforts to protect its children. State agencies are collaborating to educate parents and children. Ex. C, EO 43, at 1. The Governor issued Executive Order No. 33 to establish cell phone-free education policies and procedures, Ex. B, EO 33, and the General Assembly followed suit by enacting restrictions on students using their cell phones during the school day. Va. Code. § 22.1-79.3:1. Governor Youngkin also established a "Reclaiming Childhood Task Force," Ex. C, EO 43, at 1; *see, e.g.*, Ex. E, Social Media & Mental Health Toolkit (2025) ("Toolkit"), the goal of which is to protect Virginia's children from the addictive nature of these platforms, return control to parents, and

"ensure that [Virginia's] future workforce, future military and future parents themselves have the best shot at living out their true purpose and potential." Ex. C, EO 43, at 3.

**B.** **Virginia takes action to protect its children by imposing an adjustable one-hour default per social media platform per day.**

The law challenged here, SB 854, is a key component of the Commonwealth's efforts. Spearheaded by Senator Schuyler VanValkenburg, a high-school teacher, the bill unanimously passed the General Assembly and was signed into law by Governor Youngkin on May 2, 2025. Over two years, the General Assembly considered the views of parents, children, and industry— including the platforms themselves—and made meaningful changes to reach a compromise. For example, the initial version proposed banning addictive feeds altogether for minors, S.B. 854 (as introduced Jan. 8, 2025), but the final bill imposes only a default time limitation, thus taking a different approach than other States.[1] Meta, which operates Facebook and Instagram and is one of NetChoice's members, publicly supported the final bill and its time-based approach. Ex. F ("This is an appropriate step forward. This is something that we can support.").

As enacted, SB 854 imposes a baseline one-hour daily default per platform for children under 16. Va. Code § 59.1-577.1 (effective January 1, 2026). Parents can increase or decrease that limit, as appropriate for their child. *Id.* This law targets the amount of time that children spend on addictive feeds and aims to reduce the likelihood that social media use will disrupt activities like school or sleep. The harms from social media, as with other addictive behaviors, have been directly linked to the amount of time spent on the platform; the more time spent scrolling, the worse the

---

[1] *Cf.*, *e.g.*, Fla. Stat. § 501.1736 (2024) (prohibiting children 13 and under from having social media accounts at all and requiring parental approval for 14- and 15-year-olds); Ark. Code § 4-88-1402 (2023) (barring all minors from opening accounts absent parental consent); O.C.G.A. § 39-6-2 (2024) (same); Ohio Rev. Code § 1349.09 (2023) (barring all children under 16 from opening accounts absent parental consent).

mental health outcomes. Nelson Decl. ¶¶ 33–34. Importantly, SB 854 does not limit what platforms children can access. It does not restrict the content that children can share or view. Nor does it limit any of the features that platforms can make available to children. SB 854 thus represents a careful balance between ensuring that minors can meaningfully access social media platforms while protecting them from the proven health harms of excessive use.

SB 854's one-hour limitation applies only to social media platforms, or "a public or semipublic Internet-based service or application" that "[c]onnects users in order to allow users to interact socially with each other within such service or application." Va. Code § 59.1-575. In particular, to be covered by the statute, a platform must allow users to:

- "[c]onstruct a public or semipublic profile for purposes of signing into and using such service or application,"
- "[p]opulate a public list of other users with whom such user shares a social connection within such service or application," and
- "[c]reate or post content viewable by other users, including content on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users."

*Id.* Forums that "exclusively provide[] email or direct messaging services" do not qualify as social media platforms "on the basis of that function alone." *Id.* The same is true for "interactive gaming" and those "that consist[] primarily of news, sports, entertainment, ecommerce, or content preselected by the provider and not generated by users"—"and for which any chat, comments, or interactive functionality is incidental to, directly related to, or dependent on the provision of such content." *Id.* Social media platforms must use "commercially reasonable methods, such as a neutral age screen mechanism," to identify young users. *Id.* § 59.1-577.1.

To be subject to the law, the social media platform must have "users in the Commonwealth," and the statute's requirements apply only to those Virginia users. Va. Code § 59.1-575; *see infra* pp. 24–25. The Attorney General has "exclusive authority" to enforce the

statute. Va. Code § 59.1-584(A), (E). Before bringing an enforcement action, the Attorney General must provide "30 days' written notice identifying the specific provisions . . . being violated." *Id.* § 59.1-584(B). If the platform cures those alleged violations within 30 days, then "no action shall be initiated[.]" *Id.* The law will go into effect on January 1, 2026.

While certain of its members supported the bill, including Meta, *see supra* p. 6, NetChoice opposed SB 854 from its inception. Ex. G, Letter from S. DelBianco & NetChoice, to Speaker Scott and Members of the Va. House of Delegates (Mar. 31, 2025). Yet it waited until November 17, six months after enactment, to file this pre-enforcement facial challenge and move for a preliminary injunction. No Virginia child or parent has joined the suit.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff seeking a preliminary injunction must prove [1] that it is likely to succeed on the merits, [2] that it is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that an injunction is in the public interest. *Id.* at 20. "The failure to show any one of the relevant factors mandates denial of the preliminary injunction." *E.K. by & through Keeley v. Dep't of Def. Ed. Activity*, __ F. Supp. 3d __, 2025 WL 2969560, at *5 (E.D. Va. Oct. 25, 2025) (Giles, J.) (cleaned up). "[S]ome requests for preliminary injunctions can be quickly resolved on just the first *Winter* factor," likelihood of success on the merits, "alone." *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 169 (4th Cir. 2025); *see also id.* at 168 n.3 (likelihood of success on the merits "refers to the party's likelihood of success in the lawsuit before the court, including both merits and jurisdictional issues"). This is especially true "when a plaintiff must prevail on several independent issues, each potentially dispositive of the case, to prevail overall." *Id.* at 169. In such

cases, the plaintiff has a "multiplicative problem" that means even if they are likely to win *each* of those issues they are unlikely to win *all* of them. *Id*. at 169–70. A "plaintiff must therefore show an extremely high likelihood of success on each individual issue in order to have a normal likelihood of success overall." *Id.* at 170. This "creates a probabilistic structure that stacks the deck against a plaintiff who must prevail on multiple independent issues to prevail overall." *Id.* at 167.[2]

