**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| NETCHOICE,<br><br>   *Plaintiff*,<br><br>  v.<br><br>JASON S. MIYARES, in his official capacity as Attorney General of the Commonwealth of Virginia,<br><br>   *Defendant*. | Case No. 1:25-cv-02067-PTG-LRV |

**PLAINTIFF'S REPLY IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................................ii

INTRODUCTION ....................................................................................................................... 1

ARGUMENT .............................................................................................................................. 2

I.     NetChoice Is Likely To Succeed On Its First Amendment Claim ..................................... 2

       A.     SB 854 Triggers Strict Scrutiny .............................................................. 2

       B.     SB 854 Cannot Survive Any Level of Heightened Scrutiny................................. 7

       C.     NetChoice Has Associational Standing .............................................................. 13

II.    NetChoice Is Likely To Succeed On Its Commerce Clause Claim................................. 17

III.   The Other Preliminary Injunction Factors Support Maintaining The Status Quo ........... 18

CONCLUSION.......................................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Am. Hosp. Ass'n v. Harris*,
    625 F.2d 1328 (7th Cir. 1980) .............................................................................. 19

*Ashcroft v. Free Speech Coal.*,
    535 U.S. 234 (2002) ............................................................................................ 15

*Ass'n for Accessible Meds. v. Frosh*,
    887 F.3d 664 (4th Cir. 2018) .............................................................................. 17

*Assoc. of Am. R.R.s v. Hudson*,
    144 F.4th 582 (4th Cir. 2025) ............................................................................. 13

*Barr v. Am. Assoc. of Pol. Consultants, Inc.*,
    591 U.S. 610 (2020) .............................................................................................. 3

*Brown v. Ent. Merch. Ass'n*,
    564 U.S. 786 (2011) ....................................................................................*passim*

*CCIA v. Paxton*,
    747 F.Supp.3d 1011 (W.D. Tex. 2024) .......................................................... 6, 20

*CCIA v. Uthmeier*,
    2025 WL 3458571 (11th Cir. Nov. 25, 2025) ..................................................... 6

*Craig v. Boren*,
    429 U.S. 190 (1976) ...................................................................................... 15, 16

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975) .............................................................................................. 2

*Est. of Van Emburgh v. United States*,
    95 F.4th 795 (4th Cir. 2024) .............................................................................. 19

*Free Speech Coal., Inc. v. Paxton*,
    606 U.S. 461 (2025) .................................................................................... 7, 9, 10

*Freedom Holdings v. Spitzer*,
    408 F.3d 112 (2d Cir. 2005) .............................................................................. 19

*Interactive Digit. Software Ass'n v. St. Louis Cnty.*,
    329 F.3d 954 (8th Cir. 2003) ............................................................................... 8

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ............................................................................................ 15

*L.A. Police Dep't v. United Rep. Pub. Corp.*,
    528 U.S. 32 (1999) ................................................................................ 16

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ..................................................................11, 12, 13

*Minneapolis Star & Trib. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983) .............................................................................. 4

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) .............................................................................. 8

*Moshoures v. City of N. Myrtle Beach*,
    131 F.4th 158 (4th Cir. 2025) ................................................................ 7

*Mountain Valley Pipeline v. W. Pocahontas Props.*,
    918 F.3d 353 (4th Cir. 2019) ................................................................ 19

*N. Va. Hemp v. Virginia*,
    700 F.Supp.3d 407 (E.D. Va. 2023) ..................................................... 20

*Nat'l Pork Prods. Council v. Ross*,
    598 U.S. 356 (2023) ............................................................................ 17

*NetChoice v. Carr*,
    789 F.Supp.3d 1200 (N.D. Ga. 2025) ............................................. 6, 18

*NetChoice v. Fitch*,
    134 F.4th 799 (5th Cir. 2025) .............................................................. 14

*NetChoice v. Fitch*,
    787 F.Supp.3d 262 (S.D. Miss. 2025) ................................................... 6

*NetChoice v. Fitch*,
    2025 WL 2078435 (5th Cir. July 17, 2025) .......................................... 6

*NetChoice v. Fitch*,
    145 S.Ct. 2658 (2025) ........................................................................... 6

*NetChoice v. Griffin*,
    2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ........................ 6, 8, 13, 18

*NetChoice v. Murrill*,
    2025 WL 3634112 (M.D. La. Dec. 15, 2025) ........................................ 6

*NetChoice v. Reyes*,
    748 F.Supp.3d 1105 (D. Utah 2024) ..................................................... 6

*NetChoice v. Yost,*
778 F.Supp.3d 923 (S.D. Ohio 2025)......................................................... 6, 8, 18

*NFIB v. OSHA,*
595 U.S. 109 (2022).................................................................................. 19

*NOVA Distro v. Miyares,*
2025 WL 3680321 (E.D. Va. Dec. 18, 2025)......................................... 20

*Outdoor Amusement Bus. Ass'n v. DHS,*
983 F.3d 671 (4th Cir. 2020).................................................................. 13

*Packingham v. North Carolina,*
582 U.S. 98 (2017)................................................................................7, 11

*Quince Orchard Valley Citizens Ass'n v. Hodel,*
872 F.2d 75 (4th Cir. 1989).................................................................... 20

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
592 U.S. 14 (2020).................................................................................. 18

*Schleifer ex rel. Schleifer v. City of Charlottesville,*
159 F.3d 843 (4th Cir. 1998).................................................................... 7

*SEAT v. Paxton,*
765 F.Supp.3d 575 (W.D. Tex. 2025)....................................................... 6

*Sec'y of State v. Joseph H. Munson Co.,*
467 U.S. 947 (1984)................................................................................ 16

