**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

NETCHOICE,

    Plaintiff,

v.                              Case No. 1:25-cv-02067

JASON S. MIYARES, in his official
capacity as Attorney General of the
State of Virginia,

    Defendant.

_____/

**BRIEF OF FLORIDA, 27 OTHER STATES, AND THE DISTRICT OF COLUMBIA AS**
***AMICI CURIAE* IN SUPPORT OF DEFENDANT'S OPPOSITION TO THE MOTION**
**FOR PRELIMINARY INJUNCTION**

JAMES UTHMEIER
  *Attorney General of Florida*

JEFFREY PAUL DESOUSA (pro hac vice
  forthcoming)
  *Acting Solicitor General*
KEVIN A. GOLEMBIEWSKI (pro hac vice
  forthcoming)
  *Senior Deputy Solicitor General*
LEE ISTRAIL (VSB No. 71103)
  *Assistant Attorney General*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
(850) 488-9134 (fax)
lee.istrail@myfloridalegal.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION AND INTEREST OF AMICI ...................................................................... 1

ARGUMENT ............................................................................................................................... 3

I.  STATES HAVE A COMPELLING INTEREST IN PROTECTING CHILDREN FROM SOCIAL-
MEDIA COMPANIES' PREDATORY BUSINESS PRACTICES. ........................................................ 3

    A.  Social-media companies are misleading the public and harming children. ............ 3

    B.  Regulation is needed to protect the next generation of children. ............................ 7

II.  SB 854 IS A REASONABLE, CONSTITUTIONALLY VALID RESPONSE TO SOCIAL-MEDIA
COMPANIES' PREDATORY BUSINESS PRACTICES. ................................................................... 9

    A.  SB 854 is content-neutral. ...................................................................................... 9

    B.  No matter the level of scrutiny, NetChoice has not established that SB 854
is facially unconstitutional. ................................................................................... 11

III.  IN ANY EVENT, NETCHOICE LACKS PRUDENTIAL STANDING TO ASSERT THE RIGHTS
OF SOCIAL-MEDIA USERS. ................................................................................................... 14

CONCLUSION .......................................................................................................................... 16

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. TikTok*,
  116 F.4th 180 (3d Cir. 2024) ................................................................. 5

*Bellotti v. Baird*,
  443 U.S. 622 (1979) ............................................................................. 12

*Bethel Sch. Dist. No. 403 v. Fraser*,
  478 U.S. 675 (1986) ............................................................................. 13

*C.S. v. McCrumb*,
  135 F.4th 1056 (6th Cir. 2025) ........................................................... 13

*CCIA v. Uthmeier*,
  No. 25-11881, 2025 WL 3458571 (11th Cir. Nov. 25, 2025) ...................... 8, 9, 10

*CCIA v. Uthmeier*,
  No. 4:24-cv-438, 2025 WL 1570007 (N.D. Fla. June 3, 2025) .................... 10

*City of Austin v. Reagan Nat'l Advert. of Austin*,
  596 U.S. 61 (2022) ................................................................................. 9

*District of Columbia v. Meta*,
  No. 2023-CAB-006550 (D.C. Super. Ct. Oct. 23, 2025) ............................ 2

*Erznoznik v. City of Jacksonville*,
  422 U.S. 205 (1975) ............................................................................. 12

*Free Speech Coal. v. Paxton*,
  606 U.S. 461 (2025) ......................................................................... 12, 13

*Johnson v. City of Opelousas*,
  658 F.2d 1065 (5th Cir. 1981) .......................................................... 12, 14

*Mahmoud v. Taylor*,
  606 U.S. 522 (2025) ............................................................................. 13

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ............................................................................. 11

*Mgmt. Ass'n for Priv. Photogrammetric Surveyors v. United States*,
  492 F. Supp. 2d 540 (E.D. Va. 2007) ................................................... 15

*Moody v. NetChoice*,
    603 U.S. 707 (2024).................................................................. 8, 11, 14

*Morgan v. Swanson*,
    659 F.3d 359 (5th Cir. 2011) ................................................................ 14

*NetChoice v. Fitch*,
    134 F.4th 799 (5th Cir. 2025) ............................................................... 14

*NRA v. Bondi*,
    133 F.4th 1108 (11th Cir. 2025) ........................................................... 13

*Pa. Psychiatric Soc'y v. Green Spring Health Servs.*,
    280 F.3d 278 (3d Cir. 2002)................................................................. 15

*Prince v. Massachusetts*,
    321 U.S. 158 (1944).................................................................... passim

*Project Veritas v. Schmidt*,
    125 F.4th 929 (9th Cir. 2025) ............................................................... 14

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992)........................................................................... 9

*Retail Indus. Leaders Ass'n v. Fielder*,
    475 F.3d 180 (4th Cir. 2007) ................................................................ 15

*Sable Commc'ns of Cal. v. FCC*,
    492 U.S. 115 (1989)........................................................................... 8

*Schleifer v. City of Charlottesville*,
    159 F.3d 843 (4th Cir. 1998) ................................................................ 12

