**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| NETCHOICE,<br><br>       *Plaintiff*,<br><br>v.<br><br>JAY JONES, in his official capacity as Attorney General of the Commonwealth of Virginia,[1]<br><br>       *Defendant.* | Civil Action No. 1:25-cv-02067 |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION TO DISMISS PLAINTIFF'S COMPLAINT

---

[1] NetChoice brought this suit against the Attorney General of Virginia in his official capacity. The Honorable Jay Jones was sworn into that position on January 17, 2026. The substitution of "a public officer" sued "in an official capacity" is "automatic[]," and "[l]ater proceedings should be in the substituted party's name." Fed. R. Civ. P. 25(d); *see* Dkt. 37 (noticing substitution).

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................3

    A.    SB 854 and the One-Hour Default.........................................................................3

    B.    NetChoice's Complaint.........................................................................................4

LEGAL STANDARD..............................................................................................................6

ARGUMENT .........................................................................................................................7

I.    NetChoice has not plausibly alleged standing to challenge SB 854 ...................7

    A.    NetChoice lacks associational standing to sue on behalf of its
members. ................................................................................................................7

    B.    NetChoice cannot sue on behalf of Virginia's children or adults. ...........................8

II.    NetChoice fails to plausibly allege a violation of the First Amendment. ..........................10

    A.    SB 854 is a content-neutral time, place, and manner restriction
subject to no more than intermediate scrutiny. ......................................................11

        1.    SB 854 does not dictate the content of speech or permitted
viewpoints, and it draws permissible, content-neutral lines
between social media platforms and other forums. ...................................12

        2.    NetChoice does not identify any other basis for applying
strict scrutiny.............................................................................................17

    B.    NetChoice has not alleged that SB 854 fails intermediate scrutiny......................18

        1.    NetChoice fails to allege that SB 854 does not serve the
Commonwealth's significant interests in protecting its
children from addiction and empowering parents .....................................18

        2.    NetChoice fails to allege that SB 854 is not sufficiently
tailored to advance the Commonwealth's interests ..................................19

        3.    NetChoice fails to allege that SB 854 does not leave open
ample alternative channels of communication..........................................22

III.    NetChoice fails to plausibly allege that SB 854 is unconstitutionally
vague. ....................................................................................................................23

IV.    NetChoice fails to plausibly allege that SB 854 violates the dormant
Commerce Clause. ...............................................................................................26

    A.    NetChoice does not allege that Virginia is impermissibly regulating
conduct with no connection to the Commonwealth...............................................26

    B.    NetChoice does not allege that SB 854 discriminates against out-of-
state commerce.....................................................................................................28

    C.    NetChoice fails to allege that out-of-state costs exceed in-state benefits....................29

CONCLUSION....................................................................................................................30

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Booksellers v. Webb*,
919 F.2d 1493 (11th Cir. 1990) ....................................................12

*Ashby v. City of Charlotte*,
121 F. Supp. 3d 560 (W.D.N.C. 2015) ...........................................18

*Ashcroft v. ACLU*,
542 U.S. 656 (2004).......................................................................17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................6, 7, 10, 19

*Ass'n for Accessible Meds. v. Frosh*,
887 F.3d 664 (4th Cir. 2018) ........................................................27

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................6

*Brown v. Ent. Merchants Ass'n*,
564 U.S. 789 (2011)...........................................................12, 21, 22

*Calvary Christian Ctr. v. City of Fredericksburg*,
832 F. Supp. 2d 635 (E.D. Va. 2011) .......................................13, 14

*Cap. Assoc. Indus., Inc. v. Stein*,
922 F.3d 198 (4th Cir. 2019) ....................................................23, 25

*City of L.A. Police Dep't v. United Rep. Publ'g Co.*,
528 U.S. 32 (1999)...........................................................................9

*City of Renton v. Playtime Theatres, Inc.*,
475 U.S. 41 (1986).........................................................................21

*Comput. & Commc'ns Indus. Ass'n v. Paxton*,
747 F. Supp. 3d 1011 (W.D. Tex. 2024).........................................13

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier*,
2025 WL 3458571 (11th Cir. Nov. 25, 2025)........................14, 18, 20

*Courthouse News Serv. v. Smith*,
126 F.4th 899 (4th Cir. 2025) .................................................12, 19, 20

*Edgar v. MITE Corp.*,
   457 U.S. 624 (1982) ....................................................................................28

*Educ. Media Co. at Va. Tech, Inc. v. Swecker*,
   602 F.3d 583 (4th Cir. 2010) ......................................................................7

*Epcon Homestead, LLC v. Town of Chapel Hill*,
   62 F.4th 882 (4th Cir. 2023) .....................................................................10

*Erznoznik v. City of Jacksonville*,
   422 U.S. 205 (1975) ..............................................................................17, 21

*Free Speech Coal., Inc. v. Paxton*,
   606 U.S. 461 (2025) ........................................................11, 14, 18, 20

*Friends for Am. Free Enter. Ass'n v. Wal-Mart Stores, Inc.*,
   284 F.3d 575 (5th Cir. 2002) ......................................................................8

*GenBioPrio, Inc. v. Sorsaia*,
   2023 WL 5490179 (S.D.W.Va. Aug. 24, 2023) .............................27, 30

*Ginsberg v. New York*,
   390 U.S. 629 (1968) ...................................................................................19

*Hebb v. City of Asheville*,
   145 F.4th 421 (4th Cir. 2025) .......................................................12, 19, 22

*Hulbert v. Pope*,
   70 F.4th 726 (4th Cir. 2023) .......................................................11, 16, 18

*Johnson v. Quattlebaum*,
   664 F. App'x 290 (4th Cir. 2016) ...............................................................7

*Just Puppies, Inc. v. Brown*,
   123 F.4th 652 (4th Cir. 2024) .............................................26, 28, 29, 30

*Kessler v. City of Charlottesville*,
   441 F. Supp. 3d 277 (W.D. Va. 2020) ......................................................18

*Manning v. Caldwell for City of Roanoke*,
   930 F.3d 264 (4th Cir. 2019) ....................................................................23

*Martin v. Lloyd*,
   700 F.3d 132 (4th Cir. 2012) ....................................................................24

*McCullen v. Coakley*,
   573 U.S. 464 (2014) .................................................................11, 12, 16, 19

*Mgmt. Ass'n for Priv. Photogrammetric Surveyors v. United States*,
    492 F. Supp. 2d 540 (E.D. Va. 2007) ...................................................................10

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024)........................................................................................8, 13

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023).....................................................................26, 27, 28, 29

*NetChoice v. Bonta*,
    761 F. Supp. 3d 1202 (N.D. Cal. 2024) ...........................................................8

*NetChoice v. Bonta*,
    152 F.4th 1002 (9th Cir. 2025) ...................................................................8, 13

*NetChoice, LLC v. Reyes*,
    748 F. Supp. 3d 1105 (D. Utah 2024)..............................................................13

*New York v. Ferber*,
    458 U.S. 747 (1982)....................................................................................18, 22

*Norris v. City of Asheville*,
    721 F. Supp. 3d 404 (W.D.N.C. 2024) .............................................................23

*Outdoor Amusement Bus. Ass'n, Inc. v. DHS*,
    983 F.3d 671 (4th Cir. 2020) ..............................................................................7

*Packingham v. North Carolina*,
    582 U.S. 98 (2017).......................................................................................12, 21

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970).....................................................................................26, 29

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)...........................................................................................12

*Reno v. ACLU*,
    521 U.S. 844 (1997)...........................................................................................17

*Schleifer by Schleifer v. City of Charlottesville*,
    159 F.3d 843 (4th Cir. 1998) .............................................................................18

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
    467 U.S. 947 (1984).......................................................................................9, 10

*Students Engaged in Advancing Texas v. Paxton*,
    765 F. Supp. 3d 575 (W.D. Tex. 2025)..............................................................25

*Swagler v. Neighoff*,
    398 F. App'x 872 (4th Cir. 2010) ...............................................23

*Tanner v. City of Va. Beach*,
    674 S.E.2d 848 (Va. 2009)..........................................................23

*TikTok Inc. v. Garland*,
    604 U.S. 56 (2025)................................................................16, 20

