IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| NETCHOICE, | ) |
| *Plaintiff,* | ) |
| v. | ) Case No. 1:25-cv-2067 (PTG/LRV) |
| JAY JONES, in his official capacity as Attorney General of the Commonwealth of Virginia, | ) |
| *Defendant.* | ) |

## <u>MEMORANDUM OPINION</u>

This matter comes before the Court on Plaintiff NetChoice's Motion for Preliminary Injunction. Dkt. 4. NetChoice is a nonprofit trade association whose members are online service providers, including Facebook, Instagram, YouTube, Reddit, and Dreamwidth. NetChoice filed suit against Virginia's Attorney General to enjoin the enforcement of Senate Bill 854 ("SB 854").[1] Va. Code Ann. § 59.1-577.1 (2026) (effective Jan. 1, 2026). SB 854 requires social media platforms to (1) "use commercially reasonable methods . . . to determine whether a user is a minor," meaning under the age of sixteen, and (2) "limit a minor's use of such social media platform to one hour per day, per service or application." § 59.1-577.1(B). SB 854 permits "verifiable parental consent to increase or decrease the daily limit" of social media use. *Id.* In its Complaint, NetChoice alleges that SB 854 violates the First Amendment rights of NetChoice's member companies and their adult and minor users. *See* Dkt. 1 ("Compl.") ¶ 7. NetChoice also

---

[1] This suit was filed against the Attorney General of the Commonwealth of Virginia in his official capacity. On January 17, 2026, Jay Jones was sworn in as Virginia's Attorney General and thus has been substituted as the defendant in this action. Fed. R. Civ. P. 25(d); Dkt. 37.

contends that SB 854 violates the Commerce Clause by requiring social media platforms to verify and regulate Virginians' out-of-state activities. *Id.* ¶ 126.

NetChoice seeks a preliminary injunction to enjoin the Attorney General from enforcing SB 854. Dkt. 5 ("Pl. Br.") at 3. NetChoice argues that SB 854 is facially unconstitutional because it draws a distinction among speakers and it infringes protected speech in violation of the First Amendment. In response, the Attorney General argues that the law is a reasonable time, place, and manner restriction that is narrowly tailored to "protect [children] from the addictive features" of social media platforms. Dkt. 16 ("Def. Opp'n") at 13–14. He also contends that NetChoice lacks standing to sue or seek a preliminary injunction. *Id.* at 10–12. On January 16, 2026, the Court heard oral argument on the Motion for Preliminary Injunction. For the reasons that follow, the Court finds that NetChoice has standing and satisfied each of the factors set out in *Winter v. Natural Resources Defense Council, Inc.* 555 U.S. 7, 20 (2008). Accordingly, the Court grants the Motion for Preliminary Injunction.

## I. Factual and Procedural Background

This case concerns the tension between society's First Amendment protections and the government's duty to protect minors. This tension is particularly acute in the context of social media platforms. Platforms such as Facebook, Instagram, YouTube, Reddit, and others now serve as a central forum for expression, information sharing, and general public discourse. They provide news, entertainment, and social interaction, serving a valuable purpose. Both adult and minor users spend large amounts of time utilizing these platforms daily. As with many innovations, social media can create significant social value while also presenting real dangers, including the danger of addiction.

2

The prevalence of social media, and over-exposure to it, can undoubtably impact minors. Research shows that social media can be addictive and that minors are particularly susceptible to its addictive features.  Declaration of Dr. Melissa Nelson, Dkt. 16-1 ¶ 12.[2]  Features such as tailoring content to the individual user, infinite scroll, push notifications, and validation mechanisms (likes, etc.) lure users to stay tuned into or return to their social media. *Id.* "Childhood is the most important period of brain development," during which the portion of the brain responsive to "rewarding stimuli in their environment, particularly from peers" is "hyperactive." *Id.* ¶ 13 (quoting Maria T. Maza et al., *Association of Habitual Checking Behaviors on Social Media with Longitudinal Functional Brain Development*, 177 JAMA Pediatrics 161, 161 (2023)). These factors make children more susceptible to addiction, and the features of social media play into that.  *Id.* ¶ 14.  According to recent studies and medical research, too much social media exposure can change the parts of children's brains responsible for impulse control, emotional regulation, and social behavior. *Id.* ¶ 15. Excessive exposure also contributes significantly to high rates of anxiety, depression, and self-harm among minors. *Id.* ¶ 18.

Virginia, like many states, is facing a mental health crisis among its youth. *Id.* ¶ 19. The numbers are so severe nationally that in 2023, the U.S. Surgeon General declared a public-health crisis and urged regulators to limit children's consumption of social media.  Def. Opp'n at 1.

---

[2] For nearly twenty years, Dr. Nelson served as a primary care pediatrician. Dkt. 16-1 ¶ 4.  She currently specializes in treating children, teens, and young adults with behavioral and mental health challenges. *Id.* ¶ 2.  Dr. Nelson is also vice chair of the Virginia State Board of Health. *Id.* ¶ 7. The Attorney General submitted Dr. Nelson's declaration in support of its Opposition. *See* Def. Opp'n at 4, 19–20.  NetChoice does not challenge its accuracy.

3

In response to the social media crisis, the Virginia General Assembly unanimously passed

SB 854. On May 2, 2025, then-Governor Glenn Youngkin signed it into law.[3] *Id.* The law seeks

to address social media-related issues with minor children, who are defined as under the age of

sixteen. Va. Code § 59.1-577.1(A).