In a facial challenge under the First Amendment, the hurdle to obtain a preliminary injunction is particularly high. Unlike an as-applied challenge, where an individual seeks to prevent the law from being applied to *him*, in a facial challenge, the plaintiff attempts to invalidate the law wholesale and prevent it from applying to *anyone*. A plaintiff cannot simply point to a handful of hypothetical scenarios in which the law might run up against the First Amendment. Instead, it must establish that the law's "unconstitutional applications *substantially* outweigh its constitutional ones." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723–24 (2024) (emphasis added). Courts should thus be skeptical of facial challenges. Statutes are presumed constitutional. *Johnson v. Quattlebaum*, 664 F. App'x 290, 291 (4th Cir. 2016). And "[c]laims of facial invalidity often rest on speculation about the law's coverage and its future enforcement," *Moody*, 603 U.S. at 723, risking "premature interpretation of statutes on the basis of factually barebones records," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (cleaned up). Plus, "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 451.

---

[2] The Fourth Circuit offered the following "example for clarity: If plaintiffs in a case had a 75% chance of prevailing on each of five independent issues, but they needed to prevail on *all* of them to receive relief, then their likelihood of overall success is $(0.75)5 = {\sim}24\%$. Despite being 3:1 favorites on each issue, plaintiffs are 3:1 underdogs in the case overall. The other side's odds are mirrored; despite being 3:1 underdogs on each issue, defendants are 3:1 favorites overall. The mere existence of multiple issues disfavors plaintiffs." *Id.* at 170 n.4.

**ARGUMENT**

SB 854 should not be preliminarily enjoined. NetChoice has not shown a likelihood of success on the merits, as NetChoice lacks standing and SB 854's adjustable one-hour default is not unconstitutional—much less *facially* unconstitutional—under either the First Amendment or the dormant Commerce Clause. Nor do the other equitable factors favor NetChoice. NetChoice cannot rely on minors' or adults' First Amendment rights, as they are not before this Court. And the platforms' unspecified compliance costs cannot outweigh Virginia's own irreparable harm if unable to enforce its democratically enacted law to protect the welfare of its children.

**I.      NetChoice cannot show a likelihood of success on the merits.**

NetChoice cannot show likelihood of success on the merits. It lacks associational standing to assert its members' rights, and it lacks standing to assert claims on behalf of non-parties. Moreover, SB 854 does not violate the First Amendment or the dormant Commerce Clause. *See Bessent*, 152 F.4th at 168 n.3 (likelihood of success on the merits "refers to the party's likelihood of success in the lawsuit before the court, including both merits and jurisdictional issues").

**A.      NetChoice lacks standing to challenge SB 854.**

First and foremost, NetChoice lacks standing to bring claims on behalf of either its members or non-party Virginia citizens. *See id.* ("[J]urisdictional issues like standing can be considered as part of the first *Winter* factor.").

**1.      NetChoice lacks associational standing because individual participation of its members is required.**

NetChoice may stand only on its members' own rights to provide platforms for users, but NetChoice makes only a passing attempt to assert those rights or to explain how SB 854 infringes them. That alone is enough to give this Court pause. "An association has associational standing when at least one of its identified members would otherwise have standing to sue in their own

right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Outdoor Amusement Bus. Ass'n, Inc. v. DHS*, 983 F.3d 671, 683 (4th Cir. 2020) (cleaned up). This last requirement is a problem for NetChoice in this facial attack on a law that regulates a variety of platforms, as a constitutional challenge requires member participation if "individualized information" about them is necessary to resolve the challenge. *Friends for Am. Free Enter. Ass'n v. Wal-Mart Stores, Inc.*, 284 F.3d 575, 577 (5th Cir. 2002); *see Free Speech Coal., Inc. v. Att'y Gen.*, 974 F.3d 408, 421 (3d Cir. 2020) ("[C]onferring associational standing is improper for claims requiring a fact-intensive-individual inquiry.") (cleaned up).

So it is here. NetChoice's facial challenge to SB 854 requires this Court to find facts about different platforms. According to NetChoice, SB 854 is facially unconstitutional in part because it interferes with covered platforms' "disseminat[ion]" of "third-party speech." Br. 4. But as the Supreme Court made clear in *Moody*, a platform is not necessarily engaged in protected expression simply because it disseminates speech; rather, whether such dissemination constitutes expression turns on specific facts about the platform's functions and how it transmits speech. *See* 603 U.S. at 725–26, 736 n.5. Thus, resolving NetChoice's facial challenge requires this Court to determine which, if any, applications of the statute implicate the First Amendment and then apply the appropriate level of scrutiny to each such application. *See id.* at 725–26. Both steps are fact intensive and preclude standing here. *See, e.g.*, *NetChoice v. Bonta*, 761 F. Supp. 3d 1202, 1230–31 (N.D. Cal. 2024), *affirmed in relevant part by* 152 F.4th 1002 (9th Cir. 2025).

## 2. NetChoice lacks standing to advance the free-speech rights of Virginia's children or adults.

Largely ignoring its own members, NetChoice spends much of its papers postulating that SB 854 infringes the First Amendment rights of Virginia's children, and, to a lesser extent, adults.