*Sorrell v. IMS Health Inc.,*
564 U.S. 552 (2011).................................................................................. 8

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014)........................................................................... 17, 18

*TikTok v. Garland,*
604 U.S. 56 (2025).................................................................................. 12

*Turner Broad. Sys., Inc. v. FCC,*
512 U.S. 622 (1994).............................................................................. 4, 5

*United States v. Playboy Ent. Grp., Inc.,*
529 U.S. 803 (2000).............................................................................. 3, 12

*Va. Coal. for Immigrant Rts. v. Beals,*
2025 WL 2345822 (E.D. Va. Aug. 12, 2025)......................................... 20

iv

*Virginia v. Am. Booksellers Ass'n,*
    484 U.S. 383 (1988) ................................................................................... 14, 15, 18

*Wages & White Lion Invs., L.L.C. v. FDA,*
    16 F.4th 1130 (5th Cir. 2021) ................................................................................... 19

*Warth v. Seldin,*
    422 U.S. 490 (1975) ................................................................................... 13

*Wood v. Fla. Dep't of Educ.,*
    729 F.Supp.3d 1255 (N.D. Fla. 2024) ................................................................................... 19

**Statutes**

Ark. Code §4-88-1502(a) ................................................................................... 10

Fla. Stat. §501.1736(1)(e) ................................................................................... 6, 10

Va. Code §59.1-575 ................................................................................... 1, 3, 5, 13

**Other Authorities**

College Confidential, *The Real Deal on Applying To College,*
    https://perma.cc/39MA-J8S ................................................................................... 10

Order, *CCIA v. Att'y Gen.,*
    No. 25-11881 (11th Cir. Dec. 11, 2025) ................................................................................... 6

Roblox, *How to Make Connections,*
    https://perma.cc/3JQH-DZK8 ................................................................................... 5

*Social Media and Mental Health Toolkit* (2025),
    https://perma.cc/T492-VJQ3 ................................................................................... 13

The Trevor Project, *TrevorSpace Toolkit,*
    https://perma.cc/4N7R-H2X3 ................................................................................... 10

Xbox, *Interact With Game Posts in the Xbox Mobile App,*
    https://perma.cc/FSU8-9B96 ................................................................................... 5

## INTRODUCTION

Virginia does not seriously dispute that SB 854 restricts all manner of constitutionally protected activity. Nor could it. SB 854 restricts wide swaths of First Amendment activity—including on many websites that have no conceivable connection to any of the alleged harms the Commonwealth purports to target. Minors must obtain parental consent before spending more than an hour a day watching Fourth Circuit arguments on YouTube, debating politics on Dreamwidth, or discussing college applications on College Confidential. Virginia insists that its restrictions are not all that draconian because minors who wish to spend more than an hour a day watching, e.g., Fourth Circuit arguments may simply ask a parent for approval. But the Supreme Court has squarely held that "persons under 18 have [a] constitutional right to speak [and] be spoken to without their parents' consent." *Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 795 n.3 (2011). And while Virginia insists that its goal is to "empower[] parents," Dkt.16 ("Opp.") at 1, that is not what the statute does. Laws like SB 854 "do not enforce *parental* authority over children's speech"; they "impose *governmental* authority, subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3.

Unable to deny that SB 854 restricts speech, Virginia strains to make its law seem like a routine content-neutral time, place, and manner restriction, insisting that SB 854 leaves minors free to access whatever content and viewpoints they want on the websites covered by the law during the limited time they may access them. Opp.15. But that ignores that whether a website is covered in the first place depends on the type of *content* on the website. *See* Va. Code §59.1-575 (exempting websites that "consist[] primarily of *news*, *sports*, *entertainment*, *ecommerce*," "*interactive gaming*" content, or "*content preselected by the provider*" (emphases added)). At any rate, it is not clear why Virginia thinks that helps. Had the law at issue in *Brown* restricted access

to *all* video games (rather than just violent ones), that would have made the First Amendment problems even worse. And it beggars belief to think that California could have survived First Amendment scrutiny had it imposed a one-hour limit on playing video games instead of restricting their sale. Under Virginia's logic, it could restrict minors from spending more than one hour a day playing alluring video games on Xbox Live, watching engaging cartoons on Disney+, reading page-turning novels on Nook, or listening to captivating podcasts on Spotify—all based on its belief that such speech harms minors. The First Amendment does not give the state that remarkable—and remarkably dangerous—power.

The Court should enjoin the Attorney General from enforcing SB 854.

## ARGUMENT

### I.  NetChoice Is Likely To Succeed On Its First Amendment Claim.

#### A.  SB 854 Triggers Strict Scrutiny.

Virginia does not dispute that SB 854 triggers First Amendment scrutiny. For good reason: The Supreme Court has squarely held that "persons under 18 have [a] constitutional right to speak or be spoken to without their parents' consent." *Brown*, 564 U.S. at 795 n.3. SB 854 burdens those rights, as it prohibits minors from accessing social media websites for more than one hour a day without parental consent. Just like the law in *Brown*, SB 854 is "obviously an infringement" on the First Amendment rights of "young people and those who wish to [speak to] young people." *Id.* SB 854 "do[es] not enforce *parental* authority over children's speech." *Id.* It "impose[s] *governmental* authority, subject only to a parental veto." *Id.*; *see Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-13 (1975).

While Virginia does not dispute that First Amendment scrutiny is warranted, it insists that SB 854 triggers only intermediate scrutiny, and tries to distinguish *Brown* and *Erznoznik* on the

ground that they addressed "complete *bans* based on subject matter," whereas SB 854 imposes a time limit on access to certain speech. Opp.22. The Supreme Court has repeatedly emphasized that the "distinction between laws burdening and laws banning speech is but a matter of degree," which is why "content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000). And despite Virginia's claims to the contrary, Opp.14-17, SB 854 is content based multiple times over.