*TikTok v. Garland*,
    604 U.S. 56 (2025)........................................................................... 10

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994)......................................................................... 10

*UAW v. Brock*,
    477 U.S. 274 (1986)......................................................................... 15

*United Food & Com. Workers Union Loc. 751 v. Brown Grp.*,
    517 U.S. 544 (1996)......................................................................... 15

*Walker-Serrano ex rel. Walker v. Leonard,*
    325 F.3d 412 (3d Cir. 2003) ............................................................. 13

**Statutes**

Book of the Gen. Laws and Liberties of Mass. (1649) ................................. 13

Cal. Civ. Code § 1798.99.31 ................................................................... 8

Del. Code Ann. tit. 6, § 1204C ................................................................ 8

Fla. Stat. § 501.1736 ............................................................................ 8

La. Stat. Ann. § 51:1753 ....................................................................... 8

Miss. Code Ann. § 45-38-7 .................................................................... 8

N.Y. Gen. Bus. Law § 1501 ................................................................... 8

Ohio Rev. Code § 1349.09 ..................................................................... 8

**Other Authorities**

Bobby Allyn et al., *TikTok Executives Know About App's Effect on Teens,*
    *Lawsuit Documents Allege*, NPR (Oct. 11, 2024) .............................. 6, 7

Bobby Allyn, *States Sue Meta, Claiming Instagram, Facebook Fueled Youth*
    *Mental Health Crisis*, NPR (Oct. 24, 2023) ...................................... 1

Brian Fung, *Execs Ignored the Damage Instagram Does to Teens, Meta*
    *Whistleblower Tells Congress*, CNN Business (Nov. 7, 2023) ................. 4

Decl. of Adam Alter, Ph.D., *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan.
    13, 2025), ECF No. 51-2 ........................................................... 7, 11

Decl. of Jean M. Twenge, Ph.D., *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla.
    Jan. 12, 2025), ECF No. 51-1 ................................................... passim

Decl. of Tony Allen, *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 9, 2025),
    ECF No. 51-3 ............................................................................ 7

Dep. of Adam Alter, Ph.D., *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan.
    23, 2025), ECF No. 63-3 ............................................................. 7

Fed. Trade Comm'n, *A Look Behind the Screens*, 2024 WL 4272104 (Sep. 1,
    2024) ....................................................................................... 8

*Five Ways to Respond to Sextortion*, Meta (Aug. 20, 2025)............................................. 5

*Hidden Harms: Examining Whistleblower Allegations that Meta Buried Child Safety Research Before the Subcomm. on Priv., Tech., and the L. of the S. Comm. on the Judiciary*, 119th Cong. (2025)...................................... 2, 5

Jacqueline Thomsen, *NetChoice Pulls Expert After Allegations of AI Fabrications*, Bloomberg Law (Aug. 17, 2025) ....................................... 8

*Juries verdict agst Alice Thomas*, Volume 29: Records of the Suffolk Cnty. Ct. 1671-1680 Part 1 ................................................................... 13

Justin Rohrlich, *A 10-year-old girl died during the viral 'blackout challenge.' Now TikTok could be held liable*, The Independent (Aug. 28, 2024)...................... 5

Kalhan Rosenblatt et al., *Senate Hearing Highlights: Lawmakers Grill CEOs from TikTok, X and Meta About Online Child Safety*, NBC News (Jan. 31, 2024) ........ 1

Letter from Senators Richard Blumenthal and Marsha Blackburn to Mark Zuckerberg, June 21, 2023 .......................................................... 4

Off. of the Surgeon Gen., *Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory* (2023) ............................................. passim

Response to Questions for the Record from Evan Spiegel, Snap Co-Founder & CEO, to Senate Judiciary Comm. (Feb. 28, 2024).................................... 7

Shannon Bond & Bobby Allyn, *Whistleblower Tells Congress that Facebook Products Harm Kids and Democracy*, NPR (October 5, 2021)......................... 2

Sue Halpern, *Instagram for Kids and What Facebook Knows About the Effects of Social Media*, New Yorker (Sept. 30, 2021)........................................ 6

*What You Need to Know About Financial Sextortion*, Snap Inc. (Aug. 20, 2025)....... 5

## INTRODUCTION AND INTEREST OF AMICI

The public has learned—through whistleblowers and leaked internal documents—what social-media platforms have known for years: Their design features are destroying children's mental health. There is a "clear link" between compulsive social-media use and our kids' skyrocketing rates of depression, anxiety, self-harm, and suicide.[1] In the words of the Biden Administration's Surgeon General, "[o]ur children have become unknowing participants in a decades-long experiment."[2]

States and the federal government have come together to take swift, bipartisan action. Many States—including Virginia and several *Amici*—have passed laws regulating social-media platforms' transactions with vulnerable children, and more than 40 States have sued platforms for the harm they have caused children.[3] Last year, several CEOs were subjected to "a bipartisan thrashing" in the Senate Judiciary Committee, at which Mark Zuckerberg famously apologized to parents whose children had been harmed by Meta platforms.[4]

Rather than scale back their predatory business practices—which range from confusing account-holder contracts to design features that manipulate kids into compulsively using social media—tech companies have doubled down on their nothing-to-see-here approach. They refuse "access to [their] data," "bury evidence" of the harm they are inflicting on children, and battle

---

[1] Decl. of Jean M. Twenge, Ph.D. ¶¶ 6, 59, *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 12, 2025), ECF No. 51-1.