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994)..............................................................14, 16

*United States v. Bollinger*,
    798 F.3d 201 (4th Cir. 2015) .......................................................7

*United States v. Concepcion*,
    139 F.4th 242 (2d Cir. 2025) ................................................23, 25

*United States v. Hansen*,
    599 U.S. 762 (2023)................................................................9, 10

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000)...................................................................17

*Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982)...................................................................25

*Virginia v. American Booksellers*,
    484 U.S. 383 (1988)................................................................9, 10

*Wag More Dogs, LLC v. Artman*,
    795 F. Supp. 2d 377 (E.D. Va. 2011) ....................11, 12, 13, 17, 19

*Wag More Dogs, LLC v. Cozart*,
    680 F.3d 359 (4th Cir. 2012) ....................................................7, 23

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)........................................................12, 18, 24

*Warth v. Seldin*,
    422 U.S. 490 (1975)......................................................................9

*Williams-Yulee v. Florida Bar*,
    575 U.S. 433 (2015)................................................................20, 22

**Statutes & Bills**

15 U.S.C. § 6502(b)(1)(A)(ii)..............................................................25

Va. Code § 8.01-40.5(B) ..................................................................................25

Va. Code § 8.01-40.6(B) ....................................................................................4

Va. Code § 59.1-575 ................................................................3, 4, 14, 15, 16

Va. Code § 59.1-577.1 .................................................................3, 4, 24, 26

Va. Code § 59.1-584 ....................................................................4, 23, 24, 25

SB 359, 2024 Gen. Assemb., Reg. Sess. (Va. 2024) .......................................4

SB 532, 2024 Gen. Assemb., Reg. Sess. (Va. 2024) ......................................4

**Rules**

Fed. R. Civ. P. 8(a) ...........................................................................................6

Fed. R. Civ. P. 12(b)(1)..................................................................................6, 7

**Other Authorities**

82 C.J.S. Statutes § 362 ..................................................................................28

John Gonzalez, *New Virginia Law Limits Teens' Social Media to 1 Hour Daily:
    What Parents Should Know*, ABC News (May 14, 2025) ......................................10

T. Flint, Comment, *A New Brand of Representational Standing*, 70 U. Chi. L.
    Rev. 1037, 1038 (2003) ..................................................................................10

*Use* (defs. 1-2), *American Heritage Dictionary* ..........................................24

*Use* (def. 1), *Merriam Webster Dictionary* .................................................24

**INTRODUCTION**

NetChoice challenges SB 854, but its Complaint is light on facts and heavy on allegations of law. This is unsurprising; NetChoice brought this Complaint before SB 854 went into effect, so it lacks any record of enforcement or impact that could shed factual light on its claims. But that pre-enforcement context is no excuse for a failure to allege facts necessary to get its claims beyond a motion to dismiss. A complaint is not an appellate brief; it must set forth a short and plain statement showing that the pleader is entitled to relief, including sufficient facts to push the plaintiff's claim from possible to plausible.

NetChoice's Complaint falls short of that basic requirement. More akin to a legal memorandum broken into numbered paragraphs, the Complaint asserts that a State may not limit minor's social media access—no matter how strong its justification for doing so. According to NetChoice, States instead must hope that voluntary, platform-provided tools are effective, for States are limited to encouraging parents to use those tools to regulate their children's social media use. That position is wrong on the law; States do not have to sit idly by while social media companies addict and profit from young users. But ultimately, on a motion to dismiss such as this, the core question is whether the Complaint alleges plausible *facts* supporting NetChoice's standing and claims for relief. It does not.

SB 854, unanimously passed by the General Assembly, is a reasonable restriction requiring platforms operating in Virginia to set a default one-hour limit per platform for children under 16. Platforms can use commercially reasonable methods to verify age and regulate access. And parents can adjust that one-hour default up or down, as appropriate for their child. Virginia children can still access any content they want, from any speaker, on any topic, and on any platform. SB 854 simply imposes a content-neutral time, place, and manner restriction on how long a child can

access a given platform each day, like setting a curfew for public parks or for attending movies. NetChoice challenges the balance struck by SB 854, raising three constitutional challenges. Each is utterly devoid of factual support. And even construing the few facts that NetChoice does allege in the light most favorable to it, the claims still fail on their face.

First, with respect to NetChoice's First Amendment challenge, NetChoice lacks standing to assert the rights of either its member platforms or non-member Virginians. Even if it could, the Complaint alleges no facts suggesting that SB 854 will actually restrict platforms' ability to communicate with users. Either way, SB 854 remains well within the First Amendment's confines. Try as NetChoice might to distort the statute, SB 854 is not a content-based restriction seeking to silence any particular message or voice, but a content-neutral regulation on a particular vehicle for speech based on that vehicle's uniquely addictive nature.

NetChoice next challenges SB 854 as unconstitutionally vague. But SB 854's requirements are straightforward, and no platform is at risk of civil penalties without the Attorney General of Virginia first sending written notice of a purported violation and providing the opportunity to cure (or to dispute the Attorney General's interpretation). NetChoice offers no details about how platforms intend to comply with SB 854 or how these alleged ambiguities will impair that compliance—much less subject them to punishment absent fair notice.

Finally, NetChoice claims that SB 854 violates the dormant Commerce Clause because the statute regulates purely out-of-state conduct. But state regulations seeking in-state benefits but affecting out-of-state conduct do not run afoul of the dormant Commerce Clause. And NetChoice fails to provide any information about this purported out-of-state conduct anyway.

NetChoice has not stated a plausible claim for relief on any of its three constitutional challenges. The Complaint should be dismissed.

At this stage of the case, the factual allegations in the Complaint (sparse at they are) are taken as true and construed in the light most favorable to the plaintiff. NetChoice's legal allegations, however, do not enjoy any deference.

**A.      SB 854 and the One-Hour Default**

Effective January 1, 2026, SB 854 requires social media platforms to "limit a minor's use of [a] social media platform to one hour per day" per platform, and to "allow a parent to give verifiable parental consent to increase or decrease the daily time limit." Va. Code § 59.1-577.1(B). As NetChoice acknowledges, Virginia enacted the statute to "protect[] minors from . . . addiction to social media" and to "put[] parents back in the driver's seat." Compl. ¶¶ 107–08. The General Assembly unanimously passed the bill, and former Governor Glenn Youngkin signed it into law.

On its face, SB 854 neither limits what platforms children can access nor restricts the content or features that children can share, use, or view. Instead, the law imposes a parentally-adjustable one-hour time limitation per day. This limitation applies only to social media platforms, or "a public or semipublic Internet-based service or application" that "[c]onnects users in order to allow users to interact socially with each other within such service or application." Va. Code § 59.1-575. To be covered by the statute, a platform must allow users to:

- "[c]onstruct a public or semipublic profile for purposes of signing into and using such service or application;"

- "[p]opulate a public list of other users with whom such user shares a social connection within such service or application;" and

- "[c]reate or post content viewable by other users, including content on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users."

*Id.* Forums that "exclusively provide[] email or direct messaging services" do not qualify as social media platforms "on the basis of that function alone." *Id.* The same is true for sites "that consist[]

primarily of news, sports, entertainment, ecommerce, or content preselected by the provider and not generated by users"—"and for which any chat, comments, or interactive functionality is incidental to, directly related to, or dependent on the provision of such content, or that is for interactive gaming." *Id.* Social media platforms must use "commercially reasonable methods, such as a neutral age screen mechanism," to identify young users. *Id.* § 59.1-577.1(B).

To be subject to the law, the social media platform must have "users in the Commonwealth." Va. Code § 59.1-575. The Attorney General has "exclusive authority" to enforce the statute. Va. Code § 59.1-584(A), (E). Before bringing an enforcement action, the Attorney General must provide "30 days' written notice identifying the specific provisions . . . being violated." *Id.* § 59.1-584(B). If the platform cures those alleged violations within 30 days, then "no action shall be initiated[.]" *Id.*

Prior to SB 854, the General Assembly considered numerous measures seeking to protect children from excessive social media. *See, e.g.*, SB 359, 2024 Gen. Assemb., Reg. Sess. (Va. 2024) (proposed Va. Code § 59.1-577.1(A)) (banning providing any "addictive feed" to a minor absent parental consent); SB 532, 2024 Gen. Assemb., Reg. Sess. (Va. 2024) (proposed Va. Code § 8.01-40.6(B)) (limiting minors' social media access between 12 a.m. and 6 a.m. absent parental consent).