SB 854 amends the Virginia Consumer Data Protection Act by adding and defining social

media platforms and their responsibilities as related to minors. The statute provides that:

> Any controller or processor that operates a social media platform shall (i) use
> commercially reasonable methods, such as a neutral age screen mechanism, to
> determine whether a user is a minor and (ii) limit a minor's use of such social media
> platform to one hour per day, per service or application, and allow a parent to give
> verifiable parental consent to increase or decrease the daily time limit.

§ 59.1-577.1(B). The statute defines "social media platform" as:

> [A] public or semipublic Internet-based service or application that has users in the
> Commonwealth and that meets the following criteria:
>
> 1. Connects users in order to allow users to interact socially with each other within
> such service or application. No service or application that exclusively provides
> email or direct messaging services shall be considered to meet this criterion on the
> basis of that function alone; and
>
> 2. Allows users to do all of the following:
>
> a. Construct a public or semipublic profile for purposes of signing into and using
> such service or application;
>
> b. Populate a public list of other users with whom such user shares a social
> connection within such service or application; and
>
> c. Create or post content viewable by other users, including content on message
> boards, in chat rooms, or through a landing page or main feed that presents the user
> with content generated by other users. **No service or application that consists
> primarily of news, sports, entertainment, ecommerce, or content preselected
> by the provider and not generated by users, and for which any chat, comments,
> or interactive functionality is incidental to, directly related to, or dependent**

---

[3] On January 17, 2026, Abigail Spanberger was sworn in as Virginia's Governor, succeeding
Governor Youngkin.

**on the provision of such content, or that is for interactive gaming, shall be considered to meet this criterion on the basis of that function alone."**

§ 59.1-575 (emphasis added).

SB 854 also includes an enforcement mechanism and civil penalties for entities that violate its provisions. § 59.1-584. In particular, the Attorney General must provide a controller or processor with 30 days' written notice of any violation. § 59.1-584 (B). The controller or processor can cure the violation within those 30 days and there will be no further action. *Id.* If the controller or processor continues to violate the statute, the Attorney General may seek an injunction as well as civil penalties in the amount of $7,500 for each violation. § 59.1-584(C). The Attorney General may also recover reasonable expenses, including attorney fees, incurred in investigating and pursuing the case. § 59.1-584(D). Because SB 854 went into effect on January 1, 2026, and the statute includes a 30-day notice provision, January 31, 2026, was the earliest date a possible enforcement action could occur.

On November 17, 2025, NetChoice filed the instant motion for preliminary injunction. Pl. Br. The parties agreed to a briefing schedule. Dkt. 8. On December 19, 2025, the Attorney General filed his opposition brief. Def. Opp'n. On January 8, 2026, NetChoice filed its reply. Dkt. 28 ("Reply"). The Court heard argument on January 16, 2026. At that time, neither party indicated whether the Attorney General had issued any written notices of violation to any of NetChoice's members.

## II. Discussion

The First Amendment, which applies to the States through the Fourteenth Amendment, prohibits government from enacting laws that "abridg[e] the freedom of speech." U.S. Const. amend. I. Thus, government has "no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (quoting *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95 (1972)). NetChoice contends that SB 854 violates the First Amendment rights of its members as well as its members' users. The Attorney General challenges NetChoice's standing to bring its claims and seek a preliminary injunction. Because standing is a threshold jurisdictional question, the Court must address it first.

### A. Standing

Article III, section 2 of the Constitution limits federal court jurisdiction to actual cases and controversies. *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017). As stated above, "[s]tanding is a threshold jurisdictional question that ensures a suit is appropriate for the exercise of the [federal] courts' judicial powers." *Id.* (alteration in original) (quoting *Pye v. United States*, 269 F.3d 459, 466 (4th Cir. 2001)). To demonstrate Article III standing, a plaintiff bears the burden of showing that it (1) has suffered an injury in fact that is (2) traceable to the defendant's actions, and (3) is likely to be redressed by judicial intervention. *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560–61 (1992). Moreover, a plaintiff must establish that it has standing as to each claim.[4] *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

---

[4] Although a plaintiff must establish standing for each claim, the parties' briefs do not address whether NetChoice has standing to bring its Commerce Clause claim. At this time, it is not necessary to reach this issue because the Court's ruling on the preliminary injunction turns solely on the First Amendment claim.

Here, NetChoice contends that it has associational standing to assert the rights of its members. Reply at 13. NetChoice also contends that it has standing to assert the First Amendment rights of its members' adult and minor users. *Id.* at 14. The Attorney General argues that NetChoice does not have associational standing because its claim requires its members to individually participate in this suit. Def. Opp'n at 10–11. Additionally, the Attorney General argues that NetChoice does not have third-party standing to sue on behalf of its members' users. *Id.* at 11–12.

### 1.    NetChoice's Standing to Sue on Behalf of its Members

Associations can assert standing to bring suits on behalf of their members. For a trade association, such as NetChoice, to establish associational standing, it must allege that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

First, the Court considers whether NetChoice's members would have a right to sue, i.e., whether they have an injury in fact that is traceable to the defendant that could be redressed by the judicial relief sought. The Supreme Court has noted that "[g]overnment regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements. So in those cases, standing is usually easy to establish." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024). Moreover, "[t]he Supreme Court has regularly found associational standing for trade associations when an injunction would benefit many of their members." *Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, 983 F.3d 671, 683 (4th Cir. 2020) (citing *Hunt*, 432 U.S. at 342). Such is the case here.