But at most, NetChoice can only assert the rights of its *own* members, the platforms, to disseminate their *own* speech. A plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). This "prudential" limitation on standing ensures that courts avoid premature rulings on "abstract questions of wide public significance" that "other governmental institutions may be more competent to address." *Id.* at 500. Narrow exceptions to this rule exist, but none applies here. SB 854 creates no risk that children will "refrain from constitutionally protected speech or expression" to avoid the risk of "punishment," *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956–57 (1984), because it does not target children or their parents for enforcement, criminal or otherwise. Nor does it impose any prior restraint on users' speech. SB 854 merely requires the *platforms* to set a reasonable—and easily modified—default on children's use of a single platform in a single day. *Id.* When children, their parents, and adult users face no obstacles to protecting their own interests—which might well diverge from the platforms'—the Court need not employ the "last resort" of allowing NetChoice to speak for them. *City of L.A. Police Dep't v. United Reporting Publ'g Co.*, 528 U.S. 32, 39 (1999).[3]

### B.     SB 854 does not violate the First Amendment.

NetChoice cannot show a likelihood of success on the merits on its facial First Amendment claim. SB 854 is a content-neutral statute that readily survives intermediate scrutiny. The Commonwealth has an important interest in imposing this one-hour presumptive limit per platform, to protect its children from addiction to social media and to return supervision of children's social media use to parents. And the statute is narrowly tailored to serve those purposes.

---

[3] The social media platforms—with their algorithm-driven measures to addict children—also are not situated to "satisfactorily [] frame the issues" on the children's behalf and represent their interests. *Munson*, 467 U.S. at 958.

1. **SB 854 is a content-neutral time, place, and manner restriction subject to no more than intermediate scrutiny.**

SB 854 does not regulate content, but is instead a time, place, and manner restriction. Freedom of speech, although powerful, "is not absolute." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 470 (2025). "[T]he First Amendment does not guarantee a right to [speak] at all times and places or in any manner that may be desired." *Hulbert v. Pope*, 70 F.4th 726, 733 (4th Cir. 2023) (cleaned up). The government has "leeway to regulate features of speech unrelated to its content" and to "impose reasonable restrictions on the time, place, or manner of protected speech." *McCullen v. Coakley*, 573 U.S. 464, 477 (2014). Such restrictions may "specify when, where, or how speech may be delivered." *Hulbert*, 70 F.4th at 733. When these time, place, and manner regulations are "justified without reference to the content of the regulated speech," they are subject to intermediate scrutiny and need only be "narrowly tailored to serve a significant governmental interest," and "leave open ample alternative channels for communication of the information." *Hebb v. City of Asheville*, 145 F.4th 421, 432 n.7 (4th Cir. 2025) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). These limitations are permitted in both physical forums, *see, e.g.*, *Ward*, 491 U.S. at 792 (limits on noise levels for events in public park), and in online spaces, *Courthouse News Serv. v. Smith*, 126 F.4th 899, 908 (4th Cir. 2025) (limits on access to online court records system). That includes social media platforms—the modern, online analogue to a public "street or park." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017).

The government's leeway to establish time, place, and manner regulations is even greater for speech to and from minors. The government lacks "a free-floating power to restrict the ideas to which children may be exposed," but it does have broad authority to regulate *when* and *how* that speech occurs. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 789, 794–95 (2011). "The protection of minors" is, after all, "one of government's most profound obligations." *Am. Booksellers v. Webb*,

919 F.2d 1493, 1495 (11th Cir. 1990). SB 854 is one such time, place, and manner statute. It does not limit the *type* of speech that social media platforms can share or children can access, only for *how long* it can occur each day. It does so not to shield Virginia's children from any viewpoints or subject matter, but to protect them from the addictive features of those forums.

> **i. SB 854 does not dictate the content of speech or permitted viewpoints, and it draws permissible, content-neutral lines between social media platforms and other forums.**

SB 854 is content-neutral, on its face and in effect, because it "regulate[s] features of speech unrelated to its content." *McCullen*, 573 U.S. at 477. The statute does not restrict any content "because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Instead, the statute's one-hour default applies "without reference to the content of the regulated speech." *Id.* at 164; *see Courthouse News Serv.*, 126 F.4th at 909.

Nothing about SB 854 restricts platforms' ability to decide "what third-party speech to display and how to display it" during that default time period, *Moody*, 603 U.S. at 716—again, the only speech potentially at issue here, *supra* pp. 11–13. The statute does not require platforms to block, filter, or otherwise modify the content or features they make available to children. It thus has no substantive effect on whatever "expressive product[]" platforms create when they curate and disseminate information to their users.[4] *Moody*, 603 U.S. at 716. Again, SB 854 imposes no limitation on *what* platforms can say to children; it simply regulates *how long* they can presumptively speak to them each day. That is a classic time, place, and manner restriction.

---

[4] This distinguishes SB 854 from other monitoring, filtering, or content-blocking regulations that courts have classified as content-based. *See, e.g., NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1016 (9th Cir. 2025) ("like counts"); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1036 (W.D. Tex. 2024) (monitoring and filtering requirements that "explicitly identif[ied] discrete categories of speech and single[d] them out to be filtered and blocked"); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1114–15, 1123 (D. Utah 2024) (setting certain privacy settings, restricting minors' ability to share content, and disabling certain features).

SB 854 remains content-neutral for the children using the platforms (whose rights NetChoice lacks standing to assert in the first place, *supra* pp. 11–12). SB 854 does not "decree what constitutionally protected speech minors may access." Br. 7. It does not single out any subject matter, message, or viewpoint for restriction. Children may spend their time on social media platforms however they wish, whether messaging family and friends, attending church services, engaging in politics, or using social media for less innocent purposes. Because it preserves users' freedom to engage with any content, SB 854 poses no risk of "excising certain ideas or viewpoints from the public dialogue." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994).

NetChoice recognizes as much, accepting that a State could impose a different time, place, and manner restriction by requiring concert promoters to prohibit minors from entering rock concerts their parents have forbidden them to attend. Br. 10. That is revealing. If a State may condition a child's *ability to enter* a particular forum at all on parental consent, Virginia surely may set a parentally adjustable default on the length of time a child may *remain* in a forum. SB 854 is far less restrictive than that hypothetical ban and raises none of the same concerns about suppressing speech based on content. SB 854 does not "prevent children from hearing or saying anything without their parents' prior consent." *Brown*, 564 U.S. at 795 n.3. Children remain free to access the full array of content and viewpoints available on social media; SB 854 simply conditions any expansion (or contraction) of the length of that access on parental consent.