Virginia insists that SB 854 is just a content-neutral time, place, and manner restriction because minors "remain free to access the full array of content and viewpoints available" on websites covered by the law. Opp.15. But that ignores that whether a website is covered by SB 854 turns on the type of *content* on the website. Dkt.5 ("PI.Br.") at 14. A law that imposed limited hours of operation on bookstores that primarily sell self-help books, while exempting stores that primarily sell books about news or sports, would not be content neutral. So too here. SB 854 covers websites that "present[] the user with content generated by other users," but it exempts websites that "consist[] primarily of news, sports, entertainment, ecommerce," "interactive gaming" content, or "content preselected by the provider." Va. Code §59.1-575. SB 854 covers YouTube, Instagram, Reddit, Dreamwidth, and others because they do not consist primarily of news, sports, entertainment, ecommerce, interactive gaming content, or content preselected by the provider. But it exempts ESPN Fantasy Football because it consists primarily of "sports" content, Roblox and Xbox Live because they consist primarily of "interactive gaming" content, the Washington Post because it consists primarily of "news" content, and Disney+ and Hulu because they consist primarily of "content preselected by the provider." "That is about as content-based as it gets." *Barr v. Am. Assoc. of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020) (controlling plurality op.).

Virginia claims that the exemption for "content preselected by the provider" is a distinction based on "form of expression," not "subject matter." Opp.16 (emphases omitted). That does nothing to explain the exemptions for "news, sports, entertainment, ecommerce," and "interactive gaming" content, which are clearly based on "subject matter." Nor does it make any sense. The difference between content generated by users and content generated by providers is the speaker, not the form of the speech. Indeed, Virginia admits that SB 854 draws distinctions based on speaker. Opp.16-17. But the Supreme Court has repeatedly warned that "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content," *Citizens United v. FEC*, 558 U.S. 310, 340 (2010), and that laws that "discriminate among media" present especially heightened "First Amendment concerns." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 659 (1994); *see also Minneapolis Star & Trib. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983). Those concerns are on full display here, as SB 854's speaker-based distinctions unquestionably control content.

To be sure, websites focused on user-to-user speech will sometimes contain some of the same content as websites focused on provider-generated speech. But certain types of content and viewpoints are far more likely to proliferate on the former than the latter. For example, both Disney+ and YouTube might include video clips from the same documentary film. But only YouTube will include video clips from viewers critiquing the Disney-produced film and comments from viewers criticizing it. ESPN and Reddit both include content about sports. But while ESPN publishes *news* about sports, Reddit will include all sorts of other content and viewpoints about the topic—everything from memes to parodies to unfiltered discussion among fans praising their favorite teams, trashing opposing teams, and reacting to the latest highlight. Hulu and Dreamwidth might both include content related to politics. But only the latter will include the sort of diverse

viewpoints and perspectives that proliferate when users engage in debates with other users on the hottest topics of the day. *See* Paolucci.Decl.¶3. In fact, "social media" is popular in part because it provides an alternative forum for less filtered discussion of subjects and viewpoints that are not always reflected in the state's preferred mediums—e.g., "traditional sources of information (like the *Washington Post*)." Opp.24. So exempting websites that consist of provider-generated content while punishing websites that consist of user-generated content necessarily "distort[s] the market for ideas." *Turner*, 512 U.S. at 660.

Unable to deny its speaker-based discrimination, Virginia tries to justify it on the ground that "social media" websites pose "unique psychological and physical health risks to children." Opp.17. But Virginia acknowledges elsewhere that the reason it thinks "social media" websites present those risks is because of the *content* on those websites. Opp.23. According to Virginia, SB 854 applies to "social media" websites but not "Disney+ and other entertainment platforms" because the former include "*socially interactive*" content. Opp.23 (emphasis added).[1] And the declaration Virginia submitted alongside its brief asserts that "social media" websites are harmful in part because they include content expressing what "friends and classmates think" about a user's posts, "likes … and shares,'" exposure to "negative social interactions" like "cyberbullying" and "self-comparison," and "content that will garner 'lots of likes/comments.'" Nelson.Decl.¶¶13-14, 20, 24. To be clear, NetChoice strongly disputes those assertions. But they underscore that the

---

[1] That claim is more than a little ironic given the Act's carveout for "*interactive* gaming" websites, Va. Code §59.1-575 (emphasis added), which include many of the same features (e.g., "likes, shares, or comments") that supposedly make "social media" more "addiction-developing" than other websites, Opp.23. *See* Xbox, *Interact With Game Posts in the Xbox Mobile App*, https://perma.cc/FSU8-9B96 (last visited Jan. 5, 2026); Roblox, *How to Make Connections*, https://perma.cc/3JQH-DZK8 (last visited Jan. 8, 2026).

entire point of SB 854's speaker-based distinctions is to limit minors' exposure to content (and viewpoints) generated by speakers that the Commonwealth apparently distrusts.