[2] Off. of the Surgeon Gen., *Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory* 11 (2023), https://tinyurl.com/33u2t7kn.

[3] Bobby Allyn, *States Sue Meta, Claiming Instagram, Facebook Fueled Youth Mental Health Crisis*, NPR (Oct. 24, 2023), https://tinyurl.com/y882nt5f.

[4] Kalhan Rosenblatt et al., *Senate Hearing Highlights: Lawmakers Grill CEOs from TikTok, X and Meta About Online Child Safety*, NBC News (Jan. 31, 2024), https://tinyurl.com/2p9vvy62.

regulation at every turn.[5] It has even come to light that "Meta's counsel" advised "researchers" at Meta "to block or redesign research about teen mental health harms" caused by Meta products.[6] The reason for that deception is clear: Addicting children and destroying their mental health pays. Platforms rake in "$11 billion" a year from ads directed at children, including "nearly $2 billion in ad profits derived from users age 12 and under."[7]

Platforms have enlisted their trade association, NetChoice, to fight all efforts to regulate their business practices and protect kids online. According to NetChoice, the Constitution gives tech giants like Google and Meta a veto for any law that regulates their practices simply because their platforms host speech. The First Amendment, they say, grants platforms not just a right to speak but also a right to contract with children, exploit their developing brains with addictive design features, expose them to sexual predators, and drive them to self-harm and suicide—all while misleading the public about their products.

*Amici*—a bipartisan coalition of States and the District of Columbia—have an interest in resisting NetChoice's attempt to distort the First Amendment into an absolute regulatory immunity for internet platforms. The First Amendment is not a shield for platforms' harmful business practices.

---

[5] Surgeon General Advisory, *supra* n.2 at 11 (first quote); *Hidden Harms: Examining Whistleblower Allegations that Meta Buried Child Safety Research Before the Subcomm. on Priv., Tech., and the L. of the S. Comm. on the Judiciary*, 119th Cong. 1 (2025) (written statement of Jason Sattizahn), https://tinyurl.com/37jmj2a8 (second quote); *see also* Shannon Bond & Bobby Allyn, *Whistleblower Tells Congress that Facebook Products Harm Kids and Democracy*, NPR (October 5, 2021), https://tinyurl.com/yc4zex93 (Meta whistleblower exposing that "Facebook executives hide research about the social network's risks to keep its business humming").

[6] *District of Columbia v. Meta*, No. 2023-CAB-006550, slip op. at 10 (D.C. Super. Ct. Oct. 23, 2025).

[7] *See Hidden Harms: Examining Whistleblower Allegations that Meta Buried Child Safety Research Before the Subcomm. on Priv., Tech., and the L. of the S. Comm. on the Judiciary*, 119th Cong. 18:43–19:04 (2025) (statement of Sen. Amy Klobuchar), https://tinyurl.com/y5wtez98.

This Court should deny NetChoice's request for a preliminary injunction barring Virginia from enforcing SB 854. For several reasons, NetChoice is unlikely to succeed on its First Amendment claim. First, the law is a reasonable, constitutionally valid response to the harm that platforms are causing children. It is content-neutral and narrowly tailored to address Virginia's compelling interest in protecting kids. But even if some applications of SB 854 raised constitutional concerns, NetChoice has not established that the law is facially unconstitutional. SB 854 has a plainly legitimate sweep because Virginia can at the very least enforce it against covered platforms when they provide accounts to children of "tender years." *Prince v. Massachusetts*, 321 U.S. 158, 169–70 (1944). Finally, merits aside, NetChoice lacks prudential standing for its First Amendment claim. Though NetChoice says it is likely to succeed on the merits because SB 854 violates the rights of social-media users, *see* Br. 9–13, NetChoice has no relationship whatsoever with users.

## ARGUMENT

I. **STATES HAVE A COMPELLING INTEREST IN PROTECTING CHILDREN FROM SOCIAL-MEDIA COMPANIES' PREDATORY BUSINESS PRACTICES.**

### A. Social-media companies are misleading the public and harming children.

In recent years, mounting evidence has emerged that social-media platforms are knowingly harming children. As child social-media use proliferated over the last 15 years, adolescent depression rates more than doubled,[8] and children experienced a rise in anxiety, low self-esteem, poor body image, and eating disorders.[9] Associated behaviors like self-harm and suicide also "skyrocketed."[10] "Between 2010 and 2022, emergency room admissions for self-harm increased

---

[8] Twenge Decl., *supra* n.1 ¶ 15.

[9] Surgeon General Advisory, *supra* n.2 at 6–7; *see also* Twenge Decl., *supra* n.1 ¶ 59.

[10] Twenge Decl., *supra* n.1 ¶¶ 17–18.