### B. NetChoice's Complaint

NetChoice is a "trade association for Internet companies," including several social media platforms. Compl. ¶ 7. NetChoice brings this facial, pre-enforcement challenge to SB 854. In Count I, NetChoice asserts that SB 854 violates the First Amendment by infringing the free speech of Virginia's minors, its adults, and NetChoice's member platforms. Primarily, NetChoice complains that SB 854, in "restrict[ing] minors' access to [social media platforms] to one hour

absent parental consent," "decree[s] what constitutionally protected speech minors can and cannot access." *Id*. ¶¶ 90, 92. NetChoice also asserts that SB 854 unconstitutionally "burdens the . . . rights of *adults* to access [social media platforms] for more than one hour, as it effectively requires adults to prove their age to do so." *Id*. ¶ 95. Finally, NetChoice complains that SB 854 burdens platforms' ability "to curate and disseminate content to their users for more than one hour a day." *Id*. ¶ 97.

Heavy on law, the Complaint is sparse on facts. NetChoice provides no details on what speech its member platforms "curate and disseminate," nor how platforms "speak directly with their users." *Id*. It does not identify a single Virginia child unable to access content on any platform—whether that be "attend[ing] church services on Facebook or view[ing] educational materials on YouTube." *Id*. ¶ 98. It does not allege what amount of speech any of its members actually perform on their own behalf, nor does it allege that any Virginian would be unable to view said speech within SB 854's default time limits. Nor has it pointed to any adult who has been deterred from accessing social media because of the age-verification requirements.

In Count II, NetChoice asserts that SB 854 violates due process because it is unconstitutionally vague. NetChoice complains that its member platforms do not know how to tell who is a "user," what it means to "limit a minor's *use* . . . to one hour a day," or "what 'commercially reasonable methods' are or what constitutes 'verifiable parental consent.'" Compl. ¶¶ 119–20 (emphasis added). But again, NetChoice's allegations lack facts. It offers no information on whether and which platforms limit access to users with accounts, how platforms limit access for other purposes—like when a user has been temporarily banned for violating terms of use—or the measures that platforms currently use to verify age or consent. NetChoice does not allege that any member has sought an opinion from the Attorney General on any of those purported

ambiguities, nor that the Attorney General has informed any member that their "commercially reasonable method" is insufficient.

In Count III, NetChoice alleges that SB 854 violates the dormant Commerce Clause because it "directly regulates wholly out-of-state conduct." Compl. ¶ 126. NetChoice complains that SB 854 requires platforms "to perform actions wholly outside the state." *Id.* But it gives no detail on what "age verification" requires, much less where "the actual process" would occur for any given member. *Id.* The Complaint is likewise silent on the process for "placing time restrictions on accounts." *Id.* NetChoice also speculates that platforms may have to impose the one-hour limitation for "Virginians accessing 'social media platform[s]' outside the Commonwealth." *Id.* But it does not point to a single instance of a platform limiting access while a Virginian travels out of state, or of the Attorney General telling platforms that they must do so.

## LEGAL STANDARD

A complaint "must contain" "a short and plain statement of the grounds for the court's jurisdiction" and "of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(1)–(2). This demands "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (cleaned up). And "[a]lthough for the purposes of a motion to dismiss [a court] must take all of the factual allegations in the complaint as true," such an inference demands that facts have been alleged. *Id.* A court is thus "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* If a complaint does not contain sufficient "factual content," it must be dismissed. Fed. R. Civ. P. 12(b)(1), (6).

6

In considering a constitutional challenge to a statute, a court may "reference" "the challenged regulation and its legislative history." *Educ. Media Co. at Va. Tech, Inc. v. Swecker*, 602 F.3d 583, 588 (4th Cir. 2010). Courts presume that statutes are constitutional. *Johnson v. Quattlebaum*, 664 F. App'x 290, 291–92 (4th Cir. 2016) (citing *United States v. Bollinger*, 798 F.3d 201, 207 (4th Cir. 2015)).

## ARGUMENT

The Complaint should be dismissed. NetChoice offers plenty of case citations, but almost no facts: The Complaint is all but devoid of information about NetChoice's members and SB 854's effects on the platforms or Virginians. "[L]egal conclusions can provide the framework of a complaint," but "they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. And even taking the few factual allegations in the light most generous to NetChoice, its constitutional claims are still deficient on their face. *See, e.g.*, *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (affirming district court's dismissal of First Amendment challenge).

## I.  NetChoice has not plausibly alleged standing to challenge SB 854.

NetChoice lacks standing. The Complaint thus must be dismissed for lack of jurisdiction. Fed. R. Civ. P. 12(b)(1).

### A.  NetChoice lacks associational standing to sue on behalf of its members.

NetChoice asserts that it has associational standing to challenge SB 854 on its members' behalf. Compl. ¶ 10. To carry this burden, NetChoice must show that "one of its identified members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Outdoor Amusement Bus. Ass'n, Inc. v. DHS*, 983 F.3d 671, 683 (4th Cir. 2020) (cleaned up). NetChoice fails to plausibly allege that last requirement; its claims require "the participation of [its] individual members." *Id.*

7

For both the facial and as-applied challenges, the Court needs "individualized information" about each of the platforms. *Friends for Am. Free Enter. Ass'n v. Wal-Mart Stores, Inc.*, 284 F.3d 575, 577 (5th Cir. 2002). The Court must be able to assess which, if any, applications of the statute to which platforms implicate the First Amendment. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 725–26 (2024). That inquiry requires facts about each platform. *See, e.g.*, *NetChoice v. Bonta*, 761 F. Supp. 3d 1202, 1230–31 (N.D. Cal. 2024), *aff'd in relevant part by* 152 F.4th 1002 (9th Cir. 2025). Yet NetChoice does not allege even basic details about those platforms' relevant features— what young users they currently allow, the existing restrictions they impose and the existing controls they provide to parents, or how (and for how long) many Virginia kids use those platforms. Nor does it provide any information about the platforms' own speech that is purportedly being infringed. *See, e.g.*, Compl. ¶ 56. As *Moody* makes clear, a platform is not necessarily engaged in protected expression simply because it disseminates speech; rather, whether such dissemination constitutes expression turns on specific facts about the platform's functions and how it transmits speech. *See Moody*, 603 U.S. at 725–26, 736 n.5. And notably, NetChoice includes no allegations that SB 854 will affect each platform uniformly.

### B. NetChoice cannot sue on behalf of Virginia's children or adults.

Not only has NetChoice not plausibly alleged associational standing, but it has not shown that it can sue for purported harms to Virginians. NetChoice treats the First Amendment rights of its member platforms as little more than an afterthought, and for good reason. On its face, SB 854 does not restrict or alter the "expressive offering" platforms may publish to their users. *E.g.*, Compl. ¶ 56 (quoting *Moody*, 603 U.S. at 738). Nor does it impose any limits on a platform's ability to choose the content it disseminates to a particular user. Indeed, NetChoice does not identify a single platform that has been unable to communicate any message to a single Virginian. Instead, NetChoice is far more concerned with alleging that SB 854 infringes the First Amendment

rights of Virginia's children, and, to a lesser extent, adults. *See* Compl. ¶¶ 2–5, 84, 88, 92–96. NetChoice's attempts to assert the rights of third-party users run afoul of the prudential limitations on standing, which require a plaintiff to "assert his own legal rights and interests" rather than "rest[ing] his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

Not all plaintiffs may assert third parties' speech rights via a facial overbreadth challenge. *Cf.* Compl. ¶ 84. Courts entertain such challenges "with hesitation," and "only as a last resort" in narrowly confined situations. *City of L.A. Police Dep't v. United Rep. Publ'g Co.*, 528 U.S. 32, 39 (1999). Plaintiffs may challenge a law for overbreadth only when it threatens to "deter or chill constitutionally protected speech" and render "would-be speakers . . . silent." *United States v. Hansen*, 599 U.S. 762, 769–70 (2023) (citation omitted); *see also Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956–57 (1984) (noting that overbreadth claims are available when a law creates "a possibility that, rather than risk punishment for his conduct in challenging the statute, [the speaker] will refrain from engaging further in the protected activity").