7

NetChoice easily establishes that its members have demonstrated a real and immediate threat of future injury. Its members include internet companies such as Meta (the parent company of Facebook and Instagram), Reddit, Dreamwidth Studios, and YouTube. Compl. ¶¶ 7, 12. Further, NetChoice's members are "social media platforms" as defined by SB 854 as they allow users to create profiles, upload posts, and connect with other users to interact socially. *See* § 59.1-575.

NetChoice has also established an injury in fact. First, its members' First Amendment rights are implicated as they are engaging in expressive activity when they disseminate third-party speech. *See Moody v. NetChoice*, 603 U.S. 707, 731 (2024) ("[T]he First Amendment offers protection when an entity engaging in expressive activity, including compiling and curating others' speech, is directed to accommodate messages it would prefer to exclude."). "NetChoice members engage in First Amendment protected activity by curating and disseminating content that they deem to be most valuable to users and that complies with their rules about the content allowed on their services." Dkt. 6-1, Cleland Decl. at 20. To that end, YouTube attests that SB 854 will hinder its ability to "communicate with its users by disseminating content to users that YouTube thinks will be particularly relevant to them." Dkt. 5-1, Blumenfeld Decl. ¶ 41; *see also* Dkt. 5-2, Paolucci Decl. ¶ 4 ("Dreamwidth communicates with our users through the service about important topics of the day . . . ."). Clearly, hindering members' expression is an injury. Moreover, if SB 854 is enforced against these entities, they will suffer financial harm in terms of compliance costs as well as civil penalties for violations. Additionally, NetChoice's members could demonstrate the traceability and redressability factors for standing since only the Attorney General can enforce SB 854, and a court order enjoining enforcement would prevent the injury. Because NetChoice has

demonstrated that its members have Article III standing, it meets the first requirement for associational standing.

Turning to the second requirement, NetChoice shows that the interests it seeks to protect are germane to NetChoice's purpose. "NetChoice's mission is to promote online commerce and speech and to increase consumer access and options through the Internet, while minimizing burdens on businesses that make the Internet more accessible and useful." Compl. ¶ 7. Compliance with the age verification, parental consent, and time limitations in SB 854 could potentially burden both minor and adult users as well as the social media platforms. This goes to the heart of NetChoice's core mission.

The Attorney General does not contest NetChoice's members' standing to sue nor that the interests NetChoice seeks to protect are germane to its purpose. *See* Def. Opp'n at 10–11. In fact, the Attorney General only challenges the final requirement for associational standing: whether individual members' participation is needed in the suit. Because SB 854 regulates a variety of platforms, the Attorney General contends that the participation of individual members is necessary because "individualized information" is necessary to resolve the claim. *Id.* at 11. That assertion is true for as-applied challenges, which require a developed factual record to analyze how a statute applies to a particular party. *See NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1013–14 (9th Cir. 2025). Instead, NetChoice asserts a facial challenge, which does not require a fact-intensive analysis of the statute's application. *See infra* Section II.B.1.a. Further, NetChoice seeks an injunction to prevent its members from enforcement actions. Associational standing is routinely found when trade associations seek an injunction that would benefit many of its members. *Outdoor Amusement Bus. Ass'n*, 983 F.3d at 683; *see also* Cleland Decl. at 16, 19–20 (contending that many members will face "significant difficulty" and their "speech and business" will be burdened if they

9

have to comply with SB 854). Thus, the Court finds that NetChoice has established associational standing to sue on behalf of its members.

### 2. NetChoice's Standing to Sue on Behalf of its Members' Users

In addition to asserting the rights on behalf of its members, NetChoice also challenges SB 854 based on the First Amendment rights of its members' users. This requires NetChoice to establish third-party standing, which it does.

Third-party standing is allowed when "enforc[ing] the challenged restriction against the litigant would result indirectly in the violation of third parties' rights." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (alteration in original) (quoting *Warth v. Seldin*, 422 U.S. 490, 510 (1975)). "[V]endors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Craig v. Boren*, 429 U.S. 190, 195 (1976). Although it did not explicitly address standing, in *Brown v. Entertainment Merchants Association*, the Supreme Court implicitly recognized a trade association's ability to sue to protect its minor users' First Amendment rights to access violent video games. *See* 564 U.S. 786, 789 (2011). There, a California law sought to prohibit the sale of violent video games to minors. *Id.* at 790 (holding that video games qualify for First Amendment protection).

Here, NetChoice is in a position similar to the trade association in *Brown* as NetChoice contends that SB 854 violates the First Amendment by regulating social media users' access to protected speech. Specifically, SB 854 requires NetChoice's members to impose age verifications for all users and time limitations for minors. NetChoice contends that SB 854 restricts access to its members' platforms and burdens adult and minor users' access to protected speech. This is textbook third-party standing.