NetChoice argues that SB 854 is nevertheless content-based because it targets platforms with "social" content while exempting platforms that publish pre-selected content. Br. 14. But States can and do impose different restrictions on different forums, speakers, and mediums as needed to remedy the specific problems at hand. *McCullen*, 573 U.S. at 480–81. SB 854 does just that by focusing solely on "how speech may be delivered" on a platform, *Hulbert*, 70 F.4th at

733—defining a covered platform based on whether it "[c]onnects users in order to allow users to interact socially with each other," and whether it allows users to construct a public or semipublic profile, populate a public list of social connections with other users within the platform, and "[c]reate or post content viewable by other users, including content on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users," Va. Code § 59.1-575. Those functional criteria are not focused on the subject matter, message, or viewpoint of the speech itself. *Hulbert*, 70 F.4th at 733.

Nor does SB 854 exempt other platforms from coverage based on the content of their speech. *Cf.* Br. 14. Rather, the exception turns on form. The statute explains that:

> No service or application that consists primarily of news, sports, entertainment, ecommerce, *or content preselected by the provider and not generated by users, and for which any chat, comments, or interactive functionality is incidental to, directly related to, or dependent on the provision of such content, or that is for interactive gaming*, shall be considered to meet this criterion on the basis of that function alone.

Va. Code § 59.1-575 (emphasis added). The exemption is content-ambivalent; it applies only when content (of any kind) is "preselected by the provider and not generated by users." Va. Code § 59.1-575. Unlike social media where "chat, comments, or interactive functions" are integral to the very purpose of the platform, the services that fall within the exemption have these interactive functions as only "incidental to," "related to," or "dependent on" the provider-preselected content. That exemption describes "a *form* of expression, not a *subject matter*." *Computer & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 3458571, at *4 (11th Cir. Nov. 25, 2025) (holding that definition of social media platform in Florida statute was content-neutral for that reason).

True, SB 854 treats social media platforms differently than other forums. But the Supreme Court has soundly rejected the notion "that the First Amendment mandates strict scrutiny for any speech regulation that applies to one medium (or a subset thereof) but not others." *Turner*, 512 U.S. at 660. "[S]uch scrutiny 'is unwarranted when the differential treatment is justified by some

special characteristic of the particular [speaker] being regulated'" and the distinction does not reflect a "content preference." *TikTok Inc. v. Garland*, 604 U.S. 56, 72–73 (2025) (quoting *Turner*, 512 U.S. at 658, 660–61). That is the case here. The General Assembly adopted the one-hour default not "because of disagreement with the message the speech conveys," *Reed*, 576 U.S. at 164, but rather to address the unique psychological and physical health risks to children posed by prolonged exposure to social media. Had the General Assembly intended to target "ideas or images that [it] thinks unsuitable" for children, *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975), it would have gone well beyond setting an easily modified time limit. Nothing about SB 854 "raise[s] suspicion" that the General Assembly's "objective was, in fact, the suppression of certain ideas." *Turner*, 512 U.S. at 660. Social media platforms employ "new technologies with transformative capabilities," creating a "challenging new context" that "counsels [judicial] caution." *TikTok*, 604 U.S. at 62. Unlike other forums, social media platforms use algorithms and other features like autoplay, infinite scrolling, and push notifications to hook users. Nelson Decl. ¶¶ 12, 14–17, 28. Those unique features pose particular dangers to children. SB 854 carefully distinguishes forums posing those risks from those that do not.[5]

     ii.       **SB 854 is not subject to strict scrutiny simply based on its use of a default time limit on exposure to platforms.**

Recognizing that SB 854 is not content-based, NetChoice retreats to asserting that SB 854 triggers strict scrutiny because of how much speech it regulates. Br. 13–14. But NetChoice fails to offer any facts that establish SB 854 will have sweeping consequences for speech. Under SB 854, children may spend a default baseline of one hour *per social media platform* each day, and parents

---

[5] NetChoice's argument that SB 854 "does not restrict access to all mediums that minors enjoy using," Br. 15, raises a tailoring argument, not a reason for applying strict scrutiny. As discussed below, *see infra* p. 23, it also glosses over the many important differences between social media platforms and other forms of media.

easily may adjust that time as they see fit. In this pre-enforcement challenge, NetChoice simply lacks a record establishing that any amount of speech will be curtailed which favors allowing this case to proceed to decision on the merits prior to issuing any relief. NetChoice's argument also misreads the law. NetChoice does not cite any decision that applied strict scrutiny to a content-neutral law based solely on amount of speech implicated. Its cited cases all addressed regulations that restricted or completely prohibited speech *because of its subject matter*. *See Ashcroft v. ACLU*, 542 U.S. 656, 661–62, 665 (2004) (statute that criminalized posting content "harmful to minors" online for commercial purposes); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 811–12, 814 (2000) ("blanket ban" on broadcasting cable television channels "primarily dedicated to sexually-oriented programming" during certain hours); *Reno v. ACLU*, 521 U.S. 844, 868 (1997) (statute criminalizing the knowing online transmission of "obscene" or "indecent" messages to minors); *see also Free Speech Coal.*, 606 U.S. at 466 (*upholding* law requiring age verification to access pornographic websites). Those decisions do not provide the framework for analyzing a content-agnostic time, place, and manner regulation like SB 854.[6]

### 2.    SB 854 readily survives intermediate scrutiny.

Because SB 854 regulates social media platforms without regard to content, the statute must satisfy no more than intermediate scrutiny. It readily does so.[7] Virginia's law allows children to access social media but places reasonable time, place, and manner restrictions on their access,

---

[6] NetChoice also asserts (lacking standing to do so, *see supra* pp. 11-12) that SB 854 burdens the First Amendment rights of adults. Br. 12. But it apparently does not argue that the statute should trigger strict scrutiny for that reason, nor could it. Just last Term, in *Free Speech Coalition*, the Supreme Court held that age-verification requirements imposed at most an "incidental burden" on adults' rights to access protected speech and warranted only intermediate scrutiny. 606 U.S. at 495. SB 854's age-verification requirements impose no greater burden on adult social media users.