It is thus no surprise that every court that has considered a similarly worded exemption has concluded that it is content based.[2] The Commonwealth ignores all those decisions and instead directs the Court to the Eleventh Circuit's recent divided and non-precedential preliminary stay decision in *CCIA v. Uthmeier*, 2025 WL 3458571, at *4 (11th Cir. Nov. 25, 2025). That decision is wrong, *see id.*, at *15-16 (Rosenbaum, J., dissenting), and the Eleventh Circuit will consider the merits of Florida's appeal soon enough, Order at 2, *CCIA v. Att'y Gen.*, No. 25-11881 (11th Cir. Dec. 11, 2025) (granting motion to expedite argument and disposition of the appeal on the merits). But in all events, the Eleventh Circuit's decision has little to say about whether SB 854 is content based. The stay panel expressly distinguished "other laws and accompanying district court decisions" as "entirely distinct from HB3." *Uthmeier*, 2025 WL 3458571, at *9 n.12. And though the Florida law at issue there suffers from its own content-based problems, it at least "does not contain the same plethora of exemptions" for news, sports, entertainment, ecommerce, or interactive gaming content that SB 854 contains. *Carr*, 789 F.Supp.3d at 1222 (citing Fla. Stat. §501.1736(1)(e)). Those exemptions alone suffice to subject SB 854 to strict scrutiny.

---

[2] *See, e.g.*, *NetChoice v. Murrill*, 2025 WL 3634112, at *31 (M.D. La. Dec. 15, 2025); *NetChoice v. Carr*, 789 F.Supp.3d 1200, 1219 (N.D. Ga. 2025); *NetChoice v. Griffin*, 2025 WL 978607, at *9 (W.D. Ark. Mar. 31, 2025); *NetChoice v. Yost*, 778 F.Supp.3d 923, 950-55 (S.D. Ohio 2025); *SEAT v. Paxton*, 765 F.Supp.3d 575, 592 (W.D. Tex. 2025); *CCIA v. Paxton*, 747 F.Supp.3d 1011, 1032 (W.D. Tex. 2024); *NetChoice v. Reyes*, 748 F.Supp.3d 1105, 1122 (D. Utah 2024). *NetChoice v. Fitch*, 787 F.Supp.3d 262 (S.D. Miss. 2025), also held that a similarly worded exception is content based. *Id.* at 275. While the Fifth Circuit stayed the injunction in that case pending appeal, it provided no reasoning for its decision. *See NetChoice v. Fitch*, 2025 WL 2078435, at *1 (5th Cir. July 17, 2025). And while the Supreme Court denied NetChoice's request to vacate the stay, Justice Kavanaugh noted that the "Mississippi law is likely unconstitutional." *NetChoice v. Fitch*, 145 S.Ct. 2658, 2658 (2025) (Kavanaugh, J., concurring).

**B.      SB 854 Cannot Survive Any Level of Heightened Scrutiny.**

Virginia makes no effort to justify SB 854 under strict scrutiny.  And while it insists that SB 854 satisfies intermediate scrutiny, that argument fails multiple times over even if it applied. To satisfy intermediate scrutiny, Virginia must demonstrate that SB 854 is "narrowly tailored to serve a significant governmental interest." *Packingham v. North Carolina*, 582 U.S. 98, 105-06 (2017).  Its interest must be "unrelated to the suppression of free speech." *Free Speech Coal., Inc. v. Paxton (FSC)*, 606 U.S. 461, 471 (2025).  And its chosen solution may not "burden substantially more speech than necessary to further those interests." *Id.*  SB 854 flunks that standard.

1.  Virginia argues that SB 854 serves its important interest in "promoting parental control over children's social media." Opp.19-20.  But that ignores the doubts that both the Supreme Court and the Fourth Circuit have cast on whether "punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Brown*, 564 U.S. at 802; *see also Moshoures v. City of N. Myrtle Beach*, 131 F.4th 158, 169 (4th Cir. 2025) (same).  Virginia cites a pre-*Brown* case for the proposition that it has a "significant interest" in "strengthening parental responsibility for children." Opp.20 (quoting *Schleifer ex rel. Schleifer v. City of Charlottesville*, 159 F.3d 843, 848 (4th Cir. 1998)).  But the question is not whether Virginia has a significant interest in aiding parental authority; it is whether punishing third parties for conveying speech to children is a proper way to aid that authority. *See Brown*, 564 U.S. at 802.  Accepting Virginia's view "would largely vitiate the rule that 'only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to minors,'" *id.*, and would "invite legislatures to undermine the first amendment rights of minors willy-nilly under the guise of promoting parental

authority." *Interactive Digit. Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954, 960 (8th Cir. 2003); *see also Griffin*, 2025 WL 978607, at *13; *Yost*, 778 F.Supp.3d at 956.

Virginia pivots to insisting that SB 854 serves its interest in "protecting its children from addiction" to "social media." Opp.19. But while the government may take many steps to protect minors from harm (including alleged harms related to social media), restricting all minors from accessing mediums of expression based on concerns that some minors may find them too "addicting" is not an available option. PI.Br.16-17. Virginia's asserted interest in preventing "addiction" to mediums for engaging in *protected speech* is "very much related to the suppression of free expression." *Moody v. NetChoice, LLC*, 603 U.S. 707, 740 (2024). The Supreme Court has rejected the notion that the "popular[ity]" of speech "can justify the government's attempts to stifle it." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 577-78 (2011). Just as the state may not restrict access to Disney+ because some shows contain "catchy jingles," *id.*, Virginia cannot restrict access to "social media" because it contains too many engaging "stimuli," "distractions," "rewards," "colors," and "sounds," Nelson.Decl.¶14. "That the State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers." *Sorrell*, 564 U.S. at 577-78.