192% among 15- to 19-year-old girls" and "an incredible 411% among 10- to 14-year-old girls."[11] "The suicide rate among 10- to 14-year-old boys increased 166%," and "the suicide rate among 10- to 14-year-old girls increased 217%."[12] But for those spikes in youth suicide, "3,604 more" sons and daughters "would be alive today."[13]

Studies reveal that the correlation is no coincidence: Social media is a causal factor.[14] Children who spend at least 3 hours a day on social media double their likelihood of developing anxiety and depression.[15]

The harm does not stop there. Children are being victimized by "predatory behaviors"— including "sexual solicitation"—on platforms.[16] More than 25% of girls between ages 13 and 15 have "receiv[ed] unwanted sexual advances on Instagram."[17] And Senators Richard Blumenthal and Marsha Blackburn recently wrote to Meta after "reports that Instagram has harbored an open-air market for the sale of child sexual abuse material and the trafficking of children."[18] The problem

---

[11] *Id.* ¶ 17.

[12] *Id.* ¶ 18.

[13] *Id.*

[14] *Id.* ¶¶ 34, 47.

[15] Twenge Decl., *supra* n.1 ¶¶ 39, 47; Surgeon General Advisory, *supra* n.2 at 6; Nelson Decl. ¶¶ 18–25.

[16] Surgeon General Advisory, *supra* n.2 at 9; Twenge Decl., *supra* n.1 ¶ 22.

[17] Brian Fung, *Execs Ignored the Damage Instagram Does to Teens, Meta Whistleblower Tells Congress*, CNN Business (Nov. 7, 2023), https://tinyurl.com/ak3d34p9.

[18] Letter from Senators Richard Blumenthal and Marsha Blackburn to Mark Zuckerberg, June 21, 2023, https://tinyurl.com/2s4j243y.

is so bad that Meta and Snap actively warn children of the dangers of "sextortion" on their platforms.[19]

Platforms also market dangerous "challenges" to children, like "ten-year-old Nylah Anderson." *Anderson v. TikTok*, 116 F.4th 180, 181 (3d Cir. 2024). TikTok, "via its algorithm, recommended and promoted" to Nylah a video that "depicted the 'Blackout Challenge,' which encourages viewers to record themselves engaging in acts of self-asphyxiation." *Id.* "After watching the video, Nylah attempted the conduct depicted in the challenge and unintentionally hanged herself." *Id.* Her mother found her "lifeless body on the bedroom floor" and "rushed" her "to the hospital," where she died.[20]

Still, platforms have resisted any effort to research or mitigate their products' effects. As the U.S. Surgeon General has explained, researching the danger that platforms' practices pose to children is difficult because platforms do not allow "access to data" and insist on a "lack of transparency."[21] Or as a whistleblower testified to the Senate Judiciary Committee a few months ago, platforms "manipulate, control, and erase data" that documents the harm their products are causing.[22] As a result, only because of whistleblowers and accidental leaks do Americans know that platforms have long been aware of the harm they are inflicting on children.

---

[19] *Five Ways to Respond to Sextortion*, Meta (Aug. 20, 2025), https://tinyurl.com/292hmv44; *What You Need to Know About Financial Sextortion*, Snap Inc. (Aug. 20, 2025), https://tinyurl.com/4vwn9f39.

[20] Justin Rohrlich, *A 10-year-old girl died during the viral 'blackout challenge.' Now TikTok could be held liable*, The Independent (Aug. 28, 2024), https://tinyurl.com/yw3ebwj2.

[21] Surgeon General Advisory, *supra* n.2 at 11.

[22] *Hidden Harms: Examining Whistleblower Allegations that Meta Buried Child Safety Research Before the Subcomm. on Priv., Tech., and the L. of the S. Comm. on the Judiciary*, 119th Cong. 3 (2025) (written statement of Jason Sattizahn), https://tinyurl.com/37jmj2a8.

Meta, which operates Facebook and Instagram, is a prime example. A whistleblower exposed internal research showing that many of Instagram's youngest users "felt addicted to the app," "lacked the wherewithal to limit their use of it," and reported "that the app contributed to their depression and anxiety."[23] Rather than roll back the features it was privately acknowledging are addictive and destructive, Meta pressed on and even sought to expand its products to younger children. The company "commissioned strategy papers about the long-term business opportunities" with preteens and discussed "whether there might be a way to engage children during play dates."[24] Delivering its products to more "tweens," Meta explained in internal meetings, was imperative because "[t]hey are a valuable but untapped audience."[25]

Leaked documents from TikTok showed that it too "was aware its many features designed to keep young people on the app led to a constant and irresistible urge to keep opening the app" and that such "compulsive usage correlates with a slew of negative mental health effects like loss of analytical skills, memory formation, contextual thinking, conversational depth, empathy, and increased anxiety."[26] TikTok acknowledged that features like infinite scroll were most likely to addict children, stating that "across most engagement metrics, the younger the user, the better the performance" because "[m]inors do not have executive function to control their screen time."[27] And although TikTok has publicly touted some features ostensibly aimed at reducing the platform's addictive effects—like allowing parents to set time limits and prompting users to take

---

[23] Sue Halpern, *Instagram for Kids and What Facebook Knows About the Effects of Social Media*, The New Yorker (Sept. 30, 2021), https://tinyurl.com/y3vrehyh.