SB 854 does not meet that standard.  In *Los Angeles Police Department*—a decision post-dating *Virginia v. American Booksellers*, 484 U.S. 383 (1988), *cf.* Compl. ¶ 46—the Supreme Court rejected a publishing company's facial challenge to a California statute limiting public access to arrestees' addresses. *L.A. Police Dep't*, 528 U.S. at 40–41. The Court held that the publishing company could not assert its "potential customers[']" First Amendment rights because the customers faced "[n]o threat of prosecution" or other punitive action and could seek access on their own "without incurring any burden other than the prospect that their request will be denied." *Id.* Similarly, SB 854 has limited and non-punitive effects on social media users. It neither targets users for enforcement nor bars their access to social media platforms. *Contra Am. Booksellers*

*Ass'n*, 484 U.S. at 392 (addressing law that completely barred the display of certain material to minors). To the extent that SB 854 places default conditions on the *duration* of access to platforms, users face no barriers to asserting their own First Amendment interests; users are not "silenced." *Hansen*, 599 U.S. at 770.

Overbreadth also does not apply here because NetChoice cannot "be expected satisfactorily to frame the issues" on children's behalf. *Munson*, 467 U.S. at 958. As the Virginia legislature recognized, the "addictive feeds" that social media platforms use to attract and "addict[]" children, *see* Compl. ¶ 108 (citing John Gonzalez, *New Virginia Law Limits Teens' Social Media to 1 Hour Daily: What Parents Should Know*, ABC News (May 14, 2025),[2] create a dynamic very different than a traditional "business relationship," *Munson*, 467 U.S. at 958. NetChoice's interests—to "minimiz[e] burdens" on social media platforms, Compl. ¶ 7—are by no means "completely consistent" with those of child users. *Munson*, 467 U.S. at 958. NetChoice cannot stand in the shoes of Virginia's children.[3]

## II. NetChoice fails to plausibly allege a violation of the First Amendment.

Even if NetChoice had standing, it still has not stated a plausible claim for relief. Instead, NetChoice relies on "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678–79. But no number of cases is sufficient to replace the missing

---

[2] On a motion to dismiss, courts may "consider documents attached to the complaint or incorporated by reference." *Epcon Homestead, LLC v. Town of Chapel Hill*, 62 F.4th 882, 885 (4th Cir. 2023).

[3] The fact that NetChoice attempts to stack associational and third-party standing only reinforces the Complaint's defects. "The Supreme Court has never endorsed such a combination," which "may sometimes 'involve a relationship too attenuated to meet jurisprudential requirements.'" *Mgmt. Ass'n for Priv. Photogrammetric Surveyors v. United States*, 492 F. Supp. 2d 540, 548 (E.D. Va. 2007) (quoting T. Flint, Comment, *A New Brand of Representational Standing*, 70 U. Chi. L. Rev. 1037, 1038 (2003)). Even assuming this form of "derivative standing" may sometimes be appropriate, *see id.* at 549, the relationship between NetChoice and third-party social media users is both too attenuated and too misaligned to justify that theory here.

facts that this Court needs to assess the plausibility of NetChoice's claims. On its face, SB 854 is a content-neutral statute. NetChoice points to no facts suggesting to the contrary—nothing in the legislative history suggesting that the General Assembly passed this statute to discriminate against certain messages or viewpoints, and nothing in the statute's operation suggesting that it is being used to discriminate based on content. NetChoice does not—and cannot—dispute that the Commonwealth has an important and compelling interest in protecting its children from harm. *See* Compl. ¶¶ 107–09. SB 854 need not be perfectly tailored to serve that interest to survive intermediate scrutiny, and NetChoice fails to allege anything that, even taken as true, would result in SB 854 falling short of that standard. The First Amendment claim should be dismissed. *See, e.g.*, *Wag More Dogs, LLC v. Artman*, 795 F. Supp. 2d 377, 384–85 (E.D. Va. 2011) (granting motion to dismiss First Amendment challenge to local ordinance because the plaintiff had not plausibly alleged that the content-neutral ordinance failed intermediate scrutiny).

### A. SB 854 is a content-neutral time, place, and manner restriction subject to no more than intermediate scrutiny.

NetChoice alleges that SB is a content-based statute. Compl. ¶¶ 102–03. But that bare legal conclusion is neither entitled to deference nor borne out by the statute. SB 854 does not regulate content, but is instead a time, place, and manner restriction subject to intermediate scrutiny. Freedom of speech, although powerful, "is not absolute." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 470 (2025). "[T]he First Amendment does not guarantee a right to [speak] at all times and places or in any manner that may be desired." *Hulbert v. Pope*, 70 F.4th 726, 733 (4th Cir. 2023) (quotations omitted). The government can "impose reasonable restrictions on the time, place, or manner of protected speech," *McCullen v. Coakley*, 573 U.S. 464, 477 (2014), "specify[ing] when, where, or how speech may be delivered," *Hulbert*, 70 F.4th at 733. When such regulations are "justified without reference to the content of the regulated speech," they are subject

to intermediate scrutiny and need only be "narrowly tailored to serve a significant governmental interest," and "leave open ample alternative channels for communication of the information." *Hebb v. City of Asheville*, 145 F.4th 421, 432 n.7 (4th Cir. 2025) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). These limitations are permitted in both physical, *Ward*, 491 U.S. at 791 (limits on noise levels for events in public park), and cyber forums, *Courthouse News Serv. v. Smith*, 126 F.4th 899, 908 (4th Cir. 2025) (limits on access to online court records system). That includes social media platforms—the modern, online analogue to a public "street or a park." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017).

The government's leeway to establish time, place, and manner regulations is even greater for speech to and from minors. The government lacks "a free-floating power to restrict the ideas to which children may be exposed," but it has broad authority to regulate *when* and *how* that speech occurs. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 789, 794–95 (2011). "The protection of minors" is, after all, "one of government's most profound obligations." *Am. Booksellers v. Webb*, 919 F.2d 1493, 1495 (11th Cir. 1990) (quotations omitted). SB 854 is one such time, place, and manner statute. It merely sets a default limit on how long children can spend on social media platforms, without imposing any restrictions on what they can see, hear, or say on those platforms.

> **1.** **SB 854 does not dictate the content of speech or permitted viewpoints, and it draws permissible, content-neutral lines between social media platforms and other forums.**

SB 854 is content neutral, on its face and in effect, because it "regulate[s] features of speech unrelated to its content." *McCullen*, 573 U.S. at 477. The statute does not restrict any content "because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Instead, the one-hour default applies "without reference to the content of the regulated speech." *Id.* at 164; *see Courthouse News Serv.*, 126 F.4th at 909. That content-neutral default is akin to a classic time, place, and manner restriction. *See Artman*, 795 F. Supp. 2d at 384

(at motion-to-dismiss stage, rejecting plaintiff's argument that ordinance was "impermissibly content-based" and finding that the "ordinance is clearly content-neutral, not content-based, on its face").

NetChoice makes no attempt to allege that SB 854 interferes with the content that is member platforms may curate and disseminate to users. *See* Compl. ¶¶ 102–03. (Likewise, NetChoice has not alleged any facts that would establish that its members cannot communicate their own speech within the time settings established by SB 854.) Nor could it. Nothing in the law restricts platforms' ability to decide "what third-party speech to display and how to display it" while users are on their platforms. *Moody*, 603 U.S. at 716. The statute does not require platforms to block, filter, or otherwise modify the substance or features they make available to children. It thus has no effect on whatever "expressive product[]" platforms create and publish to their users.[4] *Id.* Again, SB 854 imposes no limitation on *what* platforms have to say to children; it simply regulates *how long* they can presumptively speak to them. *Calvary Christian Ctr. v. City of Fredericksburg*, 832 F. Supp. 2d 635, 644 (E.D. Va. 2011).