10

The Attorney General contends that NetChoice cannot assert the rights of minor users because SB 854 does not create a risk that children will "refrain from constitutionally protected speech to avoid the risk of punishment." Def. Opp'n at 12 (internal quotation marks omitted). To support his argument, he relies on *Los Angeles Police Department v. United Reporting Publishing Corp.* 528 U.S. 32 (1999). There, the challenged California law required that a person requesting an arrestee's address declare that the request was being made for one of five enumerated reasons and that the address would not be, directly or indirectly, used to sell a service or product. *Id.* at 34. A publishing company, which sold this information to its customers, sought injunctive relief, claiming that the law was unconstitutional under the First Amendment. *Id.* The Supreme Court held that the publishing company could not raise the First Amendment rights of its customers because there was no possibility that customers' protected speech would be muted, as the customers themselves could request the information under the statute without any burden. *Id.* at 40–41. However, *United Reporting Publishing Corp.* is distinguishable from this case. Here, NetChoice argues SB 854 unavoidably restricts the First Amendment rights of its members' users and there is a very real burden on speech in terms of the age verifications, limitations, and even the hurdles of parental consent. Indeed, that burden is the very issue before the Court.

NetChoice asserts the same third-party standing implicitly recognized in *Brown* and explicitly recognized by other courts around the country. *See NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 807 (5th Cir. 2025); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 946 (S.D. Ohio 2025); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *12 (W.D. Ark. Aug. 31, 2023); *NetChoice v. Carr*, 789 F.Supp.3d 1200, 1213–17 (N.D. Ga. June 26, 2025) (finding that NetChoice established standing to sue on behalf of its members as well as its members' users). Accordingly, this Court

finds that NetChoice has third-party standing to assert the rights of its members' users in challenging the constitutionality of SB 854.

**B.    Preliminary Injunction**

Having concluded that NetChoice has standing to sue on behalf of its members and its members' users, the Court now turns to the merits of NetChoice's Motion for Preliminary Injunction. "A preliminary injunction is an extraordinary remedy never awarded as a matter of right." *Winter*, 555 U.S. at 24. To obtain a preliminary injunction, a plaintiff must demonstrate (1) a likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors an injunction, and (4) that an injunction is in the public interest. *Id.* at 20. A preliminary injunction can only be granted if every factor is met. *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 169 (4th Cir. 2025).

**1.    Likelihood of Success on the Merits**

NetChoice must demonstrate by "a clear showing" that it is likely to succeed on the merits. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345 (4th Cir. 2009) (quoting *Winter*, 555 U.S. at 22). The Fourth Circuit has held that where "the irreparable harm that [the plaintiff] has alleged is inseparably linked to his claim of a violation of his First Amendment rights . . . analysis of [the plaintiff's] likelihood of success on the merits becomes the first and the most important factor for a court to consider." *Imaginary Images Inc. v. Evans*, 593 F. Supp. 2d 848, 853–54 (E.D. Va. 2008) (alterations in original) (quoting *Ctr. For Individual Freedom, Inc. v. Ireland*, 2008 WL 1837324, at *2 (S.D.W.Va. April 22, 2008), *aff'd*, 612 F.3d 736 (4th Cir. 2010). Where a plaintiff asserts multiple claims, the court needs to only find that a plaintiff is likely to succeed on one of the claims for this factor to weigh in favor of a preliminary injunction. *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 778 F. Supp.

3d 685, 759 (D. Md. 2025). Since NetChoice asserts that SB 854 violates the First Amendment, the Court proceeds with a First Amendment analysis.

### *a. First-Amendment Framework*

At the outset, the Court distinguishes between as-applied and facial challenges because this is a critical step in determining the appropriate First Amendment framework to use.

In an as-applied challenge, the plaintiffs contend that the law is unconstitutional as applied to them. *Fusaro v. Howard*, 19 F.4th 357, 368 (4th Cir. 2021). Accordingly, as-applied challenges are "fact-specific inquiries because of 'the general rule that constitutional adjudication requires a review of the application of a statute to the conduct of the party before the Court.'" *Id.* (quoting *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798 (1984)). This type of challenge is based on a developed factual record and the application of a statute to a specific entity. *Fusaro*, 19 F.4th at 368. To prevail on an as-applied First-Amendment challenge, a plaintiff must show that the statute is unconstitutional as applied to the particular speech activity. *Id.*

By contrast, a facial challenge asserts that a statute is invalid "on its face." *Taxpayers for Vincent*, 466 U.S. at 796. The inquiry centers on the statute's text and structure, rather than the circumstances of a particular enforcement action. *See United States v. Stevens*, 559 U.S. 460, 472 (2010). Facial challenges can take two different approaches. *Taxpayers for Vincent*, 466 U.S. at 796. The first approach asserts that the statute is unconstitutional in every conceivable application, not just as applied to a specific circumstance. *Id.*

The second facial approach, taken in a challenge for overbreadth, addresses whether the statute seeks to prohibit a broad range of protected speech. *Stevens*, 559 U.S. at 474. This requires an analysis of whether "a substantial number" of the statute's applications are unconstitutional,

13

judged in relation to the statute's "plainly legitimate sweep." *Moody*, 603 U.S. at 723 (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)).   A court must perform a full-scope review of the law's coverage and an in-depth review of the law's applications. *Id.* at 744.   Then finally, the overbreadth approach requires weighing the unconstitutional versus constitutional applications. *Id.*

The Attorney General argues that NetChoice must establish that SB 854's unconstitutional applications substantially outweigh its constitutional applications, implying an overbreadth challenge. Def. Opp'n at 9 (citing *Moody*, 603 U.S. at 723–24); Hearing Tr., Dkt. 49 at 26:1–8. Conversely, NetChoice claims to pursue the first type of facial challenge.  Specifically, NetChoice seeks to invalidate SB 854 based on its content restrictions, not overbreadth; so the appropriate framework does not require a weighing of SB 854's applications. *See* Pl. Br. at 13–14.  The Court agrees.  NetChoice centers its argument on a facial challenge that SB 854 is unconstitutional in every application, based on the definitions and exemptions in the text of the statute.  Accordingly, the Court proceeds with deciding which level of scrutiny applies to this particular facial challenge.