[7] Indeed, the Commonwealth's interests are compelling and SB 854 would even satisfy strict scrutiny.

subject to their parents' override. The law allows children the freedom to explore social media and enjoy its benefits while guarding them from the darker sides of social media addiction. Such content-neutral regulations survive intermediate scrutiny because they are "narrowly tailored to serve a significant governmental interest" and preserve "ample alternative channels for communication." *Hulbert*, 70 F.4th at 733–34 (quoting *Ward*, 491 U.S. at 791).

i.    **SB 854 serves the Commonwealth's significant interests in protecting its children from addiction and empowering parents.**

Virginia has significant interests in protecting its children and in promoting parental control over children's social media. Like many things, social media can be harmless, even beneficial, in moderation. Nelson Decl. ¶ 30. But when overused by children, it poses "unprecedented dangers." *Moody*, 603 U.S. at 716. Study after study has linked excessive social media usage to poor mental health, Nelson Decl. ¶¶ 18–25, prompting the Surgeon General to issue a health advisory on youth social media use and calling on policymakers to "[p]ursue policies that further limit access . . . to social media for all children," Advisory at 15. Virginia adopted SB 854 to protect its children and to empower parents to do the same.

"It is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'" *New York v. Ferber*, 458 U.S. 747, 756–57 (1982) (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607 (1982)). NetChoice agrees. *See* Br. 1 ("[S]tates certainly have a legitimate interest in protecting minors."). As the Eleventh Circuit recently recognized in a challenge to Florida's social-media law, the State has a "legitimate and substantial interest in regulating young minors' use of platforms employing addictive features." *Uthmeier*, 2025 WL 3458571, at *6 (staying preliminary injunction of law prohibiting children 13 and under from having social media accounts at all and requiring parental approval for 14- and 15-year-olds ). This interest is not "plainly related 'to the suppression of free

speech,'" *cf.* Br. 16; it is to fight the youth mental health epidemic. As Governor Youngkin stated when he signed the bill, the bill will result in "[m]ore healthy, safe kids in Virginia." Ex. H, Gov. Glenn Youngkin (@GovernorVA), X (May 4, 2025, at 4:06 p.m.), https://x.com/GovernorVA/status/1919121419868213603.

The Commonwealth also has a "significant interest" in "strengthening parental responsibility for children." *Schleifer by Schleifer v. City of Charlottesville*, 159 F.3d 843, 848 (4th Cir. 1998). Putting parents in the driver's seat, the Act gives parents more tools to protect their children and to foster healthy social media usage. *See id.* (noting the bill "put[s] parents back in control").

> ii.      **SB 854 is narrowly tailored to advance the Commonwealth's interests, imposing a one-hour default rather than a total ban.**

SB 854 is narrowly tailored to serve these significant interests. A regulation is narrowly tailored when it "focuses on the source of the evils the Commonwealth seeks to eliminate while leaving untouched other [types of speech that] do not create the same evils." *Courthouse News Serv.*, 126 F.4th at 914 (cleaned up). To survive intermediate scrutiny, "[a] regulation 'need not be the least restrictive or least intrusive means of serving the government's interests.'" *Hebb*, 145 F.4th at 437 (quoting *McCullen*, 573 U.S. at 486).

SB 854 is narrowly tailored, as NetChoice does little to dispute. For one, the law's restrictions are limited to children younger than 16, the age range most susceptible to social media's pernicious effects. Nelson Decl. ¶¶ 13–15; *see* Advisory at 5 (ages 11 to 15 "is a vulnerable period of brain development [and] social media exposure during this period warrants additional scrutiny"); *accord Uthmeier*, 2025 WL 3458571, at *6. The statute is *not* a social media ban nor does it limit *how* children spend their time on social media platforms. Instead, it simply sets a one-hour default that empowers parents to allow their children to spend more (or less) time

on social media. For those teenagers who do stream Fourth Circuit arguments or attend church services online, *cf.* Br. 17, their parents can always grant them additional social media time for those activities. Parents now simply enjoy "the support of [a] law[] designed to aid discharge of that responsibility." *Ginsberg v. State of N.Y.*, 390 U.S. 629, 639 (1968); *see Brown*, 564 U.S. at 795 n.3 ("[T]he state has the power to enforce parental prohibitions[.]").

Rather than focus on SB 854, NetChoice's first line of attack is that courts around the country have enjoined purportedly similar laws. Br. 1, 11. But NetChoice ignores decisions that ruled against its position. For instance, NetChoice does not mention that the Fifth Circuit stayed pending appeal, *NetChoice, LLC v. Fitch*, 2025 WL 2078435, at *1 (5th Cir. July 17, 2025), a district court's preliminary injunction of a Mississippi social media law, 787 F. Supp. 3d 262, 269 (S.D. Miss. 2025) (statute requiring parental consent for minors to open social media accounts and requiring platforms to "prevent or mitigate" minors' exposure "to harmful material"), and the Supreme Court declined to lift that stay, 145 S. Ct. 2658 (2025); *see also NetChoice v. Skrmetti*, 2025 WL 1710228, at *9 (M.D. Tenn. June 18, 2025) (denying preliminary injunction of law requiring parental consent for minors to open social media accounts because NetChoice failed to show irreparable injury). Moreover, after NetChoice filed the present motion, the Eleventh Circuit stayed pending appeal NetChoice's lead case, a Northern District of Florida decision preliminarily enjoining a Florida law. *See* Br. 1 (citing *Computer & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007, at *1 (N.D. Fla. June 3, 2025)); *Uthmeier*, 2025 WL 3458571, at *10. In so doing, the Eleventh Circuit reasoned that Florida's "limited restrictions likely satisfy the intermediate scrutiny test for content-neutral regulations." *Uthmeier*, 2025 WL 3458571, at *10. So too here.