Though the astounding implications of Virginia's contrary position featured prominently in NetChoice's opening brief, PI.Br.15-16, the Commonwealth has next to nothing to say in response, Opp.19-20. That is not surprising. If the government could really restrict access to mediums of expression that it deems too engaging, then it is hard to see why that power would be limited to restricting access to "social media." Virginia is hardly the first state to attempt to restrict access to new mediums of expression on the theory that they harm minors. *See Brown*, 564 U.S. at 797 (detailing historical efforts to restrict minors' access to movies, television, music lyrics, comic books, and dime novels). Under Virginia's position, states could prohibit minors from

spending more than one hour a day playing alluring video games on Xbox Live, watching engaging cartoons on Disney+, reading page-turning novels on Nook, or listening to captivating podcasts on Spotify—all based on a prediction that such speech is "addicting" and harmful. Virginia never disputes that its theory would vest the government with that remarkable (and alarming) power. *See* Opp.23 (arguing only that it "need not address all aspects of a problem in one fell swoop"). And "what is good for First Amendment rights of speech," moreover, "must be good for First Amendment rights of religion." *Brown*, 564 U.S. at 795 n.3. Under Virginia's logic, then, the government could prohibit minors from attending church or reading religious tracts for more than an hour a day without their parents' consent so long as the government believes (like some people do) that certain religions or religious practices are "addictive" and cause harm. PI.Br.17. Such laws "are obviously an infringement upon the religious freedom of young people and those who wish to [speak to] young people." *Brown*, 564 U.S. at 795 n.3.

2. In all events, SB 854 is not a narrowly tailored means of achieving any legitimate interest Virginia could assert. Virginia's law "straddles the fence" between "helping concerned parents control their children" and addressing what the Commonwealth thinks is a "serious social problem." *Brown*, 564 U.S. at 805. As a means of assisting concerned parents, SB 854 "burden[s] substantially more speech than necessary," *FSC*, 606 U.S. at 471, because "it abridges the First Amendment rights of young people whose parents" think social media is harmless, or even an affirmatively good thing for their children. *Brown*, 564 U.S. at 805. "Not all of the children who are forbidden" to spend more than an hour a day on social media without parental consent "have parents who *care* whether" they do so. *Id.* at 804. "While some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want, its entire effect

9

is only in support of what the State thinks parents *ought* to want." *Id.* That is "not the narrow tailoring to 'assisting parents' that restriction of First Amendment rights requires." *Id.*

As a means of protecting minors from alleged "addiction," SB 854 likewise "burden[s] substantially more speech than necessary." *FSC*, 606 U.S. at 471. SB 854 restricts access to all manner of protected First Amendment activity that has no conceivable connection to any of the harms the Commonwealth purports to target. PI.Br.17-18. And unlike other state laws, SB 854 does not even try to confine its reach to websites on which minors spend a significant amount of time,[3] or utilize particular features that the Commonwealth thinks are "addictive."[4] SB 854 appears to sweep in everything from LinkedIn to Dreamwidth to messaging boards on College Confidential (a community for current and aspiring college students), *see* College Confidential, *The Real Deal on Applying To College*, https://perma.cc/39MA-J8SE (last visited Jan. 3, 2026), and Trevor Space (a community for LGBTQ individuals ages 13-24), *see* The Trevor Project, *TrevorSpace Toolkit*, https://perma.cc/4N7R-H2X3 (last visited Jan. 3, 2026), even though there is no basis to think that those websites pose any of the Commonwealth's "addiction" concerns. LinkedIn hardly includes the kind of content that minors typically find "addicting," and Dreamwidth does not even offer a mobile app, *see* Paolucci Decl.¶4. Messaging boards, moreover, do not typically include the sorts of features that (according to Virginia) may lead to "excessive social media usage," Nelson.Decl.¶22; *see* Paolucci.Decl.¶5. In short, SB 854 flunks narrow tailoring because its "wide sweep precludes access to a large number of websites that are most

---

[3] *See* Fla. Stat. §501.1736(1)(e) (limiting reach to websites on which a percentage of minors "spend on average 2 hours per day or longer").

[4] *See* Fla. Stat. §501.1736(1)(e) (limiting reach to websites that utilize "[i]nfinite scrolling," "[p]ush notifications," etc.); Ark. Code §4-88-1502(a) (prohibiting the use of "a design, algorithm, or feature" that "causes a user to … [d]evelop or sustain an addiction").

unlikely" to trigger Virginia's stated concerns. *Packingham*, 582 U.S. at 114 (Alito, J., concurring).

The Commonwealth insists that SB 854 is narrowly tailored because it does not ban access altogether, but instead imposes a default one hour limit that parents can override. Opp.20. But Virginia does not dispute that the default one hour limit still restricts minors (and adults, who must now prove their age) from accessing wide swaths of entirely innocuous speech on a wide range of services. For instance, the Act would prohibit a minor from participating in church services on YouTube for more than an hour without parental consent. It would prevent a minor from watching a candidate's launch announcement on X for more than an hour without parental consent. And it would prevent a minor from spending more than an hour a day debating politics on Dreamwidth, discussing college applications on talk.collegeconfidential.com, or engaging with like-minded individuals on trevorspace.org without parental consent. While Virginia insists that teenagers can always ask their parents to "grant them additional social media time for those activities," Opp.20-21, that does not help minors who have parents that are not available or willing to provide consent. Indeed, that is why *Brown* rejected the notion that the government may "prevent children from hearing or saying anything *without their parents' prior consent*." 564 U.S. at 795 n.3.