[24] *Id.*

[25] *Id.*

[26] Bobby Allyn et al., *TikTok Executives Know About App's Effect on Teens, Lawsuit Documents Allege*, NPR (Oct. 11, 2024), https://tinyurl.com/4e5un4ru.

[27] *Id.*

a break—TikTok determined that those features "had little impact" and are "not altogether effective."[28] But that did not matter because TikTok adopted the features solely to give it "a good talking point with policymakers."[29]

**B.     Regulation is needed to protect the next generation of children.**

Because deceptive practices like Meta's and TikTok's have fueled the Nation's "youth mental health crisis,"[30] the U.S. Surgeon General has called on policymakers to develop "health and safety standards" for platforms and to adopt "policies that further limit access . . . to social media for all children"—including "strengthening and enforcing age minimums."[31]

Those policy responses are necessary because platforms' own interventions have proven inadequate. Platforms have long had parental controls, but they have made no dent in child addiction.[32] That is both because parents do not use them and because they are ineffective. Less than 1% of parents use Snapchat's controls, for example.[33] And parental controls are difficult to manage[34]; they do not address the features that make platforms addictive[35]; and platforms do not implement them with fidelity. *See* Fed. Trade Comm'n, *A Look Behind the Screens*, 2024 WL

---

[28] *Id.*

[29] *See id.*

[30] Surgeon General Advisory, *supra* n.2 at 13; *accord* Twenge Decl., *supra* n.1 ¶ 26.

[31] Surgeon General Advisory, *supra* n.2 at 15.

[32] Dep. of Adam Alter, Ph.D. at 183:16–23, *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 23, 2025), ECF No. 63-3.

[33] *See* Response to Questions for the Record from Evan Spiegel, Snap Co-Founder & CEO, to Senate Judiciary Comm. at 1–2 (Feb. 28, 2024),  https://tinyurl.com/55amwdfc.

[34] Decl. of Tony Allen ¶¶ 51–61, *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 9, 2025), ECF No. 51-3.

[35] Decl. of Adam Alter, Ph.D. ¶¶ 48–50, *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 13, 2025), ECF No. 51-2.

4272104, at *9 (Sept. 1, 2024) (Facebook has "misled parents about their ability to control" their children's accounts).

Virginia and other States have therefore passed laws that regulate platforms' harmful practices.[36] States and the federal government have a compelling interest in regulating platforms' practices given their undeniable role in the Nation's youth mental-health crisis. *See Moody v. NetChoice*, 603 U.S. 707, 733 (2024) (acknowledging that social media poses unique "dangers" to kids' "mental health"); *Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989) (States have a "compelling interest in protecting the physical and psychological well-being of minors."); *CCIA v. Uthmeier*, No. 25-11881, 2025 WL 3458571, at *6 (11th Cir. Nov. 25, 2025) ("The State has a compelling interest in protecting minors in general, and it has demonstrated that they are particularly susceptible to the potentially addictive features built into some social media platforms."). NetChoice cannot seriously dispute that when much of the evidence stems from its own members' leaks. Indeed, in one of its challenges to a State law, NetChoice tried to dispute the harm that social-media companies are causing kids, but it had to withdraw its expert report after the State defendant moved to strike the report because it relied on nonexistent studies fabricated by artificial intelligence.[37]

---

[36] *See, e.g.*, Ohio Rev. Code § 1349.09(B)(1) (limits on social-media platforms contracting with children); Miss. Code Ann. § 45-38-7 (same); Fla. Stat. § 501.1736 (regulating platforms' use of "addictive features"); N.Y. Gen. Bus. Law § 1501-1502 (limits on "addictive feeds" and push "notifications"); Cal. Civ. Code § 1798.99.31(b)(7) (limits on targeting children with deceptive practices); Del. Code Ann. tit. 6, § 1204C (limits on advertising to children); La. Stat. Ann. § 51:1753(2) (same).

[37] *See* Memo. in Support of Mot. to Exclude at 1–2, *NetChoice v. Murrill*, No. 3:25-cv-231 (M.D. La. Aug. 15, 2025), ECF No. 42-1; Jacqueline Thomsen, *NetChoice Pulls Expert After Allegations of AI Fabrications*, Bloomberg Law (Aug. 17, 2025), https://tinyurl.com/2nk64wss.

## II. SB 854 IS A REASONABLE, CONSTITUTIONALLY VALID RESPONSE TO SOCIAL-MEDIA COMPANIES' PREDATORY BUSINESS PRACTICES.

### A. SB 854 is content-neutral.

NetChoice claims that SB 854 is content-based because it (1) applies only to websites that "allow[] users to interact socially," Br. 14 (quotation omitted); and (2) discriminates based on "speaker." *Id.* But "social interaction" is not a category of content, and SB 854 is not content-based merely because it applies only to certain websites.