SB 854 remains content neutral for the children using the platforms (again, whose rights NetChoice lacks standing to assert, *supra* pp. 8-9). SB 854 does not "decree what constitutionally protected speech minors may access." Compl. ¶ 37. It does not single out any subject matter, message, or viewpoint for restriction. Children may spend their time on social media platforms

---

[4] This distinguishes SB 854 from other monitoring, filtering, or content-blocking regulations that courts have classified as content-based. *See, e.g.*, *Bonta*, 152 F.4th at 1016 ("like counts"); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1036 (W.D. Tex. 2024) (monitoring and filtering requirements that "explicitly identif[ied] discrete categories of speech and single[d] them out to be filtered and blocked"), *appeal pending*, No. 24-50721 (5th Cir. argued Nov. 3, 2025); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1114–15, 1123 (D. Utah 2024) (setting certain privacy settings, restricting minors' ability to share content, and disabling certain features).

however they wish, whether messaging family and friends, attending church services, participating in politics, or using social media for more frivolous or less innocent purposes. Because it preserves users' freedom to engage with any content, SB 854 poses no risk of "excising certain ideas or viewpoints from the public dialogue." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994); *see Calvary Christian*, 832 F. Supp. 2d at 644 (E.D. Va. 2011) (on motion to dismiss, holding that ordinance "[o]n its face . . . is content neutral" because it "regulates how speech occurs, not its content"). [5]

Distorting the language of the statute, NetChoice alleges that SB 854 must be content-based because of the examples the statute provides in its definition of "social media platform." Compl. ¶ 105. That bare legal conclusion is incorrect. SB 854 distinguishes social media platforms from all other forums on based on the manner and "*form*" of the content, not its "*subject matter*." *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 3458571, at *4–5 (11th Cir. Nov. 25, 2025) (holding that definition of social media platform in Florida statute that focused on interactive functions and certain "addictive features" was content neutral); *cf.* Compl. ¶¶ 101–03.

Specifically, under SB 854, a social media platform is a forum that "[c]onnects users in order to allow [them] to interact socially with each other" and "[a]llows users" to "[c]onstruct a public or semipublic profile," "[p]opulate a public list of other users with whom such a user shares a social connection," and "[c]reate or post content viewable by other users." Va. Code § 59.1-575. These are all functional features, devoid of any reference to content. As SB 854 goes on to clarify,

---

[5] NetChoice also asserts (lacking standing to do so, *see supra* pp. 8–9) that SB 854 burdens the First Amendment rights of adults. Compl. ¶ 95. But it does not allege that the statute triggers strict scrutiny for that reason, nor could it. Just last Term, in *Free Speech Coalition*, the Supreme Court held that age-verification requirements imposed at most an "incidental burden" on adults' rights to access protected speech and warranted only intermediate scrutiny. 606 U.S. at 495. SB 854's age-verification requirements impose no greater burden on adult social media users.

this does not include forums where "content" is "preselected by the provider and not generated by users":

> No service or application that consists primarily of news, sports, entertainment, ecommerce, *or content preselected by the provider and not generated by users, and for which any chat, comments, or interactive functionality is incidental to, directly related to, or dependent on the provision of such content, or that is for interactive gaming*, shall be considered to meet this criterion on the basis of that function alone.

*Id.* (emphasis added). In other words, forums that primarily publish provider-generated material (regardless of the nature of that content) do not qualify as "social media platforms" simply because they offer "interactive functionalit[ies]" that are "incidental to," "related to," or "dependent on" the provider-generated material. *Id.* For instance, a site like Amazon is not a "social media platform" simply because customers can interact with each other by posting product reviews, just as the *New York Times* website is not a "social media platform" simply because users can interact with each other in the comments section.

To be sure, as NetChoice emphasizes, SB 854 does reference "news, sports, entertainment, [and] ecommerce" as examples of "content preselected by the provider and not generated by users." *Id.*; *cf.* Compl. ¶ 102. But those categories are just that—illustrative examples of sites where content is "preselected by the provider and not generated by users" and the "interactive functionality" is secondary to provider-generated content. A platform that publishes content in those categories *can* fall within the statute if the "interactive functionality" is integral to the platform. Take, for instance, a social media platform focused exclusively on football or celebrity gossip. The content on those platforms might be "sports" or "entertainment," but that is not the trigger for counting as a social media platform; instead, it is whether their content—no matter the topic—is "generated by users," not "preselected by the provider."[6]

---

[6] The reference to "interactive gaming" likewise focuses on form, not substance. That language clarifies that interactive gaming services do not satisfy the "user-generated" criterion for a "social

NetChoice suggests this Court should be suspicious that SB 854 is content based because it treats social media platforms differently than other mediums. Compl. ¶ 105. But the Supreme Court has soundly rejected the notion "that the First Amendment mandates strict scrutiny for any speech regulation that applies to one medium (or a subset thereof) but not others." *Turner*, 512 U.S. at 660. "[S]uch scrutiny 'is unwarranted when the differential treatment is justified by some special characteristic of the particular [speaker] being regulated'" and the distinction does not reflect a "content preference." *TikTok Inc. v. Garland*, 604 U.S. 56, 72–73 (2025) (quoting *Turner*, 512 U.S. at 658, 660–61). To that end, States can and do impose different restrictions on different forums, speakers, and mediums as needed to remedy the specific problems at hand. *McCullen*, 573 U.S. at 480–81.

SB 854 does just that by focusing solely on "how speech may be delivered" on a platform. *Hulbert*, 70 F.4th at 733. SB 854 defines social media by its special characteristics, classifying a forum as a covered platform based on whether it "[c]onnects users in order to allow users to interact socially with each other," and whether it allows users to "construct a public or semipublic profile," "populate a public list" of social connections with other users within the platform, and "[c]reate or post content viewable by other users," Va. Code § 59.1-575. Again, those functional criteria do not discriminate on the basis of subject matter, message, or viewpoint. *Hulbert*, 70 F.4th at 733. And those features are the ones most likely to cause addiction. Compl. ¶ 108. It is difficult to imagine a forum with more "special characteristic[s]" than social media. *TikTok*, 604 U.S. at 73.

Neither the Complaint nor SB 854 itself "raise suspicion" that the General Assembly's "objective was, in fact, the suppression of certain ideas." *Turner*, 512 U.S. at 660. Beyond rank

---

media platform" simply because they offer *some* social functions that are dependent on the provider-generated gaming content.

speculation, NetChoice offers no actual *facts* suggesting that the General Assembly passed SB 854 to "disfavor[]" certain content. Compl. ¶ 105; *see Artman*, 795 F. Supp. 2d at 385 (similarly rejecting suggestion that ordinance had "target[ed] the speech because of any governmental disagreement with the specific message conveyed"). Had Virginia intended to target "ideas or images that [it] thinks unsuitable" for children, *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975), it would have regulated that content, rather than setting a default time limit during which children can access any content they please.

Social media platforms employ unique features that pose particular dangers to children. SB 854 carefully distinguishes forums posing those risks from those that do not. Nothing about that distinction is based on content.

### 2. NetChoice does not identify any other basis for applying strict scrutiny.

Unable to prove that SB 854 is content based, NetChoice retreats to alleging that SB 854 triggers strict scrutiny because of *how much* speech it regulates. Compl. ¶¶ 99–100. This argument fails on the facts and the law. In this pre-enforcement challenge, NetChoice does not allege any facts suggesting SB 854 will have such sweeping consequences. As even NetChoice does not dispute, under SB 854, children may spend a default of one hour *per social media platform per day*, and parents easily may adjust that time as they see fit. Moreover, NetChoice does not cite any decision applying strict scrutiny to a content-neutral law based solely on the amount of speech implicated; the cases it cites all addressed regulations restricting or banning speech *because of its subject matter*.[7] Those decisions do not provide the framework for analyzing a content-neutral

---

[7] *See Ashcroft v. ACLU*, 542 U.S. 656, 661–62, 665 (2004) (statute criminalizing posting content "harmful to minors" online for commercial purposes); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 811–12, 814 (2000) ("blanket ban" on broadcasting cable television channels "primarily dedicated to sexually-oriented programming" during certain hours); *Reno v. ACLU*, 521 U.S. 844, 868 (1997) (statute criminalizing the knowing online transmission of "obscene" or

regulation like SB 854.