### b. Determining the Level of Scrutiny to be Applied

The parties disagree on whether SB 854 is content based or content neutral.  Pl. Br. at 14; Def. Opp'n at 13. This disagreement is consequential because it determines what level of scrutiny applies.  Content-based laws must pass strict scrutiny, which is a particularly high bar. *See Free Speech Coal, Inc. v. Paxton*, 606 U.S. 461, 471 (2025).  It requires the government to employ a narrowly tailored restriction that is "the least restrictive means of achieving a compelling government interest." *Id.* at 484.  On the other hand, content-neutral laws only have to survive intermediate scrutiny, which is a lower bar. *See id.* at 495–96.  The law must "advance[] important governmental interests" and not "burden substantially more speech than necessary to further those

14

interests." *TikTok Inc. v. Garland*, 604 U.S. 56, 70 (2025) (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997)).

A law is content based if it regulates speech based on its message or subject matter. *Reed*, 576 U.S. at 163–64. A regulation that restricts specific ideologies or opinions is a "more blatant" type of content-based law, often referred to as viewpoint discrimination. *Id.* at 168–69 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). Laws that target a specific subject matter, even if less blatant, are also considered to be content based. *See id.* at 169. Additionally, "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Id.* at 170 (alteration in original) (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). For this reason, courts treat laws that favor some speakers over others as though they are content based when the legislature's speaker preference reflects a content preference. *Id.*

By contrast, a law is content neutral if it is "justified without reference to the content of the regulated speech." *McCullen v. Coakley*, 573 U.S. 464, 477 (2014). When a law is content neutral, the government may impose reasonable "time, place, or manner" speech restrictions. *Id.* These laws "pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Free Speech Coal.*, 606 U.S. at 471 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994)).

NetChoice argues that SB 854 is content based for two reasons. First, it argues that the law on its face draws distinctions based on the speech's content and therefore is content based. Pl. Br. at 14. Specifically, NetChoice focuses on SB 854's exemption of selected topics from its coverage. Second, NetChoice argues that SB 854 makes speaker-based distinctions. *Id.* at 14–15. In

15

particular, the law elevates content from certain speakers over others, i.e., providers over users. *Id.*

On the other hand, the Attorney General offers several reasons why SB 854 is content neutral and not content based. First, he argues that the law only regulates features of speech unrelated to its content because before the one-hour default time limit, there are no restrictions regardless of the type of speech. Def. Opp'n at 14. During that time, "[c]hildren may spend their time on social media platforms however they wish." *Id.* at 15. Additionally, the Attorney General asserts that SB 854's exemption for provider content over user content is a matter of form and not content based because it applies to all types of content from providers and users. *Id.* at 16.

To decide whether SB 854 is content based or content neutral, the Court first turns to the language of the statute. SB 854's definition of "social media platform" contains exemptions for the following:

> 1. . . . No service or application that exclusively provides email or direct messaging services shall be considered to meet this criterion on the basis of that function alone.
> . . .
> 2(c). . . . **No service or application that consists primarily of news, sports, entertainment, ecommerce, or content preselected by the provider and not generated by users, and for which any chat, comments, or interactive functionality is incidental to, directly related to, or dependent on the provision of such content, or that is for interactive gaming, shall be considered to meet this criterion on the basis of that function alone.**

Va. Code § 59.1-575 (emphasis added).

SB 854 overtly makes a distinction based on the following topics: news, sports, entertainment, and ecommerce. There is no limitation on speech for those topics. However, presumably for other topics there would be a one-hour restriction. The Court notes that these

topics—exempted and non-exempted—are protected speech that would be otherwise available to all users.[5]

In this way, SB 854 is content based like the statute in *Brown*. There, the state passed a law that prohibited selling or renting violent video games to minors. *Brown*, 564 U.S. at 789. The Supreme Court asserted: "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 795 (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975)). The Court further held that depictions of violence are protected under the First Amendment, even when it comes to minors. *Id.* Because the statute drew a distinction based on a specific subject matter of protected speech, the Supreme Court held that it was therefore a content-based restriction on protected speech. *See id.* at 799. That same reasoning applies here because SB 854 draws distinctions between areas of protected speech.