More importantly, even assuming those other decisions are correct, NetChoice ignores the ways in which SB 854 is different from the laws considered in those cases. SB 854 takes a different

approach, as the attached chart illustrates. *See* Ex. I (Other State Laws Chart). SB 854 does not

"cut teenagers off from this critical democratic forum of the Internet"; it merely imposes a baseline

time limit. *Computer & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d at 1037 (cleaned up)

(law requiring social media platform to prevent minors' exposure to "harmful material"). Virginia

approached the threat of social media addiction with a considered and careful approach that took

input from industry—again, even garnering the support of Meta, one of the largest social media

companies in the world. *See supra* p. 6. SB 854 is not a social media ban, nor does it muffle

children's ears to all but the speech their parents allow them to hear. Under SB 854, children still

will have the unfettered ability to speak and listen during their time on social media. NetChoice

thus cannot hide behind the other injunctions.

Virginia's law is also fundamentally different from NetChoice's trio of Supreme Court

cases. In *Brown*, California had banned minors from buying "violent video games." 564 U.S. at

789; Br. 1. And in *Erznoznik*, Jacksonville had prohibited playing movies with nudity at drive-in-

theaters. 422 U.S. at 213–14; Br. 1, 9–10. The Supreme Court struck down both content-based

statutes under strict scrutiny. Unlike California's and Jacksonville's complete *bans* based on

subject matter, Virginia's law is neither a ban nor content-based. *See supra* pp. 13–18. Virginia is

not attempting to invoke the power to restrict children's access to all but the speech for which they

have obtained their parents' prior consent. *See Brown*, 564 U.S. at 795. Nor has Virginia restricted

children's access to social media "solely to protect the young from ideas or images that a legislative

body thinks unsuitable for them." *Erznoznik*, 422 U.S. at 213–14. *Packingham* is likewise readily

distinguishable. There, the Supreme Court struck down a North Carolina criminal law prohibiting

sex offenders from accessing any social media sites. 582 U.S. at 105. Unlike the North Carolinian

sex offenders, young Virginians are not "foreclose[ed] access to social media altogether" nor

deprived of the ability to "speak[] and listen[] in the modern public square[] and otherwise explor[e] the vast realms of human thought and knowledge" available on social media. *Id.* at 107–08. Virginia's children are still presumptively entitled to one hour per day *per platform*.

NetChoice objects that Virginian parents already have the tools to monitor and regulate their children's social media usage. Br. 3, 18. But "[a] regulation 'need not be the least restrictive or least intrusive means of serving the government's interests.'" *Hebb*, 145 F.4th at 437. The General Assembly was entitled to conclude "that parental controls were not working" and that "simply offering parents a new tool . . . would not suffice when parents were not taking advantage of the tools already available." *Uthmeier*, 2025 WL 3458571, at *8. NetChoice also asserts that it makes little sense to regulate Instagram but not Disney+ or other streaming services. Br. 15. "But 'the First Amendment imposes no freestanding underinclusiveness limitation,' and the Government 'need not address all aspects of a problem in one fell swoop.'" *TikTok*, 604 U.S. at 76 (quoting *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015)). Moreover, Virginia has good reason to treat social media differently than other forms of online entertainment. The legislature, supported by medical studies, determined that binge watching *Bluey* does not pose the same mental health concerns as doomscrolling on Instagram. Nelson Decl. ¶¶ 12–15, 18–25. Unlike social media, Disney+ and other entertainment platforms are not socially interactive, nor do they trigger the addiction-developing dopamine rushes of likes, shares, or comments. *See, e.g.*, Toolkit at 5. Focusing on the source and symptoms of social media addiction, Virginia's law is narrowly tailored "to eliminate" "the source of the evil[]." *Courthouse News Serv.*, 126 F.4th at 914.

### 3. SB 854 leaves open ample alternative channels of communication.

Finally, SB 854 leaves open ample alternative means for speech for both platforms and Virginia's children. "[A]vailable alternatives need not be the speaker's first or best choice or

provide the same audience or impact for the speech." *Hebb*, 145 F.4th at 439 (quotations omitted). "The relevant inquiry is simply whether the challenged regulation provides avenues for the more general dissemination of a message." *Id.* (quotations omitted). Under SB 854, platforms can still presumptively speak to minors for an hour a day—and more if their parents choose. And minors have plenty of alternative avenues to engage in speech. Beyond their hour on Instagram and hour on TikTok each day, they can message and text friends directly (without the harmful effects of algorithms), not to mention communicate in person. And if they find an idea on social media that they want to engage with, they can turn to more traditional sources of information (like the *Washington Post*) or even other internet sites (like Wikipedia) for the wider context.

In sum, SB 854 is content-neutral, narrowly tailored, and provides for ample other speech. NetChoice cannot point to *any* unconstitutional application of the statute, much less prove that the purportedly unconstitutional applications substantially outweigh the constitutional ones. NetChoice thus has not shown a likelihood of success on its First Amendment claim.

**B.      SB 854 does not violate the dormant Commerce Clause.**

NetChoice also cannot come close to showing that SB 854 is unconstitutional under the dormant Commerce Clause, as the presumptive time limit for Virginia's children does not attempt to regulate or have an excessive impact outside the Commonwealth's borders. States have broad authority to regulate for the benefit of their citizens. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 375 (2023). But in doing so, the dormant Commerce Clause requires that States not engage in "economic protectionism" by "burdening out-of-state competitors" to "benefit in-state economic interests." *Id.* at 369; *see Just Puppies, Inc. v. Brown*, 123 F.4th 652, 665 (4th Cir. 2024). Nor can States impose burdens on interstate commerce that are "clearly excessive" to the local benefits. *Ross*, 598 U.S. at 376 n.1, 377 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970));

*see Just Puppies*, 123 F.4th at 669–70. SB 854 requires social media platforms with Virginia minor users to impose a one-hour default for those users. NetChoice does not suggest that SB 854 is discriminatory; Virginia is not attempting to favor any hometown platform. Nor does NetChoice argue that the minimal out-of-state compliance costs on the platforms exceed the significant in-state benefits to Virginians.