On top of that, Virginia has "too readily forgone options that could serve its interests just as well, without substantially burdening" protected speech. *McCullen v. Coakley*, 573 U.S. 464, 490 (2014). True, the government does not have to utilize the "least restrictive … means" of achieving its interests to survive intermediate scrutiny. Opp.23. But it still bears the burden of showing "that it seriously undertook to address the problem with less intrusive tools readily available to it," and that "alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 573

U.S. at 494-95. The Commonwealth has fallen short of that bar. SB 854 contains no factual findings suggesting that the many existing tools that parents already have at their disposal (including tools that limit the amount of time minors may spend on "social media") are ineffective. *See TikTok v. Garland*, 604 U.S. 56, 78 (2025) (per curiam) (noting that the government's chosen means should be "grounded on reasonable factual findings supported by evidence that is substantial for a legislative determination"). Nor has the Commonwealth identified any discussion of existing parental tools or their efficacy in the legislative record. Virginia's attempt to backfill that deficiency via two short paragraphs in one of its declarations does not suffice. *See* Nelson.Decl.¶¶26-27. To the extent Virginia thinks not enough parents "know about" the "optional features offered by platforms," Nelson.Decl.¶27, it must explain why a campaign promoting them would be ineffective. *See Playboy*, 529 U.S. at 823.

To the extent Virginia fears that efforts to "implement controls" may "lead to family conflict," Nelson.Decl.¶27, it is not clear how SB 854 is supposed to help. If anything, requiring minors to ask their parents for permission every time they wish to spend more than an hour a day on everything from YouTube to LinkedIn to Dreamwidth to messaging boards on talk.collegeconfidential.com and trevorspace.org would seem to exacerbate "family conflict." And even if the "voluntar[y] controls" already offered by websites are ineffective, Nelson.Decl.¶26, Virginia does not explain (whether in its brief, declarations, or exhibits) why parents cannot just refuse to give minors Internet-connected devices in the first place. After all, Virginia itself bans minors from using smartphones during instruction time in schools. PI.Br.18; Opp.Ex.B. Though NetChoice made this point in its opening brief, PI.Br.18, Virginia makes no effort to explain why parents cannot adopt a similar approach to limit social media use outside of school. Indeed, Virginia's own "Social Media and Mental Health Toolkit" recommends that

parents impose "daily limits" and "screen-free zones." *Social Media and Mental Health Toolkit* 3-4 (2025), https://perma.cc/T492-VJQ3. Virginia nowhere explains why it would promote such measures if using them "would fail to achieve [its] interests." *McCullen*, 573 U.S. at 495.

### C.  NetChoice Has Associational Standing.

1. With no good argument on the merits, Virginia resorts to a strained argument that NetChoice lacks associational standing. While it does not (and cannot) dispute that NetChoice's members—who are the object of Virginia's regulation—have Article III standing, it insists that NetChoice lacks associational standing because its First Amendment challenge "requires the participation of individual members in the lawsuit." Opp.11. But NetChoice seeks declaratory and injunctive relief holding SB 854 unconstitutional, not damages or any other individualized remedy. *See Warth v. Seldin*, 422 U.S. 490, 515-16 (1975). The Fourth Circuit has repeatedly recognized that associational standing is typically appropriate "for trade associations when an injunction would benefit many of their members," *Outdoor Amusement Bus. Ass'n v. DHS*, 983 F.3d 671, 683 (4th Cir. 2020), which Virginia does not deny would be the case here. Resolving NetChoice's First Amendment claim, moreover, would not require a "fact-intensive inquiry" or "proofs particular to individual members." *Assoc. of Am. R.R.s v. Hudson*, 144 F.4th 582, 593 (4th Cir. 2025). NetChoice's principal argument is that SB 854 is facially unconstitutional because it restricts *users* from accessing websites where they engage in speech. The only member-specific information the Court needs to address that argument is whether "users engage in protected speech on all the platforms that are arguably within the Act's proscription." *Griffin*, 2025 WL 978607, at *7. There is no dispute that they do, as the Act regulates only websites that allow users to "[c]reate or post content viewable by other users," Va. Code §59.1-575—i.e., engage in speech.

To be sure, NetChoice *also* maintains that SB 854 restricts the First Amendment rights of covered websites to disseminate speech to their users. But the Court does not even need to address that argument since, unlike in *Moody*, where the plaintiffs were relying *solely* on their own First Amendment rights, NetChoice is relying on the rights of its members' users, which are undisputed. And even if the Court wants to address that argument, all it would need to know to do so is whether NetChoice members covered by the Act engage in First Amendment activity when disseminating third-party speech. The declarations NetChoice submitted suffice to establish that they do. Cleland.Decl.¶19; Paolucci.Decl.¶4; Blumenfeld.Decl.¶41. It is not even clear that Virginia disputes those attestations, but to the extent it does, resolving those disputes certainly would not require excessive member participation. While Virginia claims that *Moody* requires "specific facts about [a] platform's functions" to determine whether it engages in First Amendment activity, Opp.11, it ignores that the Supreme Court had no trouble determining that Meta and Google engage in First Amendment activity when disseminating third-party speech on Facebook's News Feed and YouTube's Homepage, even though neither Meta nor Google was a party to that lawsuit. 603 U.S. 733-43. That is proof positive that any disputes about the First Amendment rights of NetChoice's members are not too "fact intensive" to necessitate their participation as parties. Opp.11.

2. Implicitly recognizing that its claims of member-specific disputes are a red herring, Virginia argues that NetChoice cannot assert the First Amendment rights of its members' users. Every court that has considered that argument has rejected it. *See, e.g.*, *NetChoice v. Fitch*, 134 F.4th 799, 805-07 (5th Cir. 2025). Rightly so: Decades of precedent forecloses it.