**1.** A law is content-based if it "target[s] speech based on its communicative content," i.e., "the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin*, 596 U.S. 61, 69 (2022). Such "content discrimination" triggers strict scrutiny because it threatens to "drive *certain* ideas or viewpoints from the marketplace." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992) (emphasis added). But SB 854's regulation of websites that "allow users to interact socially" has nothing to do with communicative content. The law "do[es] not single out any topic or subject matter for differential treatment" because social interaction can include *any* topic or subject matter. *City of Austin*, 596 U.S. at 71; *see also Uthmeier*, 2025 WL 3458571, at *5 (rejecting NetChoice's social-interaction argument because "social speech can touch on any conceivable topic, message, or idea" (cleaned up)). Whether a communication is a "social interaction" depends at most on the time, place, and manner of the communication, not its content. For example, while a statement on a commercial billboard would not constitute social interaction, the same statement to a friend over lunch would. The "substantive message itself is irrelevant." *City of Austin*, 596 U.S. at 71.

In support of its social-interaction argument, NetChoice cites *NetChoice v. Reyes*, which determined that a law that regulates platforms where users "interact socially" distinguishes "between subjects of speech." 748 F. Supp. 3d 1105, 1122 (D. Utah 2024). But nowhere did *Reyes*

explain how a provision that focuses on social-media platforms—on which users discuss "topics as diverse as human thought"—discriminates against *certain* ideas or viewpoints. *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017). That is why at least two courts have already disagreed with *Reyes*. *See Uthmeier*, 2025 WL 3458571, at *5; *CCIA v. Uthmeier*, No. 4:24-cv-438, 2025 WL 1570007, at *14 (N.D. Fla. June 3, 2025).

**2.** Nor is SB 854 content-based merely because it "singles out a subset of online services." Br. 14. According to NetChoice, SB 854 is content-based because it regulates social media but not "Disney+, Hulu, [or] Roblox." Br. 15. But a law's application to certain speakers does not by itself trigger strict scrutiny. *TikTok v. Garland*, 604 U.S. 56, 72–73 (2025). The law in *TikTok* singled out TikTok by name and not even that triggered strict scrutiny. *See id.* Speaker-based distinctions trigger strict scrutiny only if they "reflect[] a content preference" or have the object of "suppressi[ng] of certain ideas." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 658–60 (1994). If a speaker distinction is the result of a "content-neutral . . . interest," it does not trigger strict scrutiny. *TikTok*, 604 U.S. at 73.

And nothing suggests that SB 854's regulation of social media rather than websites like Disney+ or Hulu reflects a preference for the content on those websites. In fact, NetChoice has recognized that the content on social media is sometimes "the exact same" as the content on websites like Disney+. *See* Am. Complaint ¶ 94, *NetChoice v. Reyes*, No. 2:23-cv-911 (D. Utah May 3, 2024), ECF No. 51. Nor can NetChoice seriously claim that Virginia sought to suppress particular ideas by adopting a regulation specific to social media rather than the entire internet. States have a content-neutral interest in regulating social-media platforms: Their business practices have proven to cause significant harm to children's mental health. *See* Opp. 23. The CEOs of Disney+ and Hulu are not receiving "bipartisan thrashing[s]" in the U.S. Senate and then standing

up to apologize to parents of children harmed by their products.[38] That is because platforms that profit off our desire for "social feedback and connection" are "categorically different" than services where users passively consume material. Alter Decl., *supra* n.35 ¶¶ 19, 26. Social-media platforms, which "provide users with bottomless opportunities for instantaneous social interaction," are more addictive, *id.* ¶ 26, and are associated with higher rates of depression. *Id.* ¶ 19; Twenge Decl., *supra* n.1 ¶ 37.

"States adopt laws to address the problems that confront them." *McCullen v. Coakley*, 573 U.S. 464, 481 (2014). "The First Amendment does not require States to regulate for problems that do not exist." *Id.* SB 854's focus on those online services posing the greatest risk of child addiction—the harm the State seeks to mitigate—is a feature, not a bug. *See id.* at 482. Had Virginia applied the law to the entire internet as NetChoice seems to prefer, NetChoice would claim that the law was wildly overinclusive. *See* Resp. to Mot. to Alter Judgment at 6–7, *NetChoice v. Griffin*, No. 5:23-cv-5105 (W.D. Ark. June 2, 2025), ECF No. 84 (NetChoice arguing that broadening an Arkansas law's "definition of 'social media company' would make the law's tailoring problems even more glaring").