**B.      NetChoice has not alleged that SB 854 fails intermediate scrutiny.**

Because SB 854 regulates social media platforms regardless of content, it must satisfy only intermediate scrutiny. The Complaint is "devoid of any factual content," *Kessler v. City of Charlottesville*, 441 F. Supp. 3d 277, 290 (W.D. Va. 2020), suggesting the statute is not "narrowly tailored to serve a significant governmental interest" and does not preserve "ample alternative channels for communication," *Hulbert*, 70 F.4th at 733–34 (quoting *Ward*, 491 U.S. at 791); *see Ashby v. City of Charlotte*, 121 F. Supp. 3d 560, 562–63 (W.D.N.C. 2015) (granting motion to dismiss after finding that ordinance was a valid time, place, and manner restriction).

**1.      NetChoice fails to allege that SB 854 does not serve the Commonwealth's significant interests in protecting its children from addiction and empowering parents.**

Virginia has a significant interest in "protecting minors from . . . addiction to social media," and in "put[ting] parents back in the driver's seat," as even the Complaint recognizes. Compl. ¶¶ 107–08. As NetChoice put it, "states certainly have a legitimate interest in protecting minors who use" social media. *Id.* ¶ 2. Not only is this interest *significant*, but "[i]t is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is '*compelling.*'" *New York v. Ferber*, 458 U.S. 747, 756–57 (1982) (emphasis added); *accord Uthmeier*, 2025 WL 3458571, at *6 (explaining that a State has a "legitimate and substantial interest in regulating young minors' use of platforms employing addictive features"). Likewise, a State has a strong interest in "strengthen[ing] parental responsibility for children." *Schleifer by Schleifer v. City of Charlottesville*, 159 F.3d 843, 848 (4th Cir. 1998).

---

"indecent" messages to minors); *cf. Free Speech Coal.*, 606 U.S. at 466 (*upholding* law requiring age verification to access pornographic websites).

### 2. NetChoice fails to allege that SB 854 is not sufficiently tailored to advance the Commonwealth's interests.

Rather than contesting Virginia's interest, NetChoice asserts only that SB 854 is not narrowly tailored. But again, NetChoice offers only legal conclusions; it failed to "show[]," rather than merely "allege[]," that SB 854 is not narrowly tailored to meet the problem the General Assembly identified. *Iqbal*, 556 U.S. at 679. To survive intermediate scrutiny, "[a] regulation 'need not be the least restrictive or least intrusive means of serving the government's interests.'" *Hebb*, 145 F.4th at 437 (quoting *McCullen*, 573 U.S. at 486). Instead, it must "focus[] on the source of the evils the Commonwealth seeks to eliminate while leaving untouched other [types of speech that] do not create the same evils." *Courthouse News Serv.*, 126 F.4th at 914 (cleaned up). SB 854 is *not* a social media ban nor does it limit *how* children spend their time on social media platforms. Instead, it simply sets a one-hour default that parents can adjust up or down. NetChoice fails to raise any plausible argument that SB 854 is not narrowly tailored. *See Artman*, 795 F. Supp. 2d at 385–86 (finding on motion to dismiss that ordinance limiting size of signs satisfied a significant government interest and was "properly tailored").

NetChoice first asserts that SB 854 is overly broad because it prohibits children from engaging with "valuable sources" of information. Compl. ¶ 110. But NetChoice does not provide a single fact pointing to any information that minors will be deprived of. They can access any source of information during their time on social media, valuable or not. In many cases, the information children view on social media sites is equally accessible on platforms not covered by SB 854. *See* Compl. ¶ 111 (noting that "minors often encounter similar content on" non-regulated platforms). And a parent can always grant their children additional social media time. Parents now simply enjoy "the support of [a] law[] designed to aid discharge of that responsibility." *Ginsberg v. New York*, 390 U.S. 629, 639 (1968).

NetChoice next objects that Virginian parents already have the tools to monitor and regulate their children's social media usage. Compl. ¶ 112. According to NetChoice—the one area where it actually alleges facts—its member platforms "have developed sophisticated tools and technologies that allow parents to supervise and restrict what their minor children see and how they see it," including by "set[ting] screen-time limits." *Id.* ¶¶ 20, 25. But the Complaint is curiously silent about how effective these voluntary measures are—how many parents take advantage of them, and how much time children end up spending on social media despite these settings. That silence is telling. "[U]nder intermediate scrutiny a regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Free Speech Coal.*, 606 U.S. at 497 (cleaned up). The General Assembly was entitled to conclude "that parental controls were not working" and that "simply offering parents a new tool . . . would not suffice when parents were not taking advantage of the tools already available." *Uthmeier*, 2025 WL 3458571, at *8. This Court should not second guess that legislative conclusion. *See Free Speech Coal.*, 606 U.S. at 497–98 (rejecting argument that State "could adopt less restrictive means of protecting children" from porn, "such as encouraging parents to install content-filtering software on their children's devices or requiring internet service providers to block adult content unless a household opts in to receiving it").

NetChoice also asserts that it makes little sense to regulate Instagram but not Disney+ or other streaming services. Compl. ¶ 105. "But 'the First Amendment imposes no freestanding underinclusiveness limitation,' and the Government 'need not address all aspects of a problem in one fell swoop.'" *TikTok*, 604 U.S. at 76 (quoting *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015)). Addressing the source and symptoms of social media addiction, SB 854 is narrowly tailored "to eliminate" "the source of the evil[]." *Courthouse News Serv.*, 126 F.4th at 914.

SB 854 is thus fundamentally different from the trio of Supreme Court cases cited in the Complaint. In *Brown*, California had banned minors from buying "violent video games." 564 U.S. at 789; Compl. ¶¶ 17, 89, 94. And in *Erznoznik*, Jacksonville had prohibited playing movies with nudity at drive-in theaters. 422 U.S. at 206, 213–14; Compl. ¶ 89. The Supreme Court struck down both content-based statutes under strict scrutiny. *Erznoznik*, 422 U.S. at 209, 211; *Brown*, 564 U.S. at 805. Unlike California's and Jacksonville's complete subject-based *bans*, Virginia's law is neither a ban nor content based. *Supra* pp. 12–17. The one-hour time limitation cannot reasonably be reframed as a ban on accessing speech any more than a curfew can reasonably be framed as a ban on accessing a park. *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46 (1986).

Nor is Virginia attempting to "prevent children from hearing or saying anything without their parents' prior consent," as in *Brown*. Compl. ¶ 94 (quoting *Brown*, 564 U.S. at 795 n.3). Unlike a prior bill considered by the General Assembly, which would have banned minors from accessing any addictive feeds absent parental consent, SB 854 gives Virginia minors a presumptive hour of access per platform without requiring any permission. And unlike the *Brown* hypothetical, the Commonwealth is not *completely barring* minors from engaging in a particular type of speech—like a rock concert—"subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3. Instead, the Commonwealth is setting a baseline time, place, and manner default—like a rule preventing children from attending concerts after 11 p.m.—and allowing a parent to adjust that default as appropriate.

*Packingham*, too, is readily distinguishable. *Cf.* Compl. ¶ 87. There, the Supreme Court struck down a North Carolina criminal law prohibiting sex offenders from accessing any social media sites. 582 U.S. at 103–04, 107. Unlike the North Carolinian sex offenders, NetChoice does not allege that young Virginians are "foreclose[ed] access to social media altogether" nor deprived

of the ability to "speak[] and listen[] in the modern public square[] and otherwise explor[e] the vast realms of human thought and knowledge" available on social media. *Id.* at 107-08. Virginia's children are still presumptively entitled to one hour per day per platform.

### 3. NetChoice fails to allege that SB 854 does not leave open ample alternative channels of communication.

Finally, SB 854 leaves open ample alternative means for speech for both platforms and Virginia's children. "[A]vailable alternatives need not be the speaker's first or best choice or provide the same audience or impact for the speech." *Hebb*, 145 F.4th at 439 (quotations omitted). "[T]he relevant inquiry is simply whether the challenged regulation provides avenues for the more general dissemination of a message." *Id.* (quotations omitted). Under SB 854, platforms can still presumptively speak to minors for an hour a day—and more if parents allow. And minors have plenty of alternative avenues to engage in speech. In addition to their time on Instagram and TikTok each day, they can message and text friends directly (without the harmful effects of algorithms), not to mention communicate in person.