Similarly, even though SB 854 does not necessarily discriminate on the basis of viewpoint, it is still content based because it discriminates based on subject matter. *Reed v. Town of Gilbert* is on point here. In *Reed*, a town enacted an ordinance that prohibited the display of outdoor signs without a permit but exempted multiple categories, including ideological and political signs. 576 U.S. at 159. For instance, the ordinance exempted "political signs," regardless of the opinion or message that the sign expressed. *Id.* at 168. The town attempted to defend the ordinance arguing that it did not discriminate based on viewpoint. *Id.* However, ordinances that do not distinguish

---

[5] "The First Amendment has permitted restrictions upon the content of speech in a few limited areas." *Brown*, 564 U.S. at 791. Regulations in limited topic areas, such as "obscenity, defamation, fraud, incitement, and speech integral to criminal conduct" create no First Amendment issues. *Free Speech Coal.*, 606 U.S. at 471. On its face, SB 854 is not limited to one of these permitted areas of regulation. Instead, it covers all areas of speech—except for areas of speech it exempts, creating its own First Amendment issues. *See supra* Section II.B.1.b.

speech based on viewpoint but distinguish based on subject matter, while less egregious, are also content-based distinctions. *Id.* at 168–69. The Supreme Court held that despite not exempting certain viewpoints, the ordinance was still content based because it exempted certain subject matter categories. *Id.* at 171. Here, too, SB 854 exempts certain subject matter. SB 854 creates exemptions for news, sports, entertainment, ecommerce, or interactive gaming content. Such an exemption creates a content-based restriction.

SB 854 also creates an exemption for "content preselected by the provider and not generated by users." Va. Code § 59.1-575. Thus, it favors provider-selected speech over user-generated speech. In *Reed*, the Supreme Court noted that laws favoring some speakers over others are treated like content-based restrictions when the legislature's speaker preference reflects a content preference. 576 U.S. at 170. Here, Virginia chose to regulate user-generated content, but not provider-selected content, because it concluded that user-generated content is more harmful. *See* Def. Opp'n at 23 ("The legislature, supported by medical studies, determined that binge watching Bluey does not pose the same mental health concerns as doomscrolling on Instagram."). This is precisely the type of speaker preference the Supreme Court declared should be treated as content-based. *See Reed*, 576 U.S. at 170. Thus, SB 854 should be treated as though it is content based.

The Court rejects the Attorney General's arguments that SB 854 is content neutral. In order to be content neutral, the law must be "justified without reference to the content of the regulated speech." *McCullen*, 573 U.S. at 480 (quoting *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986)). SB 854 cannot. Although the Attorney General cites to *McCullen*, it does not aid his position. In *McCullen*, the state passed a law that prohibited people from standing on a public sidewalk adjacent to a reproductive health care facility where abortions were performed. 573 U.S.

18

at 471. The law exempted persons entering or leaving the facility, employees and agents of the facility, first responders, and persons using the sidewalk to get to any destination other than the facility. *Id.* at 472. People who wished to engage women approaching the clinics challenged the law based on their First Amendment right to express their moral or religious beliefs on abortion while standing on a public sidewalk. *Id.* The law's stated purpose was to increase public safety at health care facilities and applied no matter the content of any speech. *Id.* at 480. The Supreme Court held that the law was content neutral. *Id.* at 481.

SB 854 is meaningfully distinct from the statute in *McCullen*. Here, "enforcement authorities" must "examine the content of the message that is conveyed to determine whether a violation has occurred." *Id.* at 479 (internal quotation marks omitted) (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)). Whether SB 854 is violated depends on what topics a user seeks out (e.g., no restrictions—and no potential violation—for content that is primarily news, sports, entertainment, or ecommerce). This is unlike in *McCullen* where people can violate the law "merely by standing in a buffer zone, without displaying a sign or uttering a word." *Id.* at 480. Said differently, SB 854 overtly references content, but *McCullen* does not.

Further, the Attorney General's argument that SB 854 is content neutral because of its one-hour default limit is unpersuasive. Designating a default amount of initial time for access to protected speech does not cure the statute's content-based restriction. Moreover, framing the default limit as a matter of form does not erase the speaker and topic-based distinctions and restrictions. *See* Def. Opp'n at 16. Accordingly, the Court finds that SB 854 is content based.

### c. Strict Scrutiny Analysis

Having determined that the definition of "social media platform" in SB 854 creates content-based regulations of speech, the Court now evaluates whether SB 854 can withstand strict scrutiny

19

analysis. Strict scrutiny is the "most demanding test known to constitutional law." *Free Speech Coal.*, 606 U.S. at 484 (quoting *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997)). Strict scrutiny requires the government to employ a narrowly tailored restriction that is the "least restrictive means of achieving a compelling government interest." *Id.* "Moreover, the restriction cannot be overinclusive by 'unnecessarily circumscrib[ing] protected expression.'" *Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015) (alteration in original) (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 775 (2002)). Strict scrutiny is fatal in fact, absent "truly extraordinary circumstances." *Free Speech Coal.*, 606 U.S. at 485.

NetChoice concedes that Virginia has an interest in protecting children, and from the established record, the Court finds this interest is compelling. *See* Dkt. 16-1 ¶¶ 19-22. Therefore, the Court's analysis focuses on whether SB 854 is narrowly tailored to be the least restrictive means of protecting children from the potential harms of social media use.

The Attorney General asserts that Virginia can adopt laws to empower parents to protect their children. *See* Def. Opp'n at 15. To support his position, he discusses a hypothetical scenario presented in *Brown*. *See* 564 U.S. at 795 n.3; Def. Opp'n at 15. In the hypothetical, a state could require promoters of a rock concert to exclude minors whose parents have advised the promoters that their children are forbidden to attend. Def. Opp'n at 15. In doing so, the state would be enforcing parental prohibitions. The Attorney General attempts to draw a parallel with SB 854 and contends that Virginia may set a "parental adjustable default" on the length of time that a child may remain on a social media platform. *Id.* These are not the same. In the scenario in *Brown*, the state is enforcing a prohibition that parents have created. In the Attorney General's scenario, the state is creating a prohibition that prevents children from accessing protected speech and requires the parents to veto the state's prohibition.