Instead, NetChoice frets (Br. 19) that SB 854 seeks to "*directly* regulate[] out-of-state transactions by those with *no* connection to the State." *Ross*, 598 U.S. at 376 n.1. But as the Supreme Court recently made clear, a state law does not run afoul of the dormant Commerce Clause simply because it "control[s] commerce outside the State." *Id*. at 371. After all, "[i]n our interconnected national marketplace, many (maybe most) state laws have the practical effect of controlling extraterritorial behavior." *Id.* at 374 (quotations omitted). Even assuming that NetChoice is not attempting to revive that rejected extraterritoriality test, *see id.* at 376 n.1; *Just Puppies*, 123 F.4th at 667 n.10, the extraterritorial regulation it fears is not present here. SB 854 addresses in-state transactions between platforms and Virginia residents, regulating only those with a significant connection to the Commonwealth. *See Just Puppies*, 123 F.4th at 666–67 & n.10 (upholding Maryland statute that prohibits pet stores in Maryland from selling dogs and cats to Maryland consumers); *N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 483, 496–97 (4th Cir. 2023) (upholding Virginia statute limiting hemp sales in Virginia). SB 854 is thus nothing like the price-gouging statute in *Frosh*, where the State regulated the price of drugs sold "entirely outside Maryland's borders" so long as the drugs were the kind "made available for sale in Maryland." *Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 671, 673–74 (4th Cir. 2018); *see also Ass'n for Accessible Meds. v. Raoul*, __ F. Supp. 3d __, 2025 WL 2764558, at *5 (N.D. Ill. Sept. 26, 2025), *appeal filed*, No. 25-2960 (7th Cir. Oct. 31, 2025) (explaining that *Frosh* turned

on extraterritorial impact, "a conception of the dormant Commerce Clause that the Supreme Court has now rejected"); *Just Puppies*, 123 F.4th at 667 n.10 (recognizing same).

NetChoice continues to worry that SB 854 will apply "whenever Virginians 'access social media platform[s]' *from anywhere*" in the world. Br. 21. But NetChoice has offered nothing to suggest that the Virginia Attorney General is likely to initiate an enforcement action against a platform for not imposing the default when a Virginia minor travels to Florida for vacation. The black-letter presumption, after all, is that "the legislature did not intend to give its enactment impermissible extra-territorial operation." 82 C.J.S. Statutes § 362 (2025). In enacting SB 854, Virginia has exercised its "usual legislative power . . . to act upon persons and property within the limits of its own territory." *Ross*, 598 U.S. at 375. This is exactly why caution is required at the preliminary-injunction stage. "The State has had no opportunity to implement" SB 854, "and its courts have had no occasion to construe the law in the context of actual disputes . . . , or to accord the law a limiting construction to avoid constitutional questions." *Wash. State Grange*, 552 U.S. at 450. If the Commonwealth ever attempted to enforce the law outside its borders, NetChoice could bring an as-applied challenge at that point. Unless and until that happens, SB 854 cannot be struck down in its entirety based on fretting about "hypothetical" or "imaginary" or "fanciful" applications. *Id.*; *United States v. Hansen*, 599 U.S. 762, 770 (2023).

NetChoice also complains that SB 854 and laws like it "threaten to fragment the Internet," urging that platforms should be allowed to act "with a minimum of government regulation." Br. 19. That pitch is better made to legislatures, not this Court. Congress has not preempted state regulation of the Internet. *Ross*, 598 U.S. at 368. And over the past two decades, States have recognized the need to impose key checks on platforms. Br. 19; *see, e.g.*, *Free Speech Coal.*, 606 U.S. at 465 (age-verification laws on porn sites). There is no special exception to the dormant

Commerce Clause for the Internet, and *PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004) is not to the contrary. There, the Fourth Circuit struck down a criminal statute barring porn sites from making "harmful" content available to minors because technological limitations at the time meant that "speakers have no way of preventing Virginia juveniles from accessing their Internet speech," as opposed to adult users in other States that have chosen not to impose similar limitations. *Id.* at 230, 234–35, 239–40. That was twenty years ago; the Internet has come a long way since then. *Moody*, 603 U.S. at 713–14. Today's platforms all have technology allowing them to readily identify a user's geographic location and age and provide services accordingly.

At bottom, NetChoice's argument means that no State could ever impose a regulation on social media for its residents. This Court should reject that breathtaking position. NetChoice cannot show a likelihood of success that SB 854 is unconstitutional under the dormant Commerce Clause.

## III. The social media platforms will not suffer irreparable harm absent an injunction.

Apart from the merits, NetChoice also fails on the other preliminary-injunction factors. NetChoice has not shown that it or its members will suffer irreparable harm if SB 854 goes into effect on the legislatively appointed date: January 1, 2026. Indeed, NetChoice waited half a year to file suit and, in any event, it has not demonstrated that the law will cause it any harm.

NetChoice knew of SB 854 since its consideration in the General Assembly, yet it waited over six *months* after the Governor signed it on May 2, 2025 to move for an injunction. *See Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 75, 80 (4th Cir. 1989) (a six-month "delay in seeking" a preliminary injunction, like NetChoice's here, "indicates that speedy action is not required") (cleaned up); *N. Va. Hemp & Agric. LLC v. Virginia*, 700 F. Supp. 3d 407, 427 (E.D. Va. 2023), *aff'd in relevant part*, 125 F.4th 472 (4th Cir. 2025) ("Plaintiffs' allegations of harm are undercut by the [approximately five-month] delay with which they undertook filing this

civil action to enjoin enforcement of [a state law].”). NetChoice did not need six months to prepare its case: NetChoice and its members engaged in the legislative process for SB 854, and NetChoice has been actively challenging other restrictions on minors' social media access across the country under the First Amendment. *See, e.g.*, *NetChoice v. Griffin*, 5:23-cv-05105 (W.D. Ark.), *appeal pending*, No. 25-1889 (8th Cir.); *Comput. & Commc'ns Indus. Ass'n et al. v. Uthmeier*, 4:24-cv-00438 (N.D. Fla.), *appeal pending*, No. 25-11881 (11th Cir.); *see also NetChoice v. Brown*, 2025 WL 3267786, at *1 (D. Md. Nov. 24, 2025) (noting that NetChoice has filed “approximately 22 lawsuits in 14 different states” challenging state social media laws involving minors); Ex. I (Other States Chart). If NetChoice faced true irreparable harm, it would not have waited to bring this action until mere weeks before the effective date.