Start with *Virginia v. American Booksellers Association*, 484 U.S. 383 (1988). There, organizations of booksellers and two bookstores brought a pre-enforcement First Amendment challenge to a Virginia statute that made it unlawful for booksellers to knowingly display explicit

material to minors. *Id.* at 387-88 & n.3. Virginia argued that the plaintiffs lacked standing to bring their First Amendment challenge because they asserted only the "rights of bookbuyers." *Id*. at 392-93. The Supreme Court disagreed. While "the usual rule is that a party may assert only a violation of its own rights," in "the First Amendment context '[l]itigants … are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Id.* The Court therefore had no problem with the booksellers who were regulated by the law "alleg[ing] an infringement of the First Amendment rights of bookbuyers." *Id.* at 388 n.3, 393 & n.6.

*American Booksellers* hardly stands alone. The plaintiffs in *Brown* were organizations that represented the video game and software industries, not minors asserting a First Amendment right to purchase video games without their parents' consent. 564 U.S. at 789-90. Although the Court did not specifically address standing, it allowed the association plaintiffs to assert the First Amendment rights of minors and repeatedly emphasized their rights in striking down California's law. *Id.* at 795 n.3, 805; *see, e.g.*, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 252-53 (2002).

Even outside the First Amendment context, the Court has repeatedly held that plaintiffs who have Article III standing in their own right may "litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). In *Craig v. Boren*, for example, the Court held that a beer vendor could assert the equal-protection rights of her underage male customers in a challenge to the constitutionality of a law that prohibited the sale of 3.2% beer to men under 21 and women under 18. 429 U.S. 190, 195 (1976). The Court explained that the vendor was "entitled to assert those concomitant rights of third parties that would be 'diluted or

adversely affected' should her constitutional challenge fail and the statutes remain in force." *Id.* at 195. The same reasoning applies here. SB 854 directly regulates NetChoice's members, so their own standing is undisputed. And the "threatened imposition of governmental sanctions" will require them to restrict users from accessing their services, thereby "result[ing] indirectly in the violation of third parties' rights." *Id.* NetChoice members may therefore "act[] as advocates of the rights of third parties who seek access to their market or function." *Id.*

Virginia's cases are not to the contrary. *Los Angeles Police Department v. United Reporting Public Corporation*, 528 U.S. 32 (1999) held that the plaintiff could not raise the First Amendment rights of its potential customers because there was "no possibility that [customers'] protected speech will be muted" under the challenged statute. *Id.* at 40-41. Here, by contrast, enforcement of SB 854 against NetChoice members would unquestionably restrict the First Amendment rights of their users; indeed, that is the whole point. And *Secretary of State v. Joseph H. Munson Co.*, 467 U.S. 947 (1984), held that the plaintiff *had* standing to assert the First Amendment rights of its clients. How that case helps the Commonwealth, it does not explain. To the extent Virginia's argument is that NetChoice may assert the First Amendment rights of users only if a statute "target[s] [users] for enforcement," Opp.12, that cannot be squared with *American Booksellers*. The Virginia law there did not "target [bookbuyers] for enforcement." Opp.12. It imposed obligations on *booksellers*. Yet the Court still held that the bookseller associations could assert the rights of bookbuyers. Finally, Virginia suggests (in a footnote) that "social media platforms" are "not situated" to represent their users' First Amendment interests because some minors may agree with SB 854. Opp.12 n.3. But the same could be said whenever a vendor invokes its customers rights; some customers in *Craig* may well have approved of Oklahoma's differing age restrictions

on the sale of alcohol, but that did not prevent the vendor from asserting the interests of customers who wanted to purchase beer but could not.

## II.    NetChoice Is Likely To Succeed On Its Commerce Clause Claim.

As for the Commerce Clause, Virginia does not seriously deny that SB 854 directly regulates wholly out-of-state commercial activity on its face.  Opp.26.  Nor could it.  By its plain terms, SB 854 requires "social media" websites to restrict Virginia minors from accessing their websites even if the minor is physically located in a different state.  PI.Br.21.  In other words, YouTube must restrict a Virginia minor from watching YouTube for more than an hour a day even if the minor is visiting a friend in Maryland or on vacation in California.  PI.Br.21.

The Commonwealth does not actually dispute that SB 854 so requires, or that applying the statute in that manner would violate the Commerce Clause.  Opp.26.  Nor could it, as the Fourth Circuit has squarely held that laws that directly regulate out-of-state activity are unconstitutional. *See Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 674 (4th Cir. 2018).  Virginia makes a passing suggestion that *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023), did away with the ban on direct regulation of out-of-state activity.  Opp.25.  But it does not engage at all with NetChoice's explanation of why that claim is wrong, as *Ross* concerned a law that regulates only *in*-state conduct.  *See* PI.Br.20-21.

Virginia instead insists that NetChoice's challenge is premature because "nothing … suggest[s] that the Virginia Attorney General is likely to initiate an enforcement action against a platform for not imposing the default when a Virginia minor travels to Florida for vacation," and that NetChoice members must wait for the Attorney General to bring such a suit before seeking relief.  Opp.26.  But plaintiffs need not wait for an enforcement action to challenge an unconstitutional law.  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014).  They

have standing to bring a pre-enforcement challenge so long as they face a "credible threat of enforcement." *Id.* at 159. Tellingly, Virginia never denies that it could bring such an enforcement action under SB 854 or disclaims any intention of doing so. Opps.26. Because Virginia "has not suggested that the newly enacted law will not be enforced" in this manner, NetChoice members have an "actual and well-founded fear that [it] will." *Am. Booksellers*, 484 U.S. at 393. At a minimum, the Court should enjoin the Attorney General from applying SB 854 outside Virginia.