## B. No matter the level of scrutiny, NetChoice has not established that SB 854 is facially unconstitutional.

Regardless which level of scrutiny applies, NetChoice has not shown that SB 854's "constitutional applications" are "substantially outweigh[ed]" by "unconstitutional applications." *Moody*, 603 U.S. at 723–24. The law—which protects all children under age 16—has a broad sweep of constitutional applications because it can be validly enforced against a platform when it provides accounts to children of "tender years." *Prince*, 321 U.S. at 169–70. The First Amendment

---

[38] Rosenblatt et al., *supra* n.4.

does not strip States of the power to protect those children from platforms. They have more limited First Amendment interests than older children, and States have an even greater interest in protecting them because they are more vulnerable to the harms posed by platforms. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 n.11 (1975) ("[T]he age of the minor is a significant factor" in determining the First Amendment interests at stake.); *Schleifer v. City of Charlottesville*, 159 F.3d 843, 847 (4th Cir. 1998) (Wilkinson, J.) (Given the Nation's "customary limitations" on young children, regulations aimed at them are "subject to less than the strictest level of scrutiny.").

"The [Supreme] Court long has recognized that the status of minors under the law is unique in many respects." *Bellotti v. Baird*, 443 U.S. 622, 633 (1979) (plurality op.); *Prince*, 321 U.S. at 169–70. "[A]lthough children generally are protected by the same constitutional guarantees against governmental deprivations as are adults, the State is entitled to adjust its legal system to account for children's vulnerability." *Bellotti*, 443 U.S. at 635. "[E]ven where there is an invasion of protected freedoms[,] the power of the [S]tate to control the conduct of children reaches beyond the scope of its authority over adults." *Id.* at 636. "It is well settled that a State . . . can adopt more stringent controls on communicative materials available to youths than on those available to adults" because "[t]he First Amendment rights of minors are not coextensive with those of adults." *Erznoznik*, 422 U.S. at 212, 214 n.11. States can impose "restraints on minors which would be unconstitutional [under the First Amendment] if placed on adults" when the restraints are "based on" the "peculiar vulnerability of children." *Johnson v. City of Opelousas*, 658 F.2d 1065, 1073 (5th Cir. 1981).

That precedent accords with history and tradition. *See Free Speech Coal. v. Paxton*, 606 U.S. 461, 472 (2025) (considering "[h]istory, tradition, and precedent" in determining the scope of children's First Amendment rights). States have always had more power to regulate children's

activities. At the Founding, children were viewed as "lack[ing] the reason and judgment necessary to be trusted with legal rights." *NRA v. Bondi*, 133 F.4th 1108, 1117 (11th Cir. 2025) (en banc). So the Founding generation "imposed age limits on all manner of activities." *Id.* at 1123. Children could not enlist in the military without parental consent. *Id.* at 1117. States "set age limits restricting marriage without parental consent." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 834 (2011) (Thomas, J., dissenting). And children did not have access to the same speech as adults. "Parents controlled children's access to information, including books," *NRA*, 133 F.4th at 1117, and States prohibited "[e]ntertaining . . . [c]hildren" without parental consent. Juries verdict agst Alice Thomas, Volume 29: Records of the Suffolk Cnty. Ct. 1671-1680 Part 1, pp. 82-83, available at https://tinyurl.com/3r8hw435; *see also* Book of the Gen. Laws and Liberties of Mass. 137 (1649) (penalizing "entertain[ing]" children "to the dishonour of God and grief of their parents"). The Founding generation also "targeted for special regulation works manifestly tending to the corruption of the morals of youth." *Free Speech Coal.*, 606 U.S. at 473.

This longstanding "power" to regulate "children's activities" is at its zenith for children of "tender years." *Prince*, 321 U.S. at 168–70. The State has a greater interest in protecting those children because they are more vulnerable to "emotional excitement and psychological or physical injury." *Id.* at 170; *see also Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683–84 (1986) (Some "speech could well be seriously damaging to" young children but not high-school students.); *Mahmoud v. Taylor*, 606 U.S. 522, 555 n.8 (2025) (similar). Young children also have narrower First Amendment interests because they "are at a stage in which learning how to develop relationships and behave in society is as or even more important than their forming particular views on controversial topics." *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 417 (3d Cir. 2003); *see also C.S. v. McCrumb*, 135 F.4th 1056, 1065–66 (6th Cir. 2025) (recognizing that the

"immaturity" of "elementary-aged children" bears on the scope of their First Amendment interests); *Morgan v. Swanson*, 659 F.3d 359, 386–87 (5th Cir. 2011) (en banc) ("elementary students" are still learning "the most basic social and behavioral tasks").

SB 854 thus has a broad sweep of valid applications. Virginia can at the very least enforce it against covered platforms when they provide accounts to young children. That is a valid exercise of Virginia's longstanding "power" to regulate the "activities" of children of "tender years" to protect them from "danger[.]" *Prince*, 321 U.S. at 168–70. Even if those children have a First Amendment interest in social-media accounts that expose them to harm, the State is "justif[ied]" in protecting them because of their unique "vulnerability." *Johnson*, 658 F.2d at 1073; *see also* Nelson Decl. ¶ 13 (explaining that "children are especially susceptible to addictions").