*     *     *     *     *

In sum, SB 854 is a content-neutral statute that serves an important government interest and is narrowly tailored, and NetChoice has not plausibly alleged to the contrary. Count I should be dismissed.[8]

---

[8] In any event, NetChoice does not show that SB 854 fails strict scrutiny. SB 854 "is narrowly tailored," *Williams-Yulee*, 575 U.S. at 444, to serve the Commonwealth's compelling interest in protecting her children's mental and physical health, *Ferber*, 458 U.S. at 756–57. Singling out social media because of its uniquely and inherently addictive qualities, *cf. Brown*, 564 U.S. at 802 (striking down a law that "singled out the purveyors of video games for disfavored treatment [compared to other types of media]" when the state gave "no persuasive reason why"), SB 854 "aims squarely at the conduct most likely to" cause addiction, *Williams-Yulee*, 575 U.S. at 449.

**III.  NetChoice fails to plausibly allege that SB 854 is unconstitutionally vague.**

The vagueness claim should also be dismissed, as NetChoice cannot plausibly allege that SB 854 is so vague that social media platforms lack adequate notice.[9] Due process demands that a statute "give a person of ordinary intelligence adequate notice of what conduct is prohibited and . . . include sufficient standards to prevent arbitrary and discriminatory enforcement." *Manning*, 930 F.3d at 272. As opposed to criminal laws, "[l]ess clarity is required in purely civil statutes because the consequences of imprecision are qualitatively less severe." *Id.* (quotations omitted). "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Cap. Assoc. Indus., Inc. v. Stein*, 922 F.3d 198, 210 (4th Cir. 2019).

SB 854 is a civil statute; the sole available remedies are civil penalties and injunctive relief. Va. Code § 59.1-584(C). And it readily provides fair notice of its straightforward requirements: Social media platforms must verify the age of their users and limit users under 16 to an hour per day on the platform absent parental consent. These are "objectively discernable" requirements, and compliance is not "left to the subjective view of judges and law enforcement officials." *Manning*, 930 F.3d at 276, 278; *cf. Tanner v. City of Va. Beach*, 674 S.E.2d 848, 853 (Va. 2009). SB 854 is thus far afield from statutes vaguely referencing "vagabonds," "night walkers," "loafers," and "habitual drunkards." *United States v. Concepcion*, 139 F.4th 242, 249 (2d Cir. 2025); *Manning*, 930 F.3d at 274.

---

[9] Vagueness challenges are routinely dismissed at the motion-to-dismiss stage. *See Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019) (explaining that "the question of a statute's vagueness is a purely legal issue that does not require additional fact-finding"); *see, e.g.*, *Cozart*, 680 F.3d at 371 (at motion-to-dismiss stage, holding that ordinance was not unconstitutionally vague); *Swagler v. Neighoff*, 398 F. App'x 872, 879 (4th Cir. 2010) (holding that district court erred in declining to dismiss vagueness claim); *Norris v. City of Asheville*, 721 F. Supp. 3d 404, 416 (W.D.N.C. 2024) (dismissing vagueness claim where the plaintiffs had "not sufficiently alleged that the [municipal policy] fail[ed] to provide adequate notice of what conduct is prohibited because such notice is provided by reference to existing laws and policies").

NetChoice purports to identify three unconstitutional ambiguities in SB 854. First, NetChoice asserts that its members do not know if they must prevent minors from simply "posting" on their platforms for more than an hour a day, from "viewing content," or "from accessing the website at all" after an hour. Compl. ¶ 120. But the statute's plain text answers that question. *Martin v. Lloyd*, 700 F.3d 132, 136–37 (4th Cir. 2012). Each platform must "limit a minor's *use* of such social media platform." Va. Code § 59.1-577.1 (emphasis added). In other words, after an hour, the minor cannot "employ" or "avail [her]self of" the platform—whether that be posting, liking, or viewing. *Use* (def. 1), *Merriam Webster*; *accord Use* (defs. 1-2), *American Heritage Dictionary*. In any event, as NetChoice touts, many of its members have voluntarily created similar tools to allow parents to limit how long their children can "use" social media. Compl. ¶¶ 5, 20 ("Plaintiff's members . . . have developed sophisticated tools and technologies that allow parents to supervise and restrict what their minor children see and how they see it. Parents who wish to limit minors' access to online services . . . have many options at their disposal."). Clearly, platforms know how to calculate an hour of activity and advise users of the same.

NetChoice also frets whether the one-hour limitation applies to all platform visitors or only account holders. Compl. ¶ 119. No matter the answer, none of NetChoice's members are at risk of suit or penalty without fair notice of the Commonwealth's position, and NetChoice does not allege to the contrary. *See Ward*, 491 U.S. at 795–96 (city conferred with concert operators before taking "corrective action"). Only the Attorney General can enforce SB 854. Va. Code § 59.1-584(A), (E). And before bringing any enforcement action, he must issue a notice to the platform and then give the platform 30 days to cure the violation—or to urge the Attorney General to adopt a different interpretation of the statute. *Id*. § 59.1-584(B). If the platform complies, then "no action shall be initiated." *Id.* Only if the platform refuses to change its conduct can the Attorney General sue. *Id.*

§ 59.1-584(C). Because of this notice-and-cure period, no social media platform is at risk of penalty prior to receiving a specific notice from the Attorney General and having an opportunity to conform to avoid suit. *Cap. Assoc. Indus.*, 922 F.3d at 210–11; *see Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982) (explaining that a business "may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process").

Finally, NetChoice complains that the statute does not detail how platforms are supposed to obtain "verifiable parental consent," or what "commercially reasonable methods" are for verifying age." Compl. ¶ 120. For its part, the Complaint offers no facts about how the platforms intend to comply with SB 854 or how the purported ambiguities will impair that compliance. Either way, "verifiable" and "commercially reasonable" are both well-known concepts with "settled legal meanings" that can be assessed based on objective criteria; they do not demand "wholly subjective judgments without . . . narrowing context." *Concepcion*, 139 F.4th at 249; *see, e.g.*, 15 U.S.C. § 6502(b)(1)(A)(ii) (requiring "verifiable parental consent" for websites to collect personal information of children under 13); Va. Code § 8.01-40.5(B) (requiring websites to use a "commercially reasonable method" to ensure that minors under 18 do not access pornography). And once again, the notice-and-cure provisions prevent platforms from facing civil penalties for good-faith compliance attempts. *See Students Engaged in Advancing Texas v. Paxton*, 765 F. Supp. 3d 575, 603 (W.D. Tex. 2025) (in challenge to Texas social media law, rejecting suggestion that "commercially reasonable" and "verified parent" were vague).

SB 854, a straightforward civil statute with a notice-and-cure period, is not unconstitutionally vague, and NetChoice cannot plausibly assert to the contrary. Count II should be dismissed.

**IV.    NetChoice fails to plausibly allege that SB 854 violates the dormant Commerce Clause.**

Finally, NetChoice cannot plausibly show that SB 854 is unconstitutional under the dormant Commerce Clause. States have broad authority to regulate for their citizens' benefit. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 375 (2023). But in doing so, the dormant Commerce Clause requires that States not engage in "economic protectionism" by "burdening out-of-state competitors" to "benefit in-state economic interests." *Id.* at 369; *see Just Puppies, Inc. v. Brown*, 123 F.4th 652, 665 (4th Cir. 2024). Nor can States impose burdens on interstate commerce that are "clearly excessive" to the local benefits. *Ross*, 598 U.S. at 376 n.1, 377 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). SB 854 does not, as NetChoice insists, impermissibly attempt to regulate outside the Commonwealth's jurisdiction. Beyond attempting to revive the extraterritoriality principle *Ross* rejected, NetChoice does not meaningfully allege a dormant Commerce Clause claim. Nor could it. SB 854 does not discriminate in favor of in-state platforms. And the law's purported out-of-state burdens do not exceed the important in-state interests—to the extent that the platforms' pocketbooks can be weighed against young Virginians' health and safety. Count III should be dismissed.