"[M]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Brown*, 564 U.S. at 794 (alteration in original) (quoting *Erznoznik*, 422 U.S. at 212–13). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 795 (quoting *Erznoznik*, 422 U.S. at 213–14). Virginia has the authority to enforce a prohibition that a parent puts in place to prevent their child from accessing information. But Virginia does not have the legal authority to block minors' access to constitutionally protected speech until their parents give their consent by overriding a government-imposed default limit.

SB 854 is likely not narrowly tailored because it is overinclusive. As NetChoice argues, the law burdens more speech than necessary as it requires all persons to verify their age before accessing speech that is protected for everyone. Pl. Br. at 12–13. To illustrate, NetChoice provides an example where under SB 854, a minor would be barred from watching an online church service if it exceeded an hour on YouTube. *Id.* at 17. Yet, that same minor is allowed to watch provider-selected religious programing exceeding an hour in length on a streaming platform. This treats functionally equivalent speech differently. Further, a minor is prohibited from watching science or history programming on YouTube that is longer than one hour without their parent's consent. As stated by NetChoice's General Counsel, "[w]hether it is to practice their religious beliefs, engage in political discourse, seek cross-cultural dialogue, supplement their education, or learn new skills, people across the nation and world (minors and adults alike) use these websites every day to explore protected speech." Cleland Decl. at 2. These are examples of protected speech that would be burdened under SB 854 for all users due to the age-verification requirement. All users

21

are restricted from accessing protected speech, even adults, until they can show that they are not a minor, or if the user is a minor, that they have obtained their parent's verifiable consent to exceed the default time limitation. Because SB 854 places these burdens on protected speech, which appears to be more than necessary, it is likely not narrowly tailored.

Additionally, there are other less restrictive means to achieve the government's goals. NetChoice emphasizes that parents have ample tools to limit minors' access to social media. Pl. Br. at 18; Cleland Decl. at 3–10. The most obvious alternative is parents restricting access to smartphones like schools do during instruction time. *See, e.g.*, Va. Code § 22.1-79.3:1 (restricting student cell phone and smart device possession and use on school property from "bell to bell"). In retort, the Attorney General argues that the General Assembly concluded that current parental controls were not working because parents were not taking advantage of them. Def. Opp'n at 23. But the question is not whether SB 854 would be effective, but whether there are less restrictive alternatives. "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *U.S. v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) (citing *Reno v. ACLU*, 521 U.S. 844, 874 (1997)). Additionally, even if parents are not using the available parental controls, Virginia could work with companies and launch advertising campaigns to ensure parents know how to use the current tools effectively. Reply at 12; Hearing Tr., Dkt. 49 at 16:13–15.

Given all of this, the Court concludes that SB 854 is likely not the least restrictive means of achieving the government's interest of protecting minors from the harms of social media use and therefore fails strict scrutiny.

#### d. Intermediate Scrutiny Analysis

Even if SB 854 is analyzed under the more lenient intermediate scrutiny standard, it is still likely to fail. As stated above, a law will survive intermediate scrutiny "if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *TikTok*, 604 U.S. at 70 (quoting *Turner*, 520 U.S. at 189). Under intermediate scrutiny, the law does not need to be "the least speech-restrictive means of advancing the Government's interests." *Id.* at 76 (quoting *Turner*, 512 U.S. at 662). While intermediate scrutiny is "not as exacting as strict scrutiny," it is still "tough scrutiny" and not a "judicial rubber stamp." *NetChoice, LLC v. Fitch*, 787 F. Supp. 3d 262, 280 (S.D. Miss. 2025) (quoting *Hines v. Pardue*, 117 F.4th 769, 779 (5th Cir. 2024)).

Given the Court's conclusion that Virginia asserted a compelling interest in protecting its children, the Court necessarily finds that Virginia also satisfies the "significant governmental interest" requirement under intermediate scrutiny. *Packingham v. North Carolina*, 582 U.S. 98, 106 (2017) (quoting *McCullen*, 573 U.S. at 486). However, SB 854 must still be narrowly tailored as to not burden substantially more speech than necessary. *Id.* at 105–06. A law that is either underinclusive or overinclusive is not narrowly tailored. *Brown*, 564 U.S. at 805.

With this in mind, SB 854 is likely not narrowly tailored under intermediate scrutiny. The Court's analysis above established that the statute is overinclusive because it covers a significant amount of protected speech. Additionally, its age verification burdens adults'–as well as minors'–rights to access protected speech.

SB 854 is underinclusive as well. Virginia's purpose in creating SB 854 was to address the addictive properties of social media platforms, specifically for minors. Def. Opp'n at 1. However, studies have shown that digital gaming has severe addiction-forming properties.

*Addictive Behaviours: Gaming Disorder*, World Health Organization (Oct. 22 2020), https://www.who.int/news-room/questions-and-answers/item/addictive-behaviours-gaming-disorder. So much so that the World Health Organization now includes gaming disorder in its International Classification of Diseases. *Id.* Children in this country spend a substantial amount of time gaming. Frank W. Paulus et al., *Internet Gaming Disorder in Children and Adolescents: A Systematic Review*, 60 Dev. Med. Child Neurol. 645, 645 (2018). Yet, SB 854 exempts interactive gaming from its coverage. In this context, SB 854's exemption for interactive gaming is underinclusive because it is inconsistent with its stated purpose. Thus, SB 854 is likely not narrowly tailored to survive intermediate scrutiny.