In any event, NetChoice fails to point to any actual irreparable harm. For one, as shown above, neither NetChoice's nor its members' First Amendment rights have been infringed. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Uthmeier*, 2025 WL 3458571, at *9 (finding no irreparable harm when plaintiff failed to demonstrate an infringement on its First Amendment rights); *Google, Inc. v. Hood*, 822 F.3d 212, 227–28 (5th Cir. 2016) (“invocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury”). NetChoice next insists that *it* and *its members* will suffer irreparable harm because *Virginia's children* will. Br. 22. But again, SB 854 does not infringe on the First Amendment rights of Virginia's children. Even if it did, that does not give *NetChoice* an irreparable injury. A plaintiff must demonstrate that “*he*” will suffer irreparable harm, absent an injunction—not that some third party will. *Winter*, 555 U.S. at 20 (emphasis added). Irreparable injury “is not satisfied by the harm that may befall a nonparty.” *Am. Dairy Queen Corp. v. Brown-Port Co*., 621 F.2d 255, 259 n.4 (7th Cir. 1980); *see Skrmetti*, 2025 WL 1710228, at *9 (holding that “irreparable harm to [the]

users [was not] 'irreparable harm' sufficient . . . for a preliminary injunction" of Tennessee's social-media law on behalf of NetChoice).

Unable to show a First Amendment harm, NetChoice retreats to arguing that the platforms will have to expend unspecified money to comply with Virginia's law. Br. 22. But while "unrecoverable compliance costs may represent a harm—perhaps even a substantial one," "that does not mean that such harm is irreparable for purposes of the preliminary-injunction analysis." *Skrmetti*, 2025 WL 1710228, at *14. Costs incurred to comply with challenged government regulations are routinely held not to constitute irreparable injury. *See, e.g.*, *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005); *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980). NetChoice's manufactured "emergency" is no emergency at all, and neither NetChoice nor its members face any irreparable harm warranting a rush to a merits decision.

## IV. The balance of the equities and the public interest weigh strongly against a preliminary injunction.

The balance of the equities strongly favors withholding judgment on SB 854 until the Court has the benefit of a full record. That will happen soon given that this case is in the Rocket Docket. Meanwhile, an injunction will cause significant harm to the Commonwealth. Virginia is a sovereign with a strong interest in enforcing its laws. SB 854 was passed unanimously by the General Assembly with the Governor's support. If SB 854 is enjoined from going into effect, Virginia will suffer harm to its sovereignty that outweighs any compliance costs that the platforms might suffer. The "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Uthmeier*, 2025 WL 3458571, at *9 (quoting *Abbot v. Perez*, 585 U.S. 579, 602 n.17 (2018)); *accord Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025).

Public interest likewise favors allowing this law to go into effect. Anxiety, depression, self-harm, and suicide have skyrocketed among Virginia's kids and teens. Nelson Decl. ¶¶ 18–25. Yet

platforms develop ever more addictive features to keep kids scrolling, making hundreds of millions of dollars from them each year. Parents have struggled to maintain control, and children admit their inability to quit on their own. *Id.* ¶¶ 26–28. SB 854 is necessary to stem this public-health crisis. *Id.* ¶¶ 29–37. "The public . . . has an interest in the protection of children and the enforcement of [a] law that seeks to do just that." *Uthmeier*, 2025 WL 3458571, at *10. NetChoice insists that this crisis does not warrant intervention, and purports to be concerned about the free speech of Virginia's children. To be clear, NetChoice does not speak for the kids, just as casinos do not speak for gambling addicts. Not a single child or parent is before the Court asking to overturn this much-needed law.

NetChoice and its members urge this Court to find, in an emergency posture, that the platforms' pocketbooks outweigh the Commonwealth's interest in protecting its children. "In a functioning democracy, policy choices like these usually belong to the people and their elected representatives." *Ross*, 598 U.S. at 382. Virginia has found that social media addiction poses a risk to its children, and its democratically accountable representatives have resoundingly chosen to impose a reasonable time, place, and manner restriction that allows children to have meaningful access to social media while minimizing its harms. This Court should not disrupt that unanimous solution to a clear problem.

## CONCLUSION

NetChoice cannot clear the "high bar" for a preliminary injunction. *Bessent*, 152 F.4th at 169. It is not likely to succeed on the merits on any of its arguments, much less "prevail overall." *Id.* Either way, the equities and the public interest strongly favor Virginia, justifying denial on that basis alone. *Id.* The motion for preliminary injunction should be denied.

Dated: December 19, 2025

Respectfully submitted,

**JASON S. MIYARES, in his official capacity as Attorney General of the Commonwealth of Virginia**

Kevin M. Gallagher (VSB No. 87548)
*Solicitor General*
Thomas J. Sanford (VSB No. 95965)
*Deputy Attorney General*
VIRGINIA OFFICE OF THE
ATTORNEY GENERAL
202 North 9th Street
Richmond, VA 23219
T: 804.786.2071
F: 804.786.1991
kgallagher@oag.state.va.us
tsanford@oag.state.va.us

/s/ Benjamin L. Hatch
Benjamin L. Hatch (VSB No. 70116)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street
Suite 9000
Norfolk, Virginia 23510
T: 757.640.3727
F: 757.640.3947
bhatch@mcguirewoods.com

Erin B. Ashwell (VSB No. 79538)
John D. Adams (VSB No. 65203)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: 804.775.1002
F: 804.698.2002
eashwell@mcguirewoods.com
jadams@mcguirewoods.com

## CERTIFICATE OF SERVICE

I certify that on this 19th day of December, 2025, a true and correct copy of the foregoing was served on all registered counsel of record via Notice of Electronic Filing through the Court's CM/ECF system.

.                                        */s/ Benjamin L. Hatch*
                                         Benjamin L. Hatch (VSB No. 70116)