### III. The Other Preliminary Injunction Factors Support Maintaining The Status Quo.

On the equities, Virginia has nothing to say about the First Amendment harms to NetChoice members. It just asks this Court to ignore the harm to the millions of minors its law will impact by positing that "[i]rreparable injury 'is not satisfied by the harm that may befall a nonparty.'" Opp.28. Whatever purchase that principle has as a general matter, it has no role to play when it comes to the loss of First Amendment rights that the plaintiffs have standing to assert. *See supra* I.C. The Supreme Court's decision in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020), illustrates the point. There, the Court granted an injunction pending appeal prohibiting New York from enforcing an executive order imposing occupancy restrictions on houses of worship during the COVID-19 pandemic. In finding irreparable harm, the Supreme Court did not mention the First Amendment rights of the church or the synagogue—the only plaintiffs in the case. *Id.* at 19. The Court instead focused exclusively on the First Amendment rights of *third parties*—namely, Catholics who wished to "receive communion" and "attend Mass on Sunday," and Jews who wished to "attend … services in a synagogue on Shabbat." *Id.* It is thus no surprise that courts have routinely relied on the First Amendment rights of NetChoice members' users in finding irreparable harm in comparable cases. *See, e.g.*, *Carr*, 789 F.Supp.3d at 1232-33; *Yost*, 778 F.Supp.3d at 958; *Griffin*, 2025 WL 978607, at *17.

As for compliance costs, while Virginia declares that "[c]osts incurred to comply with challenged government regulations are routinely held not to constitute irreparable injury," Opp.29, it does not deny that the compliance costs at issue here could not be recouped, *see Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021), or that unrecoverable compliance costs can constitute irreparable harm. Having failed to offer any explanation for why the unrecoverable compliance costs NetChoice detailed in its declarations are not irreparable, Virginia has forfeited any such argument. *See Est. of Van Emburgh v. United States*, 95 F.4th 795, 800 (4th Cir. 2024). In all events, there is no argument Virginia could have made. Courts routinely consider unrecoverable compliance costs in finding irreparable harm. *See NFIB v. OSHA*, 595 U.S. 109, 120 (2022); *Mountain Valley Pipeline v. W. Pocahontas Props.*, 918 F.3d 353, 366 (4th Cir. 2019). Virginia's cases do not suggest otherwise. *Freedom Holdings v. Spitzer*, 408 F.3d 112 (2d Cir. 2005), involved compliance costs that the plaintiffs *could recover* because the funds were deposited in an escrow account. *Id.* at 115. And *American Hospital Association v. Harris*, 625 F.2d 1328 (7th Cir. 1980), involved costs that the plaintiffs had *already incurred* before the preliminary injunction hearing. *Id.* at 1331.

Virginia is thus left accusing NetChoice of waiting too long to file its lawsuit. But "[t]he law does not demand that a plaintiff move for a preliminary injunction the moment a challenged statute is enacted." *Wood v. Fla. Dep't of Educ.*, 729 F.Supp.3d 1255, 1287 (N.D. Fla. 2024). Plaintiffs "are allowed some time to consider their options, prepare their lawsuit, and prepare their motion." *Id.* at 1288. And NetChoice filed this lawsuit on November 17—two and a half months before Virginia could bring an enforcement action against any of its members—and filed its preliminary injunction motion just a few days later. That is more than enough time for the parties to brief the motion and this Court to decide it—as Virginia itself seemingly recognized when it

negotiated an extra two weeks to file its opposition brief. Courts routinely grant preliminary injunctions on similar timelines. *See, e.g.*, *Paxton*, 747 F.Supp.3d at 1043; *NOVA Distro v. Miyares*, 2025 WL 3680321, at *2-3, 14 (E.D. Va. Dec. 18, 2025); *Va. Coal. for Immigrant Rts. v. Beals*, 2025 WL 2345822, at *1-3 (E.D. Va. Aug. 12, 2025) (Giles, J.).

The Commonwealth's cases do not aid its cause. In *Quince Orchard Valley Citizens Association v. Hodel*, 872 F.2d 75 (4th Cir. 1989), the plaintiffs waited until after the County had already spent $7.1 million planning and constructing a road through a park before seeking a preliminary injunction to stop the construction. The court held that plaintiffs' delay tipped the balance of harms in favor of the County. *Id.* at 79. *Quince* has no relevance here, as Virginia has not suffered any harm because of any claimed delay. *Northern Virginia Hemp v. Virginia*, 700 F.Supp.3d 407 (E.D. Va. 2023), is even less relevant. There, plaintiffs sued two months *after* the law took effect. In that context, the plaintiffs' delay undercut its claim of harm. *Id.* at 416. Here, by contrast, NetChoice filed this lawsuit two and half months before the Attorney General could begin enforcing the law—precisely because it wants to avoid any risk of the Attorney General ever doing so.

Finally, Virginia insists that the equities and the public interest cut in its favor because of its general interest in protecting children. But the Commonwealth has no interest in enforcing an unconstitutional law, and its arguments are considerably undermined by the fact that the law leaves minors free to access all the same content and features on exempted services. Particularly given the many tools already available to parents who wish to restrict their children's access to online services, it is hard to see how maintaining the status quo could cause any material harm.

## CONCLUSION

The Court should grant the injunction.

Respectfully submitted,

Craig Crandall Reilly (Virginia Bar #20942)
LAW OFFICE OF CRAIG C. REILLY
429 North Saint Asaph Street
Suite 501
Alexandria, VA 22314
(703) 549-5355
Fax: (703) 549-5355
craig.reilly@ccreillylaw.com

*/s/Erin E. Murphy*
Paul D. Clement (*pro hac vice*)
Erin E. Murphy (Virginia Bar #73254)
James Y. Xi (*pro hac vice*)
Barrett L. Anderson (*pro hac vice*)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
barrett.anderson@clementmurphy.com

*Counsel for Plaintiff NetChoice*

January 8, 2026