Yet NetChoice has made no showing that SB 854's supposedly unconstitutional applications to older children substantially "outweigh" its constitutional applications to younger children. *Moody*, 603 U.S. at 723–24. That alone forecloses a preliminary injunction. *See NetChoice v. Fitch*, 134 F.4th 799, 809 (5th Cir. 2025) (vacating a preliminary injunction that NetChoice obtained because it did not meet its burden under *Moody*); *Project Veritas v. Schmidt*, 125 F.4th 929, 961 (9th Cir. 2025) (en banc) (The plaintiff "fail[ed] to meet its burden" under *Moody* "because it ma[de] little effort to identify and weigh the . . . statute's lawful and unlawful applications.").

III.    **IN ANY EVENT, NETCHOICE LACKS PRUDENTIAL STANDING TO ASSERT THE RIGHTS OF SOCIAL-MEDIA USERS.**

Merits aside, NetChoice has not established a likelihood of success because it lacks prudential standing to assert social-media users' rights. NetChoice relies on users' rights, *see* Br. 9–13 (pressing adults and children's rights, while only mentioning platforms' rights in passing), yet NetChoice has no relationship whatsoever with its members' users. In asserting users' rights,

NetChoice asks this Court to bless what the Third Circuit has dubbed "derivative standing," where an association uses associational standing to satisfy Article III and then invokes third-party standing to assert the rights of nonmembers with whom only its members have a relationship. *See Pa. Psychiatric Soc'y v. Green Spring Health Servs.*, 280 F.3d 278, 291–93 (3d Cir. 2002). But there is no derivative-standing exception to the bar on asserting others' rights. If NetChoice wishes to assert the rights of nonmember third parties, NetChoice itself must satisfy an exception that allows it to do so.

Associations cannot string together associational and third-party standing (two different prudential-standing exceptions) to assert the rights of parties who are multiple "steps removed" from the association. *Id.* at 294–95 (Nygaard, J., dissenting). Associational standing is a vehicle for enforcing the "rights of . . . members." *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 186 (4th Cir. 2007). It is a "strand" of "representational standing" that allows an association to enforce the rights of members—even though they are "absent third parties"—because the association has a "particular," "recognized" "relationship[]" with them. *United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544, 557 (1996). Given the close relationship between an association and its members, the "concrete adverseness" that federal courts require is presumed when an association brings a claim "on behalf of its directly affected members." *UAW v. Brock*, 477 U.S. 274, 289 (1986) (citation omitted). That presumption stretches to its breaking point when an association seeks to represent members who would, in turn, be representing the interests of nonmembers—here, social-media users—if they sued.[39]

---

[39] This Court has previously allowed an association to assert the rights of nonmembers, but in so doing, it acknowledged that "the Supreme Court has never endorsed" such derivative standing. *Mgmt. Ass'n for Priv. Photogrammetric Surveyors v. United States*, 492 F. Supp. 2d 540, 548 (E.D. Va. 2007).

**CONCLUSION**

This Court should deny NetChoice's request for a preliminary injunction.

December 22, 2025

Respectfully submitted,

JAMES UTHMEIER
  *Attorney General of Florida*

*/s/ Lee Istrail*
JEFFREY PAUL DESOUSA (pro hac vice
  forthcoming)
  *Acting Solicitor General*
KEVIN A. GOLEMBIEWSKI (pro hac vice
  forthcoming)
  *Senior Deputy Solicitor General*
LEE ISTRAIL (VSB No. 71103)
  *Assistant Attorney General*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
(850) 488-9134 (fax)
lee.istrail@myfloridalegal.com

*Counsel for Amici Curiae*

# ADDITIONAL SIGNATORIES

STEVE MARSHALL
*Attorney General of Alabama*

STEPHEN J. COX
*Attorney General of Alaska*

KRIS MAYES
*Attorney General of Arizona*

TIM GRIFFIN
*Attorney General of Arkansas*

PHILIP J. WEISER
*Attorney General of Colorado*

WILLIAM TONG
*Attorney General of Connecticut*

KATHLEEN JENNINGS
*Attorney General of Delaware*

BRIAN L. SCHWALB
*Attorney General for the
District of Columbia*

CHRIS CARR
*Attorney General of Georgia*

ANNE E. LOPEZ
*Attorney General of Hawaii*

THEODORE E. ROKITA
*Attorney General of Indiana*

BRENNA BIRD
*Attorney General of Iowa*

LIZ MURRILL
*Attorney General of Louisiana*

AARON M. FREY
*Attorney General of Maine*

DANA NESSEL
*Attorney General of Michigan*

KEITH ELLISON
*Attorney General of Minnesota*

AARON D. FORD
*Attorney General of Nevada*

RAUL TORREZ
*Attorney General of New Mexico*

DREW H. WRIGLEY
*Attorney General of North Dakota*

GENTNER DRUMMOND
*Attorney General of Oklahoma*

DAN RAYFIELD
*Attorney General of Oregon*

ALAN WILSON
*Attorney General of South Carolina*

MARTY JACKLEY
*Attorney General of South Dakota*

KEN PAXTON
*Attorney General of Texas*

STANFORD PURSER
*Utah Solicitor General*

CHARITY R. CLARK
*Attorney General of Vermont*

JOHN B. MCCUSKEY
*Attorney General of West Virginia*

KEITH G. KAUTZ
*Attorney General of Wyoming*