**A.    NetChoice does not allege that Virginia is impermissibly regulating conduct with no connection to the Commonwealth.**

NetChoice alleges that SB 854 is unconstitutional because it "directly regulates wholly out-of-state conduct." Compl. ¶ 126. But NetChoice misunderstands both the contours of the dormant Commerce Clause and the scope of SB 854. SB 854 requires social media platforms with "users in the Commonwealth" to verify the age of those Virginia users and to limit access to Virginia minors under 16. Va. Code § 59.1-577.1. States have broad power to regulate to benefit their citizens, even if those laws control conduct occurring outside state lines. Indeed, "[i]n our interconnected national marketplace, many (maybe most) state laws have the practical effect of

controlling extraterritorial behavior." *Ross*, 598 U.S. at 374 (quotations omitted). "Companies that choose to sell products in various States must normally comply with the laws of those various States." *Id.* at 364.

For instance, in *Ross*, California prohibited the in-state sale of pork from pigs "confined in a cruel manner," to advance its residents' interest in accessing ethically produced foods. 598 U.S. at 365–66. "California imports almost all the pork it consumes," so the burdens of the law—the "compliance costs" of the pig farmers—would fall almost exclusively on "out-of-state firms." *Id.* at 367. The Supreme Court (on a motion to dismiss) nonetheless upheld California's law, squarely overruling the "principle against extraterritoriality" adopted by numerous circuits, including the Fourth, that had broadly read the dormant Commerce Clause to prohibit a state from "regulat[ing] commerce occurring wholly outside of its borders." *Id.* at 373–76; *Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 671, 667 (4th Cir. 2018); *compare GenBioPrio, Inc. v. Sorsaia*, 2023 WL 5490179, at *11 (S.D.W.Va. Aug. 24, 2023) (recognizing this abrogation) *with* Compl. ¶ 127 (still citing *Frosh* for the extraterritoriality principle).

For those same reasons, SB 854 is well within Virginia's power to regulate. To be clear, NetChoice does not actually allege *where* the platforms must take action to comply with SB 854. But even assuming that the platforms engage in "the actual process of age verification and placing time restrictions on accounts" from out-of-state locations, Compl. ¶ 126, the fact that the platforms must "perform actions wholly outside the state" to comply does not render SB 854 unconstitutional, as *Ross* made clear. *Id.* The platforms are made available in Virginia to Virginians, and the effects of those out-of-state actions are felt in Virginia. In enacting SB 854, Virginia has exercised its "usual legislative power . . . to act upon persons and property within the limits of its own territory." *Ross*, 598 U.S. at 375.

NetChoice suggests that *Ross* recognized that state laws still cannot "regulate purely out of state transactions." Compl. ¶ 127 (quoting *Ross*, 598 U.S. at 376 & n.1). But NetChoice overreads that single footnote. There, the Court distinguished *Edgar*, a prior plurality opinion that "declined to enforce an Illinois securities law that '*directly* regulate[d] transactions which [took] place . . . wholly outside the State' and *involved individuals* '*having no connection with Illinois*.'" *Ross*, 598 U.S. at 376 n.1 (quoting *Edgar v. MITE Corp.*, 457 U.S. 624 (1982)) (emphasis added). The Court "questioned whether the state law at issue in *Edgar* posed a dormant Commerce Clause question" at all, as opposed to an equal-sovereignty issue. *Id.* "But either way," *Edgar* did not apply because it involved "a law that *directly* regulated out-of-state transactions by those with *no* connection to the State." *Id.* California's law—like SB 854—did not meet those conditions, as the state's law prohibited the in-state sale of inhumanely raised pork.

Nothing about SB 854 requires the platforms to engage in age-verification or time-limitations for individuals "having *no* connection to" Virginia. *Ross*, 598 U.S. at 376 n.1. NetChoice speculates that the Commonwealth will apply SB 854 to users with no connection to Virginia. Compl. ¶ 126. But NetChoice offers no factual allegations, much less plausible ones, that suggest the Commonwealth might do so, and a State is presumed to "not intend to give its enactments *impermissible* extraterritorial operation." 82 C.J.S. Statutes § 362 (emphasis added).

**B.**    **NetChoice does not allege that SB 854 discriminates against out-of-state commerce.**

Beyond its extraterritoriality challenge, NetChoice has not meaningfully attempted to state a claim under the dormant Commerce Clause. Nor could it. SB 854 is not an example of "economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Just Puppies*, 123 F.4th at 665 (quotations omitted). SB 854 does not plausibly discriminate against out-of-state platforms in favor of any in-state platforms.

*Id.* at 666–67 & n.10 (dismissing claim and rejecting argument that Maryland statute prohibiting Maryland pet stores from selling pets to Maryland consumers discriminated against out-of-state breeders).

### C.     NetChoice fails to allege that out-of-state costs exceed in-state benefits.

Likewise, NetChoice has not plausibly alleged a *Pike* balancing claim, as the out-of-state costs to the platforms do not exceed the in-state benefits to Virginians. "[T]he burden imposed on [interstate] commerce" must be "clearly excessive in relation to the putative local benefits." *Just Puppies*, 123 F.4th at 669 (quoting *Pike*, 397 U.S. at 142). NetChoice has "failed to plead facts plausibly suggesting a substantial harm to interstate commerce." *Id.* at 670. The dormant Commerce Clause concerns itself with economics, so NetChoice cannot point to its alleged First Amendment harms. And NetChoice puts no effort into alleging its compliance costs, instead blankly asserting that the changes "would be costly." Compl. ¶¶ 55, 64, 73, 82; *cf. Ross*, 598 U.S. at 367 (cataloguing costs imposed by California ban on inhumanely raised pork).

NetChoice has also "failed to plead facts plausibly suggesting . . . that the legislature lacked a rational basis to believe [SB 854] advanced a legitimate purpose." *Just Puppies*, 123 F.4th at 670. As NetChoice acknowledges, the Commonwealth imposed a reasonable one-hour limitation to avoid the documented harms of social media addiction among its youth. Compl. ¶ 108. NetChoice offers no allegations to rebut that "rational basis"—no studies or expert of its own suggesting that the General Assembly's concerns are overstated. *Just Puppies*, 123 F.4th at 670.

Finally, NetChoice has "failed to plausibly allege that . . . [SB 854's] burdens are 'clearly excessive' in comparison to its benefits." *Id.* (quoting *Pike*, 397 U.S. at 142). Even assuming that monetary harm to social media platforms can be balanced against the health of Virginia's youth, NetChoice has offered nothing to suggest that its pocketbook injury outweighs SB 854's

significant public health benefits. The General Assembly unanimously "acted within the legislative purview by hearing [] information about a problem and choosing among possible solutions." *Id.* This Court should not "second guess these empirical judgments" but instead "give due deference to the body whose primary responsibility it is to judge the benefits and burdens of legislative action." *Id.* (cleaned up); *see GenBioPro*, 2023 WL 5490179, at *12–15 (dismissing dormant Commerce Clause claim on motion to dismiss).

## <u>CONCLUSION</u>

For these reasons, Defendant respectfully moves this Court to grant its Motion to Dismiss and dismiss NetChoice's Complaint.

Dated: January 26, 2026
Respectfully submitted,

**JAY JONES, in his official capacity as**
**Attorney General of the Commonwealth of Virginia**

*/s/ Benjamin L. Hatch*
Benjamin L. Hatch (VSB No. 70116)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street
Suite 9000
Norfolk, Virginia 23510
T: 757.640.3727
F: 757.640.3947
bhatch@mcguirewoods.com

Erin B. Ashwell (VSB No. 79538)
John D. Adams (VSB No. 65203)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: 804.775.1002
F: 804.698.2002
eashwell@mcguirewoods.com
jadams@mcguirewoods.com

## CERTIFICATE OF SERVICE

I certify that on this 26th day of January, 2026, a true and correct copy of the foregoing was served on all registered counsel of record via Notice of Electronic Filing through the Court's CM/ECF system.

.                                         */s/ Benjamin L. Hatch*
                                        Benjamin L. Hatch (VSB No. 70116)