At this stage, SB 854 is not likely to survive strict or intermediate scrutiny. Accordingly, NetChoice has shown a substantial likelihood of success on the merits of its facial challenge.

### 2.    Irreparable Harm

Having concluded that Plaintiff is likely to succeed on the merits, the Court now determines whether there is irreparable harm absent an injunction. "A plaintiff's claimed irreparable harm is inseparably linked to the likelihood of success on the merits of plaintiff's First Amendment claim." *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (internal quotation marks omitted). "[T]he Supreme Court has explained that 'loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury.'" *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Following this reasoning, NetChoice has established irreparable harm because it has shown a likelihood of success on the merits that SB 854 infringes on the First Amendment rights of its members and their users.

The Attorney General argues that there would be no irreparable harm because there was a six-month delay from when the Governor signed the law to when NetChoice filed its complaint. However, his cited cases do not involve matters where the plaintiff has already shown a likelihood of success on a constitutional claim. *See* Def. Opp'n at 27. Either way, that argument is not persuasive.

The Fourth Circuit has recognized that "an inordinate delay in initiating a preliminary injunction proceeding may 'indicate an absence of the kind of irreparable harm required to support a preliminary injunction.'" *Candle Factory, Inc. v. Trade Assocs. Grp., Ltd.*, 23 F. App'x 134, 137 (4th Cir. 2001) (quoting *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989). "[A]ny delay attributable to plaintiffs in initiating a preliminary injunction request, coupled with prejudicial impact from the delay, should be considered when the question of irreparable harm to plaintiffs is balanced against harm to defendants." *Candle Factory*, 23 F. App'x at 138.

Virginia's Governor signed SB 854 into law on May 2, 2025. Def. Opp'n at 6. NetChoice filed its suit on November 17, 2025, roughly six months after the law was enacted but before it went into effect. *See* Compl. NetChoice filed its Motion for Preliminary Injunction four days later, on November 21, 2025. *See* Dkt. 4. SB 854 includes a provision requiring the Attorney General to provide 30-day written notice before commencing an enforcement action. Va. Code § 59.1-584(B). Because the law took effect on January 1, 2026, the earliest date of an Attorney General enforcement action was January 31, 2026. *Id.*; Va. Code § 59.1-577.1. Thus, NetChoice filed its suit seventy-five days before SB 854 could be enforced.

Courts analyzing similar laws have assessed when the suit was filed relative to the date the law was enacted and went into effect. *See NetChoice v. Skrmetti*, 2025 WL 1710228, at *7-10

(M.D. Tenn. June 18, 2025) (stating that the timing of the preliminary injunction motion did not undermine plaintiff's arguments as to irreparable harm where motion filed after enactment but prior to the law going into effect, but not finding irreparable harm on other grounds); *see also Carr*, 789 F. Supp. 3d at 1232 (finding irreparable harm when a suit was filed just sixty days *before* a similar law went into effect). Thus, it appears that a plaintiff's claim of irreparable harm is not diminished when suit is filed before a law takes effect. Such is the case here. This Court finds that Virginia has not been harmed or prejudiced by the delay because NetChoice filed its suit before the law went into effect. Accordingly, NetChoice has established irreparable harm.

### 3.    Balance of Equities and Public Interest

The remaining factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Attorney General argues that the balance of equities strongly favors withholding judgment on SB 854 until there is a full record and that Virginia has a strong interest in enforcing its laws. Def. Opp'n at 29. NetChoice argues that it is not in the public's interest to enforce a law that violates the First Amendment. Hearing Tr., Dkt. 49 at 64:17–19. The Fourth Circuit has held that "upholding constitutional rights surely serves the public interest." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). "If anything, the system is improved by such an injunction." *Id.* Accordingly, given that the Court has found that NetChoice will likely prevail on its First Amendment claim, the Court holds that the balance of equities and the public interest support a preliminary injunction in this matter.

### 4.    Bond

Under Federal Rule of Civil Procedure 65(c), the Court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been

26

wrongfully enjoined or restrained." Rule 65(c) seeks "to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). The Court has "discretion to set the [Rule 65(c)] bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) (citing *Hoechst Diafoil Co.*, 174 F.3d at 421).

Here, neither side addressed the issue of bond. The Court finds that it does not appear that the Commonwealth will suffer significant monetary damage due to the issuance of an injunction. Accordingly, the Court finds that a security is not necessary in this case.

### III. Conclusion

The issues in this matter are not to be taken lightly. The Court recognizes the Commonwealth's compelling interest in protecting its youth from the harms associated with the addictive aspects of social media. However, it cannot infringe on First Amendment rights, including those of the same youth it aims to protect. At this juncture, Plaintiff has established all four *Winter* factors, including a likelihood of success on its First Amendment claim. Therefore, based on the reasons set forth above, Plaintiff's Motion for Preliminary Injunction (Dkt. 4) is **GRANTED**.

A separate order will issue.

Entered this 27th day of February, 2026.
Alexandria, Virginia

Patricia Tolliver Giles
United States District Judge